No. 23-2200

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

MARK RIDLEY-THOMAS

*Defendant-Appellant.*

_____

On Appeal from the United States District Court for the Central
District of California, The Honorable Dale S. Fischer, Presiding.
CR No. 2:21-cr-00485-DSF
_____

**APPELLANT'S OPENING BRIEF**
_____

Paul J. Watford
WILSON SONSINI GOODRICH & ROSATI
  *953 East Third Street, Suite 100*
  *Los Angeles, CA 90013*

Erwin Chemerinsky
UNIVERSITY OF CALIFORNIA,
BERKELEY SCHOOL OF LAW
  *Law Building 215*
  *Berkeley, CA 94720*

Alyssa D. Bell
Michael V Schafler
Neil S. Jahss
COHEN WILLIAMS LLP
  *724 South Spring Street, 9th Floor*
  *Los Angeles, CA 90014*
  *(213) 232-5160*
  *abell@cohen-williams.com*

*Attorneys for Mark Ridley-Thomas*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

ISSUES PRESENTED..........................................................................................5

JURISDICTIONAL STATEMENT .........................................................................6

STATUTORY AUTHORITIES .............................................................................6

DETENTION STATUS .......................................................................................6

STATEMENT OF FACTS ....................................................................................6

    A.    The Vermont Avenue Reentry Center...................................8

    B.    Probation University. ...........................................................9

    C.    Telehealth Amendment. .....................................................10

    D.    Sebastian's USC admission and scholarship. ....................13

    E.    Sebastian's professorship and resignation from the assembly............15

    F.    The $100,000 donation.......................................................17

    G.    The government's flawed investigation. ............................21

    H.    The indictment....................................................................22

    I.    The trial. .............................................................................23

        1.    The *quid*. ................................................................23

        2.    The *quo*. .................................................................25

        3.    The exchange. ..........................................................25

        4.    Material deception....................................................26

    J.    The verdict, post-trial motions and sentencing. .................28

SUMMARY OF ARGUMENT ..............................................................................29

    A.    Ridley-Thomas's honest services fraud convictions must be reversed....................................................................................29

    B.    Ridley-Thomas's federal-programs bribery conviction must be reversed....................................................................................31

    C.    Ridley-Thomas's conspiracy conviction must be reversed. ..............32

    D.    Ridley-Thomas is entitled to a new trial under *Batson*.......................32

ARGUMENT ...................................................................................32

I.    RIDLEY-THOMAS'S HONEST SERVICES FRAUD
     CONVICTIONS MUST BE REVERSED. ...................................32

     A.    The honest services fraud statute does not extend to a public
         official's receipt of perceived reputational benefits that enhance
         his public image, political brand, or electability. ..............................32

         1.    Standard of review. ..................................................................33

         2.    *Skilling* is fatal to the prosecution..........................................34

         3.    Well-established precedent also dooms the government's
             theory.......................................................................................38

         4.    The government's novel theory would chill legitimate
             policymaking and yield absurd results.....................................42

     B.    The honest services fraud statute does not extend to schemes to
         defraud the public by means of deception material only to the
         bribe-payor or peripheral third parties. ...............................................44

         1.    Standard of review. ..................................................................44

         2.    Yet again, *Skilling* is fatal to the prosecution. ..........................45

         3.    The government's novel theory violates this Circuit's
             convergence doctrine. ..............................................................50

     C.    At a minimum, Ridley-Thomas's convictions must be reversed
         and the case remanded for a new trial. ................................................53

         1.    The district court erroneously instructed the jury that
             honest services fraud requires no proof of deception. ..............54

             i.    Standard of review.........................................................54

             ii.    Honest services fraud requires the intent to deceive
                and cheat. .......................................................................54

             iii.    The district court's erroneous *mens rea* instruction
                was not harmless...........................................................56

         2.    The government secured Ridley-Thomas's conviction
             under a legally invalid "monetization" theory..........................58

II.    RIDLEY-THOMAS'S FEDERAL-PROGRAMS BRIBERY CONVICTION MUST BE REVERSED. ....................................62

    A.    Section 666(a)(1)(B) does not criminalize the solicitation or acceptance of perceived reputational benefits. .....................62

        1.    The phrase "thing of value" should be construed coextensively in §§ 1346 and 666(a)(1)(B). .............63

        2.    The phrase "thing of value" in § 666(a)(1)(B) can be no broader than traditional notions of property. ............64

    B.    At a minimum, Ridley-Thomas is entitled to a new trial because the district court's instructional errors undermined the verdict. .........68

        1.    Standard of review. ....................................................68

        2.    Like honest services fraud, federal-programs bribery requires *quid pro quo* corruption. .............................68

        3.    The jury instructions failed to distinguish bribery from gratuities. .................................................................71

        4.    The jury instructions failed to distinguish bribery from lawful ingratiation. ...................................................72

III.    RIDLEY-THOMAS'S CONSPIRACY CONVICTION HAS NO VALID OBJECT AND MUST BE REVERSED. ........................75

IV.    PROSECUTORS' DISCRIMINATORY EXCLUSION OF BLACK WOMEN FROM THE JURY DENIED RIDLEY-THOMAS A FAIR TRIAL. .................................................................................75

    A.    Standard of review. ...........................................................76

    B.    The district court erred in its application of *Batson's* burden-shifting framework. ....................................................77

        1.    The strike of Juror 13 was pretextual. .....................78

        2.    The strike of Juror 1 was pretextual. .......................80

CONCLUSION ...............................................................................84

CERTIFICATE OF RELATED CASES ........................................85

CERTIFICATE OF COMPLIANCE ..............................................86

## TABLE OF AUTHORITIES

### Cases

*Ali v. Hickman*,
  584 F.3d 1174 (9th Cir. 2009) .................................................................. 80, 82

*Batson v. Kentucky*,
  476 U.S. 79 (1986) ........................................................................ *passim*

*Boyd v. Newland*,
  467 F.3d 1139 (9th Cir. 2006) ..........................................................78

*California v. Trump*,
  963 F.3d 926 (9th Cir. 2020) ............................................................63

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ..................................................... 53, 65, 66

*Currie v. McDowell*,
  825 F.3d 603 (9th Cir. 2016) .............................................................80

*Erlenbaugh v. United States*,
  409 U.S. 239 (1972) ........................................................................63

*Gonzalez v. Brown*,
  585 F.3d 1202 (9th Cir. 2009) ..........................................................77

*Griffin v. United States*,
  502 U.S. 46 (1991) ...........................................................................67

*Harris v. Hardy*,
  680 F.3d 942 (7th Cir. 2012) .............................................................82

*Harwin v. Goleta Water Dist.*,
  953 F.2d 488 (9th Cir. 1991) .............................................................72

*J.E.B. v. Alabama ex rel. T.B.*,
  511 U.S. 127 (1994) .................................................................. 76, 83

*Johnson v. California*,
  545 U.S. 162 (2005) ..........................................................................78

*Kelly v. United States*,
    140 S.Ct. 1565 (2020) .............................................................. 49, 65, 66

*Kesser v. Cambra*,
    465 F.3d 351 (9th Cir. 2006) ................................................83

*McDonnell v. United States*,
    579 U.S. 550 (2016) .................................................... *passim*

*McNally v. United States*,
    483 U.S. 350 (1987) .................................................... *passim*

*Neder v. United States*,
    527 U.S. 1 (1999) ......................................................... 50, 57

*Nguyen v. Frauenheim*,
    45 F.4th 1094 (9th Cir. 2022) ......................................... 76, 77

*Ratzlaf v. United States*,
    510 U.S. 135 (1994) ..............................................................53

*Salinas v. United States*,
    522 U.S. 52 (1997) ...............................................................64

*Shushan v. United States*,
    117 F.2d 110 (5th Cir. 1941) .......................................... 35, 47

*Skilling v. United States*,
    561 U.S. 358 (2010) .................................................... *passim*

*United States v. Abdelaziz*,
    68 F.4th 1 (1st Cir. 2023) ........................................ 37, 38, 48

*United States v. Alanis*,
    335 F.3d 965 (9th Cir. 2003) ................................................81

*United States v. Alcantar*,
    897 F.2d 436 (9th Cir. 1990) ................................................82

*United States v. Alexander*,
    741 F.2d 962 (7th Cir. 1984) .......................................... 35, 45

*United States v. Barona*,
56 F.3d 1087 (9th Cir. 1995) ...............................................................60

*United States v. Barrett*,
505 F.2d 1091 (7th Cir. 1974) ...................................................... 36, 46

*United States v. Blagojevich*,
794 F.3d 729 (7th Cir. 2015) ........................................................ 40, 41

*United States v. Boffa*,
688 F.2d 919 (3d Cir. 1982).......................................................... 36, 46

*United States v. Bohonus*,
628 F.2d 1167 (9th Cir. 1980) ................................................. 36, 46, 54

*United States v. Bonansinga*,
773 F.2d 166 (7th Cir. 1985) ........................................................ 36, 45

*United States v. Bottom*,
638 F.2d 781 (5th Cir. 1981) ........................................................ 35, 46

*United States v. Bruno*,
809 F.2d 1097 (5th Cir. 1987) ...................................................... 35, 45

*United States v. Bryza*,
522 F.2d 414 (7th Cir. 1975) ........................................................ 36, 46

*United States v. Choy*,
309 F.3d 602 (9th Cir. 2002) ...............................................................75

*United States v. Collins*
551 F.3d 914 (9th Cir. 2009) ................................................... *passim*

*United States v. Conner*,
752 F.2d 566 (11th Cir. 1985) ...................................................... 35, 45

*United States v. Craig*,
573 F.2d 455 (7th Cir. 1977) ........................................................ 35, 46

*United States v. DeLuca*,
692 F.2d 1277 (9th Cir. 1982) .............................................................75

vi

*United States v. Esparza-Gonzalez,*
    422 F.3d 897 (9th Cir. 2005) ................................................................82

*United States v. Fernandez,*
    722 F.3d 1 (1st Cir. 2013) ................................................ 69, 70, 72

*United States v. Frega,*
    179 F.3d 793 (9th Cir. 1999) ................................................................73

*United States v. Gann,*
    718 F.2d 1502 (10th Cir. 1983) .................................................. 35, 46

*United States v. Garrido,*
    713 F.3d 985 (9th Cir. 2013) ................................................................70

*United States v. George,*
    477 F.2d 508 (7th Cir. 1974) ....................................................... 36, 46

*United States v. Gorny,*
    732 F.2d 597 (7th Cir. 1984) ....................................................... 35, 46

*United States v. Holzer,*
    816 F.2d 304 (7th Cir. 1987) ................................................................51

*United States v. Hsieh Hui Mei Chen,*
    754 F.2d 817 (9th Cir. 1985) ....................................................... 71, 72

*United States v. Inzunza,*
    638 F.3d 1006 (9th Cir. 2011) ..................................................... 39, 41

*United States v. Isaacs,*
    493 F.2d 1124 (7th Cir. 1974) ..................................................... 36, 46

*United States v. James,*
    987 F.2d 648 (9th Cir. 1993) ................................................................37

*United States v. Jennings,*
    487 F.3d 564 (8th Cir. 2007) ....................................................... 52, 61

*United States v. Kincaid-Chauncey,*
    556 F.3d 923 (9th Cir. 2009) ................................................. 55, 73, 74

*United States v. Lew*,
  875 F.2d 219 (9th Cir. 1989) ................................................................ 50, 51, 58

*United States v. Lovett*,
  811 F.2d 979 (7th Cir. 1987) ...................................................................... 36, 45

*United States v. Manarite*,
  44 F.3d 1407 (9th Cir. 1995) ...............................................................................75

*United States v. Mandel*,
  591 F.2d 1347 (4th Cir. 1979) .................................................................... 36, 46

*United States v. Margiotta*,
  688 F.2d 108 (2d Cir. 1982).......................................................................... 35, 46

*United States v. Marguet-Pillado*,
  648 F.3d 1001 (9th Cir. 2011) ............................................................ 68, 72, 74

*United States v. Mariano*,
  983 F.2d 1150 (1st Cir. 1993)............................................................................60

*United States v. Miller*,
  953 F.3d 1095 (9th Cir. 2020) .................................................................... 54, 55

*United States v. Milovanovic*,
  678 F.3d 713 (9th Cir. 2012) ................................................................. *passim*

*United States v. Munguia*,
  704 F.3d 596 (9th Cir. 2012) ..............................................................................68

*United States v. Murphy*,
  768 F.2d 1518 (7th Cir. 1985) ................................................................... 35, 45

*United States v. Nevils*,
  598 F.3d 1158 (9th Cir. 2010) ...........................................................................44

*United States v. Newell*,
  658 F.3d 1 (1st Cir. 2011)............................................................................. 67, 68

*United States v. Patel*,
  32 F.3d 340 (8th Cir. 1994) .................................................................................60

*United States v. Pecora*,
   693 F.2d 421 (5th Cir. 1982) .................................................................35

*United States v. Price*,
   788 F.2d 234 (4th Cir. 1986) ....................................................... 36, 45

*United States v. Primrose*,
   718 F.2d 1484 (10th Cir. 1983) ................................................... 35, 46

*United States v. Qaoud*,
   777 F.2d 1105 (6th Cir. 1985) ..................................................... 35, 45

*United States v. Rauhoff*,
   525 F.2d 1170 (7th Cir. 1975) ..................................................... 35, 46

*United States v. Renzi*,
   769 F.3d 731 (9th Cir. 2014) ................................................................41

*United States v. Roberson*,
   998 F.3d 1237 (8th Cir. 2021) ............................................................70

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003).......................................................... 51, 52

*United States v. Saini*,
   23 F.4th 1155 (9th Cir. 2022) ............................................................57

*United States v. Sarkisian*,
   197 F.3d 966 (9th Cir. 1999) ..............................................................34

*United States v. Sawyer*,
   239 F.3d 31 (1st Cir. 2001).................................................................51

*United States v. Sawyer*,
   85 F.3d 713 (1st Cir. 1996)......................................................... 55, 73

*United States v. Schwartz*,
   785 F.2d 673 (9th Cir. 1986) ..............................................................36

*United States v. Shields*,
   844 F.3d 819 (9th Cir. 2016) ..............................................................58

*United States v. Snyder*,
   71 F.4th 555 (7th Cir. 2023) .................................................................69

*United States v. Staszcuk*,
   502 F.2d 875 (7th Cir. 1974) ....................................................... 35, 46

*United States v. Sun-Diamond Growers of Cal.*,
   526 U.S. 398 (1999) ................................................................. *passim*

*United States v. Thompson*,
   484 F.3d 877 (7th Cir. 2007) ....................................................... 38, 42

*United States v. Tisor*,
   96 F.3d 370 (9th Cir. 1996). ...............................................................44

*United States v. Venneri*,
   736 F.2d 995 (4th Cir. 1984) ....................................................... 36, 45

*United States v. Wallen*,
    874 F.3d 620 (9th Cir. 2017) ...........................................................57

*United States v. Washington*,
   688 F.2d 953 (5th Cir. 1982) ....................................................... 36, 46

*United States v. Whitt*,
   718 F.2d 1494 (10th Cir. 1983) ................................................... 35, 46

*United States v. Wilkes*,
   662 F.3d 524 (9th Cir. 2011) .............................................................55

*United States v. Yates*,
   16 F.4th 256 (9th Cir. 2021) ................................................. 34, 40, 60

*Yates v. United States*,
   354 U.S. 298 (1957) ........................................................................59

*Yates v. United States*,
   574 U.S. 528 (2015) ........................................................................64

*Zant v. Stephens*,
   462 U.S. 862 (1983) ........................................................................66

## Statutes

18 U.S.C. § 1341 ............................................................ 22, 39

18 U.S.C. § 1343 ............................................................ 22, 65

18 U.S.C. § 1346 ............................................................ *passim*

18 U.S.C. § 1954 ............................................................ 36

18 U.S.C. § 201 ............................................................. 70

18 U.S.C. § 3231 ............................................................ 6

18 U.S.C. § 371 ............................................................. 22

18 U.S.C. § 641 ............................................................. 64

18 U.S.C. § 666 ............................................................. *passim*

28 U.S.C. § 1291 ............................................................ 6

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ............................................ 38

## PRELIMINARY STATEMENT

This case involves an unprecedented application of the federal bribery and honest services fraud statutes and an equally unprecedented expansion of federal jurisdiction over state and local government. In the prosecution of an elected official, the essence of bribery is *quid pro quo* corruption where the *quid* is personal enrichment, solicited with the intent to be influenced in the performance of official action. Honest services fraud requires proof of bribery or kickbacks coupled with deception material to the victim. The prosecution of Dr. Mark Ridley-Thomas involved *none* of these prerequisites: no personal enrichment, no intent to be influenced, and no deception material to the would-be victims. His convictions cannot stand.

Ridley-Thomas is a dedicated public servant. He spent over 30 years representing the most vulnerable residents of Los Angeles County, focusing on homelessness and housing, civic engagement, civil rights, and access to health care. While serving on the Los Angeles City Council, he was indicted for bribery, following the discovery that then-Dean Marilyn Flynn of the University of Southern California's ("USC") School of Social Work made a donation to a nonprofit associated with Ridley-Thomas's son, Sebastian Ridley-Thomas, that violated University policy. What should have begun and ended with an internal

1

investigation into Flynn's malfeasance was molded into a criminal prosecution untethered to federal precedent.

The events giving rise to this case began in late 2017 when Sebastian, who was then a member of the California State Assembly, resigned citing health concerns. Prosecutors claimed that Sebastian was not sick but was instead seeking to evade an investigation into sexual harassment allegations. They alleged Ridley-Thomas, who was then one of five Los Angeles County Supervisors, planned to run for L.A. mayor in 2022 and moved swiftly to avoid a scandal.

Prosecutors claimed that, to preserve his reputation and political brand, Ridley-Thomas strong-armed Flynn into creating prestigious landing spots for Sebastian: admission to a dual-degree graduate program at USC, a full-tuition scholarship, an adjunct professorship, and support for a nonprofit directorship. For the last of these, Ridley-Thomas made a $100,000 donation to USC with the understanding that Flynn would donate those funds to the Policy, Research, and Practice Initiative ("PRPI"), an organization that Sebastian directed, for the hiring of a full-time staff member. In exchange, according to prosecutors, Ridley-Thomas agreed to vote for three matters favorable to USC's School of Social Work, which faced a budget shortfall.

From these alleged facts, the government charged Ridley-Thomas with a sweeping conspiracy to commit honest services fraud, 18 U.S.C. § 1346, and

federal-programs bribery, 18 U.S.C. § 666. The government's theory was fatally deficient in multiple respects, however, and at trial the jury rejected most of it, returning not-guilty verdicts on twelve of nineteen counts. Jurors acquitted Ridley-Thomas of honest services fraud in connection with Sebastian's admission to USC, the scholarship, and the adjunct professorship, and in connection with votes on two of the three legislative initiatives at issue. He was convicted solely for accepting Flynn's assistance in funding PRPI, in exchange for his vote in favor of amending an existing contract with USC for the provision of tele-mental health services to at-risk youth.

The *quid* in that alleged *quid pro quo* exchange is unlike any in the history of the honest services doctrine and bears no resemblance to the personal enrichment that is the hallmark of traditional bribery. Under the government's theory, Flynn's assistance was valuable to Ridley-Thomas because it avoided the "nepotistic optics" of a direct donation to his son's initiative, and thereby protected his "public image" and "family brand." But the honest services fraud statute does not reach quintessential political activity, such as the solicitation of perceived reputational benefits that enhance a public official's electability. Ridley-Thomas is not guilty as a result.

Ridley-Thomas's prosecution was legally invalid in yet another respect. Prosecutors presented no evidence that, in enlisting Flynn's assistance, Ridley-

3

Thomas made misrepresentations or omitted facts material to his constituents, the ostensible victims. Instead, prosecutors proceeded on the theory that Ridley-Thomas deceived *USC*—the would-be bribe-payor and beneficiary of the alleged scheme's ill-gotten benefits. The government claimed that USC had policies prohibiting donations to nonprofits for the purpose of hiring staff, and thus would have wanted to know that Ridley-Thomas's funds were earmarked for that purpose. But the honest services fraud statute does not extend to schemes to defraud the victim through deception material to the bribe-giver. The government's theory fails as a matter of law.

Compounding these errors, prosecutors argued that Ridley-Thomas was guilty of bribery because he "monetized" his public service by accepting benefits in exchange for votes that he had already determined to take—*i.e.*, gratuities. But a *quid pro quo* exchange is required under both § 1346 and § 666. If Ridley-Thomas accepted mere gratuities, he was not guilty of any charge against him. The government's invalid theory pervaded the trial—it was the focus of opening and closing arguments—and the district court gave erroneous instructions that failed to preclude reliance upon it.

For these, and the many additional reasons discussed herein, Ridley-Thomas's convictions must be reversed. If Ridley-Thomas is guilty of federal crimes although he derived no personal enrichment and had no intention either of

4

deceiving his constituents or being influenced in the casting of his votes, so too are innumerable law-abiding public servants engaged in the daily work of legislating.

## ISSUES PRESENTED

1. Whether Ridley-Thomas's honest services fraud convictions must be reversed because the government introduced insufficient proof that he accepted a legally cognizable "thing of value" or engaged in deception material to his constituents?  Alternatively, whether Ridley-Thomas is entitled to a new trial because the jury instructions permitted his conviction absent proof that he intended to deceive the public, and failed to preclude reliance upon the government's legally invalid gratuities theory of conviction?

2. Whether Ridley-Thomas's federal-programs bribery conviction must be reversed because the government introduced insufficient proof that he accepted a legally cognizable "thing of value"?  Alternatively, whether the district court committed a series of instructional errors warranting a new trial, including refusing to instruct that § 666 requires a *quid pro quo*, that gratuities are not bribes, and that goodwill gifts are not criminal?

3. Whether Ridley-Thomas's conspiracy conviction must be reversed because both of its objects are legally invalid?

4. Whether the district court erred in rejecting Ridley-Thomas's *Batson* challenges to the prosecution's discriminatory exercise of its preemptory strikes to eliminate all Black women from the jury?

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTORY AUTHORITIES

Pursuant to Rule 28-2.7, the complete text of § 1346 and § 666 is set forth in an addendum to this brief.

## DETENTION STATUS

Ridley-Thomas is on bail pending this Court's resolution of his appeal. (6-ER-1003.)

## STATEMENT OF FACTS

Ridley-Thomas is an iconic Los Angeles public servant who dedicated his 40-year career to improving the lives of marginalized communities through social justice reform and activism. His career began with the Southern Christian Leadership Conference (PSR-26), and spanned the L.A. City Council (1991-2002, 2020-2023), the California State Assembly (2002-2006), the California State Senate (2006-2008), and the L.A. County Board of Supervisors (the "Board") (2008-2020). (15-ER-2878-79; PSR-26.)

As one of five members of the Board of Supervisors, Ridley-Thomas represented the Second District (7-ER-1293-94), whose nearly two million constituents are predominantly minority, lower-income, and disproportionately incarcerated. (20-ER-3942-43.) Ridley-Thomas's legislative agenda targeted the systemic inequities of his district, from developing critical healthcare infrastructure, to improving services for probationers and at-risk youth, to addressing the homelessness crisis. (21-ER-3992-93.) Given his otherwise resource-poor district, Ridley-Thomas frequently collaborated with USC to leverage its programmatic initiatives to benefit his broader constituency. (PSR-26; 21-ER-3991, 3994-95; 22-ER-4271.) Ridley-Thomas's close ties with USC were longstanding, as he had received his PhD in Social Ethics from the University in 1989 and was proudly supportive of his alma mater. (PSR-26; 21-ER-3991; 22-ER-4271.)

The government's indictment charged that, beginning in May 2017, Ridley-Thomas solicited Flynn for various alleged benefits tied to USC, namely, his son Sebastian's admission to USC to receive a master's degree; Sebastian's receipt of a full-tuition scholarship; Sebastian's hiring for an adjunct professorship; and Flynn's assistance in "funneling" a $100,000 payment from Ridley-Thomas's ballot committee through the School of Social Work for the benefit of PRPI. (6-ER-1110-14.) The indictment asserted that, in return, Ridley-Thomas agreed to

7

take favorable legislative action with respect to three County programs involving USC: (1) the Vermont Avenue Reentry Center; (2) Probation University; and (3) the Telehealth Clinic. (*Id.*) As discussed below, the undisputed trial evidence showed that Ridley-Thomas supported each of these initiatives prior to the alleged conspiracy's inception.

A.    **The Vermont Avenue Reentry Center.**

In 2014, three years prior to the alleged conspiracy's inception, Ridley-Thomas collaborated with USC to build support for the location of a residential reentry center on Vermont Avenue, near Campus. (7-ER-1146; 15-ER-2987-88; 17-ER-3342-43.) USC officials were initially opposed to servicing ex-cons blocks away from undergraduates, but Ridley-Thomas worked "with [USC] to resolve" those concerns and "to come up with a solution" where USC could "bridge that gap between the new population and the current residents." (7-ER-1296; 8-ER-1658; 10-ER-4204; 22-ER-4205-06.)

The Board of Supervisors voted in 2015 to house the Reentry Center on Vermont Avenue, in large part due to that location's proximity to USC and the "wraparound support services" it could provide, with a target opening date of June 2017. (7-ER-1299, 1301; 17-ER-3348-49; 20-ER-3925-26.) Ridley-Thomas's deputies had a "very exciting meeting" with Flynn two months prior to that target opening date—and two months prior to the alleged conspiracy's inception—to

8

discuss USC's role "in providing social work services" at the Reentry Center, and ultimately recommended that Ridley-Thomas move forward with the initiative in partnership with Flynn. (3-ER-525-27; 8-ER-1432, 1433, 1438, 1660; 18-ER-3387-88; 22-ER-4289-90, 4292-94.) Flynn and Ridley-Thomas met shortly thereafter to discuss USC's interest in "being involved in … planning" and "rethinking services[.]" (7-ER-1155; 15-ER-2999, 3004.)

On August 1, 2017, Ridley-Thomas and fellow-Supervisor Sheila Kuehl presented the Board with a motion requiring the development of a plan for the Reentry Center that included a memorandum of understanding to establish a partnership with USC to provide health, homelessness, and case management services. (7-ER-1280.) The Board unanimously approved the motion by "Common Consent," a streamlined process for matters deemed non-controversial. (7-ER-1285; 17-ER-3337-38; 20-ER-3921-22.)

## B. Probation University.

A Blue Ribbon Commission[1] report in 2014 recommended improvements in the training of County employees who encounter mistreated children. (22-ER-

---

[1] Five years before the alleged conspiracy's inception, the Board established the Blue Ribbon Commission on Child Protection to address flaws in the County's child welfare system. (7-ER-1307; 22-ER-4272-73.) Ridley-Thomas appointed Flynn to the Commission, where the two collaborated extensively. (7-ER-1925; 18-ER-3396-97.)

9

4287.) That recommendation manifested in the creation of the Department of Children and Family Services ("DCFS") University, a consortium of universities—including USC—that provided internships and best-practices training for the County workforce. (14-ER-2699-2700; 22-ER-4286-87.) "Probation University" aimed to adopt a similar model for the County Probation Department's employees. (9-ER-1901-02; 14-ER-2700.)

Ridley-Thomas, a longtime advocate for probation reform, was predictably supportive. (2-ER-280.) On October 17, 2017, he and fellow-Supervisor Janice Hahn moved the Board to instruct the Chief Probation Officer to conduct a feasibility study and identify potential funding streams. (7-ER-1287.) The Board unanimously approved the motion by common consent. (8-ER-1444; 20-ER-3926-27.)

## C. Telehealth Amendment.

Three years before the alleged conspiracy's inception, in 2014, Ridley-Thomas and Flynn met to discuss a potential partnership between the County's Department of Mental Health ("DMH") and USC whereby social work students would provide tele-mental health services to at-risk youth. (7-ER-1310, 1394; 8-ER-1511; 22-ER-4269, 4273-74; PSR-14.) Flynn lobbied Ridley-Thomas to voice public support for the initiative and, in early 2015, Ridley-Thomas made a statement committing to "improving access to mental health services for youth"

10

through a Telehealth "partnership with USC[.]" (8-ER-1509; 22-ER-4269-70, 4273.) By April 2015, "with [Ridley-Thomas's] help, [USC] had DMH, DCFS, and DHS all sitting at the table talking" about the Telehealth initiative. (7-ER-1305-06; 22-ER-4233-34, 4239-40, 4242-43.)

In 2016, the Telehealth program launched, following DMH's request for Board approval to enter into an agreement with USC to treat "teens and transitioning youth" and the Board's unanimous approval. (7-ER-1307, 1309; 8-ER-1425; 22-ER-4276.) A proud Ridley-Thomas issued a press release extolling the virtues of the program, which made "critically needed early intervention easily accessible and convenient to youth, by using technology familiar to them." (8-ER-1431; 18-ER-3408-10.)

Despite the virtues of Telehealth, by 2017, it was operating at a loss and its future was uncertain. (14-ER-2696.) During a June 2017 meeting with Ridley-Thomas, Flynn advocated for "finding a way as soon as possible" "to solidify the functionality of Telehealth." (7-ER-1158.) Flynn made several suggestions for expanding the scope of services—to include high-risk children younger than 12 and homeless veterans—that DMH Director John Sherin had vetted "several weeks" prior. (*Id.*)

With the existing Telehealth contract set to expire on August 31, 2018 (7-ER-1196), USC's lobbying efforts ramped up during the winter. In a February 23,

2018 email, Marleen Wong, Executive Director of the Telehealth Clinic, proposed that Flynn enlist Ridley-Thomas's support for amendments that included the expansion of "billable services" and an "increase [in] the flat rate for services to a level comparable to other county contract agencies."  (7-ER-1192, 1196; 22-ER-4295.)  Flynn agreed, forwarding Wong's email to Ridley-Thomas, and averring that Wong's suggestions had "the support of current DMH leadership."  (7-ER-1192.)  Ridley-Thomas, a champion of Telehealth since its inception, responded to Flynn/Wong's email with, "Your wish is my command."[2]  (7-ER-1194.)  Ridley-Thomas then forwarded Flynn/Wong's email to his Deputy, Williams, adding "FYI."  (7-ER-1196.)

In the weeks that followed, Wong made "good headway" in convincing DMH officials to support amendments critical to Telehealth's survival (7-ER-1167), while Dr. Nadia Islam, the USC faculty member responsible for Telehealth, did her part by giving a presentation about the amendments to the Supervisors' health deputies.  (21-ER-4104-06.)  USC's presentation "was generally well received," there was "enthusiasm for the [amended] contract," and Ridley-Thomas's deputy recommended that he vote for it.  (21-ER-4106-07.)

---

[2] At trial, Ridley-Thomas's Deputy, Emily Williams, testified that the "your wish is my command" verbiage was typical: Ridley-Thomas "would sometimes say these pithy, succinct things in text and emails so that seemed like something he would say."  (22-ER-4298.)

USC's months of lobbying proved successful and, in July 2018, Sherin requested the Board's authority for DMH to extend the Telehealth contract by one year on amended terms that, while falling short of fulfilling Flynn's requests, expanded coverage at an increased reimbursement rate.  (7-ER-1155; 18-ER-3432.)  Upon fellow-Supervisor Barger's motion (seconded by fellow-Supervisor Solis), the Board of Supervisors unanimously authorized Sherin—by consent, without discussion—to execute the Telehealth amendment (Item 27).  (8-ER-1458; 20-ER-3929-30; 21-ER-4107.)

### D.    Sebastian's USC admission and scholarship.

In late 2017, while USC's lobbying efforts on the Telehealth amendment were ongoing, Sebastian left public service and joined his father's alma mater.

Sebastian represented Los Angeles in the State Assembly for three terms, beginning at age 26.  (7-ER-1292, 9-ER-1749, 1782; 13-ER-2595-96.)  Despite his youth, Sebastian was a powerhouse, authoring thirty-eight pieces of legislation ranging from economic development to civil rights, and chairing the Committees on Mental & Behavioral Health, Homelessness, Elections & Redistricting, and Revenue & Taxation.  (7-ER-1292.)  Sebastian also led the L.A. County Legislative Delegation, was Secretary-Treasurer of the California Legislative Black Caucus, and a founding member of the California Millennial Legislative Caucus.  (*Id.*)

13

Sebastian's work nonetheless took a toll on his health, and he sought mental health treatment in 2016 and 2017. (20-ER-3830-32, 3833, 3845.) Sebastian's decline was sufficiently serious that his mother encouraged him, in early summer 2017, to consider leaving the Assembly "because it was clear that … he needed to do something else with his life to ensure that his health was good." (2-ER-361.)

Sebastian began contemplating alternatives, including graduate school. On May 18, 2017, Sebastian spoke with Flynn about "continuing his education, especially in the area of social policy." (7-ER-1147; 9-ER-1914.) Flynn was ecstatic: "I am very anxious to admit him. He would be the second elected official, following in the footsteps of [then Congresswoman and current L.A. Mayor] Karen Bass." (*Id.*) Sebastian, both the son of a prominent leader and an accomplished legislator in his own right, was a perfect candidate for USC's "VIP program," which recruited high-profile students who could help build the USC endowment and brand. (7-ER-1147; 8-ER-1656; 10-ER-2083.)

Eager to land Sebastian, Flynn worked swiftly in coordination with Dean Jack Knott to develop a joint, online degree program (the first of its kind) between the Price School of Public Policy and the School of Social Work. (7-ER-1149; 15-ER-2994-95; 18-ER-3434.) Together with her colleagues, Flynn secured a full-tuition scholarship to boot. (*Id.*) On June 5, 2017, Flynn informed Mark Todd of the Provost's office about her and Knott's offer to Sebastian: "Jack and I are going

14

to try to make it a joint degree. We will offer a full scholarship between the two schools. I did the same for Karen Bass—full scholarship for our funds."[3] (7-ER-1150; 12-ER-2386-87.) To which Todd responded: "That's great." (8-ER-1439.)

Sebastian's scholarship offer came weeks *before* the government alleged that Ridley-Thomas agreed with Flynn to exchange benefits for votes (9-ER-1755-76), and months before Sebastian learned that he was the subject of a sexual harassment investigation. (7-ER-1225; 15-ER-2908.)

### E. Sebastian's professorship and resignation from the assembly.

During an October 2017 breakfast with Knott, one month before the Assembly's investigation was announced, Sebastian expressed an interest in teaching a class at the Price School while earning his MPA. (8-ER-1451; 11-ER-2278-79.) Teaching a single class locally was desirable, as Sebastian had long been experiencing health issues—in addition to job stress precipitating the mental health referrals—that were incompatible with life as a busy legislator commuting between Los Angeles and Sacramento.

Dr. George Mallouk, Sebastian's physician, spoke with him about resigning from the legislature following multiple surgeries and a life-threatening infection, because he "was starting to wonder if this is the career for [Sebastian]." (20-ER-

---

[3] At trial, multiple witnesses testified that Flynn was prone to typos in her emails (*i.e.*, "for our funds" instead of "*from* our funds"). (3-ER-546; 18-ER-3441.)

3883-84.) During an October 17, 2017 appointment, Sebastian agreed, and told Dr. Mallouk he'd decided to resign. (20-ER-3884-85, 3862.)

On November 28, 2017, Sebastian received a letter revealing that he was the subject of a "recent[] … complaint," which he later learned alleged sexual harassment. (7-ER-1225; 15-ER-2908; 20-ER-3915.) Though privately Sebastian's resignation was decided, the investigation complicated the timing of his announcement, and the Ridley-Thomases consulted a PR team. (7-ER-1189; 15-ER-2907, 2908-09; 16-ER-3074-76.)

According to the government, Ridley-Thomas was deeply concerned about *optics*: "A scandal" could "spell ruin for the political futures" of both Sebastian and Ridley-Thomas, who "planned to run for mayor of Los Angeles …." (1-ER-121-22.)

In December 2017, Sebastian continued discussions with USC about a teaching position. (7-ER-1160; 16-ER-3064.) Knott suggested using "some community diversity funds to support" a part-time professorship, given the School's commitment to a diverse faculty. (8-ER-1452; 10-ER-2152; 11-ER-2283-84.) On December 13, Knott's staff reached out to Flynn's staff to put together "a 50% time position for Sebastian[] which will be jointly shared by both Price & Social Work." (7-ER-1164; 11-ER-2200, 2203.) Flynn, who was not shy about her wish to impress Ridley-Thomas with a prestigious offer to his son, told

16

Knott she wanted to "deliver" for Ridley-Thomas and extend Sebastian an offer before the holidays. (7-ER-1161.)

However, USC was not able to offer Sebastian a job by the end of the year. (7-ER-1166.) Sebastian nonetheless resigned from the Assembly on December 26, 2017, citing his "deteriorating health." (7-ER-1291.) An offer from USC did not materialize until February 2018. (8-ER-1454-55; 11-ER-2289-91.)

By that time, Sebastian's health had improved somewhat since leaving the stress of the Assembly behind. He was living at home, taking online classes at USC and, according to his mother, "[h]e seemed relaxed. … [T]hose classes … really seemed to help rejuvenate him." (2-ER-362.) Sebastian accepted USC's offer of a yearlong "appointment as Professor of the Practice," a role for "individuals who have demonstrated excellence and effectiveness in the public practice of a field" (8-ER-1571; 11-ER-2287-89), for which he was uniquely qualified. (7-ER-1292; 11-ER-2273-74.)

### F. The $100,000 donation.

With his USC activities set to occupy only part of his time, Sebastian contemplated assisting the African American Civic Engagement Project ("AACEP") with Black voter outreach. (7-ER-1187; 13-ER-2594-95, 2601-2602.) Ridley-Thomas helped conceive of AACEP in 2015 and assisted periodically in fundraising efforts. (13-ER-2545-46, 2601-02.)

17

Community Partners was AACEP's fiscal sponsor, *i.e.*, a non-profit umbrella organization that acted as the administrator of its projects. (13-ER-2541-42, 2545, 2593.)

In December 2017, when Sebastian's resignation was imminent, Ridley-Thomas learned that AACEP was low on operating funds. Ridley-Thomas told Paul Vandeventer, Community Partners' CEO, that his ballot committee would donate $100,000 to reinvigorate AACEP, so it could engage in "policy development work preparatory to the 2020 national census and nonpartisan community education work on upcoming ballot measures." (7-ER-1185, 1278; 13-ER-2552-53, 2555, 2557-58.) After Vandeventer confirmed with counsel that it was legal for Community Partners to receive funds from a ballot committee, the Mark Ridley-Thomas Committee for a Better L.A. donated $100,000 to Community Partners for the benefit of AACEP. (7-ER-1279; 13-ER-2556-58, 2561-62.) Ridley-Thomas identified the donation on a public disclosure Form 460, as required. (8-ER-1463; 18-ER-3468-69.)

Around Christmas 2017, Ridley-Thomas informed Vandeventer that Sebastian would be resigning from the legislature, and they discussed the possibility of Sebastian running AACEP. (13-ER-2562-65.) Vandeventer thought that was a "good idea," given that "Sebastian was highly qualified" for the position. (13-ER-2566.) His Vandeventer's disagreed, however, as they worried

18

about "nepotism" and being "seen as doing special favors for special people …."
(12-ER-2465-66; 13-ER-2568-70.)  To assuage their concerns about "the optics of
favoring … the child or son of an elected official" (12-ER-2479-80; 13-ER-2576),
Vandeventer returned the $100,000 to Ridley-Thomas's ballot committee in late
January 2018.  (13-ER-2520.)

Shortly after his AACEP opportunity fell through, Sebastian first considered
serving as the Director of PRPI, "an African American-focused effort on polling,
voter research, civic engagement, policy analysis, and democracy-building,"
launched in 2015.  (3-ER-546; 7-ER-1205; 16-ER-3102-03; 19-ER-3635.)  PRPI,
like AACEP, needed a fiscal sponsor, and Ridley-Thomas contacted United Ways
of California's ("UWC") CEO Peter Manzo.  (7-ER-1204; 20-ER-3715-19.)
Manzo agreed UWC would sponsor PRPI in early March 2018 (7-ER-1206; 20-
ER-3729-31) and, as part of the approval process, Sebastian submitted a budget
proposing a $67,200 salary plus benefits for an Associate Director, Zanetta Smith.
(7-ER-1202; 20-ER-3729-32.)  PRPI still had not raised those funds by the end of
March, however.  (20-ER-3734-35.)

On April 26, 2018, Ridley-Thomas and Flynn first discussed a role for USC
in funding PRPI—nine months after Ridley-Thomas voted in favor of the Vermont
Reentry Center motion, six months after Ridley-Thomas voted in favor of
Probation University, and more than two months after Ridley-Thomas agreed to

19

support the Telehealth amendment ("Your wish is my command"). (7-ER-1194, 1285; 8-ER-1444; 17-ER-3231.)

On May 2, Ridley-Thomas sent Flynn a $100,000 check from his Committee for a Better L.A. with a letter stating: "As Dean, these funds can be used at your discretion in order to best facilitate the impressive policy and practical work of the School and its impact in the community." (7-ER-1181.) Consistent with Ridley-Thomas's letter, the check was deposited into the Dean's Discretionary Gift Account. (22-ER-4195-96.) Those funds were earmarked for PRPI, however, "to facilitate the completion of Ms. Smith's on-boarding with the United Ways in a timely manner"—*i.e.*, by May 15, when Smith was set to begin employment. (7-ER-1199, 1216; 16-ER-3145-46.)

To effectuate Ridley-Thomas's donation to PRPI (and unbeknownst to Ridley-Thomas), Flynn made a series of misrepresentations to her USC colleagues and subordinates, and to UWC. (7-ER-1219; 19-ER-3646-50.) She did not disclose that the funds would pay Smith's salary, although University policy forbade nonprofit sponsorships for that purpose. (3-ER-583; 7-ER-1199; 14-ER-2786; 15-ER-2861; 19-ER-3646, 3659.) Flynn never told Ridley-Thomas that she broke USC's rules. (19-ER-3545-46.)

Ridley-Thomas's funds ultimately transferred from USC to UWC on May 9, 2018. (7-ER-1214; 17-ER-3229.)

## G.    The government's flawed investigation.

Flynn's colleagues sounded alarm bells when they realized a $100,000 donation "had come in" to USC "and then [gone] right back out." (9-ER-1970.) John Clapp, Flynn's Associate Dean, informed the Provost, and USC ultimately returned the funds to Ridley-Thomas's ballot committee. (7-ER-1183; 10-ER-2077-78.)

USC, which "had just gone through a very high-profile sexual harassment case that … damaged the school's reputation nationally in the social work community" (10-ER-2083)—in addition to the well-publicized Varsity Blues and George Tyndall scandals—made a criminal referral to the United States Attorney's Office. A public announcement of the referral by Rick Caruso, Chair of USC's Board of Trustees, swiftly followed. (3-ER-565-66; 8-ER-1462.) The same day (August 1, 2018), the *L.A. Times* published an article discussing USC's internal investigation into the $100,000 transaction, along with the University's criminal referral. (19-ER-3599.)

The government's subsequent investigation was one-sided. The case agent, Special Agent Brian Adkins, spoke with over twenty potential witnesses from USC. (17-ER-3310.) He did not attempt to interview *anyone* from Ridley-Thomas's office despite their extensive knowledge of the Vermont Reentry Center, Probation University, and the Telehealth initiatives. (15-ER-2979.) At trial,

21

Adkins justified his failure to interview anyone from Ridley-Thomas's office by testifying that approaching County witnesses could have tipped off Ridley-Thomas to the FBI's investigation, even though USC's Caruso had already publicly disclosed the referral and the *L.A. Times* had already reported on it before Adkins conducted his first interviews.  (17-ER-3322-23.)

## H.    The indictment.

Based on the foregoing, the government brought a sweeping 19-count indictment against Ridley-Thomas: Count 1 charged conspiracy (18 U.S.C. § 371), Count 2 charged federal-programs bribery (18 U.S.C. § 666), Counts 4-5 charged honest services mail fraud (18 U.S.C. §§ 1341, 1346), and Counts 6-20 charged honest services wire fraud (18 U.S.C. §§ 1343, 1346).[4]  (6-ER-1110-14.)  In their totality, the 19 counts alleged that Ridley-Thomas solicited from Flynn: (1) Sebastian's admission to USC to receive a master's degree; (2) Sebastian's receipt of a full-tuition scholarship; (3) Sebastian's hiring for a USC professorship; and (4) Flynn's agreement to "funnel" the $100,000 payment from Ridley-Thomas's ballot committee through the School of Social Work to UWC for the benefit of PRPI. (*Id.*)  The indictment asserted that, in return, Ridley-Thomas agreed to support

---

[4] Count 3 charged Flynn with bribery (6-ER-1110), to which she pleaded guilty pursuant to an agreement with the government on September 19, 2022.  She was sentenced to three years' probation.  (6-ER-1105, 1009.)  The government chose not to call Flynn as a witness at trial.

USC's role in providing services at the Vermont Reentry Center and Probation University, and an amendment to the Telehealth contract on favorable terms.[5] (*Id.*)

## I.    <u>The trial.</u>

On March 7, 2023, prosecutors brought Ridley-Thomas to trial. Errors, legally invalid theories, and insufficient evidence plagued their case from start to finish.

### 1.    The *quid.*

Per the indictment, prosecutors presented the jury with their novel theory that Ridley-Thomas committed honest services fraud and federal-programs bribery by soliciting Flynn's assistance in funding PRPI—what prosecutors termed "secret funneling"—in return for casting votes favorable to USC.

The government could not argue that Ridley-Thomas received a traditional bribe because it was his ballot committee that donated $100,000 *to* USC—rather than USC lining Ridley-Thomas's pockets, his own money was going out of them. (7-ER-1181.) The government claimed, instead, that Flynn's assistance was the *quid* in a corrupt exchange because Ridley-Thomas avoided the "political optics"

_____

[5] Though the indictment alleged Ridley-Thomas cast tainted votes on three County *contracts* (6-ER-1110), the alleged *quos* involved just one contract—an amendment of DMH's existing Telehealth contract with USC—and two votes in favor of adopting program plans for the Vermont Reentry Center and Probation University. (7-ER-1285; 8-ER-1444, 1458.)

of "sending $100,000 to an organization that impacted his son."  (23-ER-4548-49;

*see also* 1-ER-171 ("[I]t's always good for a politician to not look nepotistic, not

look like he's just giving money to his son."); 9-ER-1753 ("[D]efendant did not

want to donate directly to the nonprofit from his Ballot Committee.  He was afraid

it would look bad, look nepotistic for a politician to use his own committee funds

to benefit his son.").)  Ridley-Thomas, prosecutors claimed, was obsessed with

optics, reputation, and protecting his family's political brand, and Flynn's

assistance was therefore important to him.  (1-ER-121-22; 9-ER-1749-50, 1760.)

The government asked the jury to convict Ridley-Thomas under this novel

theory despite unrebutted testimony from Ann Ravel, the former Chair of

California's Fair Political Practices Commission and an expert in campaign finance

laws (2-ER-292-97), that Ridley-Thomas's donation to USC, and USC's

subsequent donation to PRPI, were both compliant with California law.  (2-ER-

303.)  The "secret funneling," Ravel explained, was not secret because Ridley-

Thomas made proper public disclosure of his donation on his ballot committee's

Form 460.  (2-ER-303-04; 7-ER-1226.)  Nor was it illicit, since Ridley-Thomas

complied with the applicable regulations, which permitted a donation to USC that

was destined for PRPI.  (2-ER-328-29.)  Though prosecutors derided Ravel's

testimony in closing, saying it "seemed crazy," they presented no contrary

evidence or expert opinions.  (1-ER-190-91.)

24

### 2. The *quo*.

The government argued repeatedly that Ridley-Thomas was guilty of bribery if he "monetized" his public service by soliciting benefits intending to be rewarded for votes that he had already decided to take. (*See, e.g.*, 1-ER-130, 131, 133, 134, 147, 203; 23-ER-4446-48, 4448, 4489, 4491, 4495, 4541, 4553.) That described *all* of the votes that were the alleged *quos* in the case, including Ridley-Thomas's support for extending the Telehealth contract on amended terms, which he voiced two months prior to the so-called "secret funneling." (7-ER-1194.)

### 3. The exchange.

The government's evidence of an exchange was tenuous and circumstantial. First, prosecutors claimed that Flynn outlined the conspiracy in a confidential letter she sent Ridley-Thomas memorializing their June 2017 meeting regarding various initiatives. (7-ER-1155; 23-ER-4511.) Although prosecutors claimed the letter was a conspiratorial "to do list" (23-ER-4513), which was hand-delivered to Ridley-Thomas's office to hide their misconduct (1-ER-201; 7-ER-1155; 9-ER-1758), the trial evidence belied that notion.

Ridley-Thomas often received hand-delivered letters marked confidential and Flynn's, like all others, was shared with his staff. (7-ER-1155; 9-ER-1820-21; 14-ER-2782-83; 18-ER-3415-16; 20-ER-3946-47; 22-ER-4281-82, 4307-09.) Flynn shared the letter with numerous USC personnel as well. (*Id.*)

In addition, the letter addressed the racial and ethnic composition of a USC committee tasked with evaluating a homelessness initiative, and the letter criticized USC for omitting minorities and "persons with lived experience" from its membership. (7-ER-1155; 21-ER-4004.) Ridley-Thomas sought Flynn's input on that delicate subject "discretely," and Flynn obliged. (8-ER-1513.)

Apart from the letter, the government relied on Flynn's July 2018 lobbying report, which disclosed that she discussed a "gift agreement" with Ridley-Thomas (1-ER-176; 15-ER-2993; 16-ER-3137; 17-ER-3251; 23-ER-4548), and two uncorroborated hearsay statements Flynn made to Associate Dean Clapp about Telehealth's extension. Clapp testified that Flynn said she "had to do a little favor" to get the amendment and winked (9-ER-1965-67), and said she had to tell him about a "side deal" with Ridley-Thomas and Sebastian (10-ER-2056-57). Clapp did not know what either the "favor" or the "side deal" entailed (*id.*), and prosecutors elected not to call Flynn to testify. Clapp was not an alleged coconspirator, and the government offered no plausible theory for why Flynn would have admitted her involvement in serious crimes to him.

### 4. Material deception.

Prosecutors argued that Ridley-Thomas deprived his constituents of their right to his honest services by lying to USC, and by failing to tell USC and UWC that his donation to the University was earmarked for PRPI. In closing,

26

prosecutors pointed to Ridley-Thomas's alleged "lies and deceit": "The lying to USC officials." "The Pete Manzo not telling him about the true source of the funds." "All of it." (1-ER-200.)

Yet the government presented no evidence that Ridley-Thomas's constituents would have found his alleged misstatements or omissions material. Prosecutors did not, for example, adduce evidence that the other Supervisors would have found any of the benefits Ridley-Thomas allegedly received to be material in deciding how they voted on the Reentry Center, Probation University, or the Telehealth amendment. Indeed, in closing, the government argued: "Multiple witnesses testified in this trial, and they were asked …: 'Hey, did you know the nature and the scope of the relationship between the Defendant and Marilyn Flynn?' And they said: 'No.' … But for some of them, this would have been a problem." (23-ER-4516-17.) But those witnesses were employees of USC and UWC, both of which had their own internal policies pertaining to the donation: Clapp (9-ER-1928-29), Michelle Clark (14-ER-2778-79), Alberto Gonzalez (15-ER-2865-66), Mary-Rose McMahon (19-ER-3659-60), and Manzo (20-ER-3747).

The government tacitly recognized this critical oversight after it rested, but to no avail. Called by the defense, former-Supervisor Kuehl testified on cross that, when she voted on the Telehealth amendment, she did not know whether Ridley-Thomas had asked Flynn to make a $100,000 donation to a nonprofit associated

with his son. (2-ER-353-54.) When the government then asked her, "Would that have mattered to you," the district court sustained defense counsel's objection that the question was beyond the scope of Kuehl's direct. (2-ER-354.)

Prosecutors then tried to plug this hole in their case by requesting that the district court allow them to call another Supervisor, Janice Hahn, on rebuttal for "[f]ive minutes" to ask her "if a supervisor voting on something would have wanted to know 'X' before she cast that vote," and "[i]f you had known this, if you had known that, would you still have voted?" (2-ER-383.) Defense counsel opposed: "If they wanted to make an affirmative point about that, they could have called her in their case-in-chief … They elected not to do that." (2-ER-384.) The district court agreed, and disallowed Hahn's rebuttal testimony. (*Id.*)

## J.     The verdict, post-trial motions and sentencing.

Following lengthy deliberations, the jury convicted Ridley-Thomas on Count 1 (conspiracy), Count 2 (federal-programs bribery), Count 5 (honest services mail fraud) and Counts 15-16, 19-20 (honest services wire fraud). (1-ER-308.) The fraud counts of conviction related solely to Flynn's facilitation of Ridley-Thomas's $100,000 donation to PRPI and his support for the Telehealth amendment. (*Id.*) The jury acquitted Ridley-Thomas of twelve fraud counts relating to Sebastian's USC admission, scholarship, and professorship, and Ridley-Thomas's support for the Reentry Center and Probation University. (*Id.*)

28

Post-verdict, Ridley-Thomas moved for acquittal on all counts and for a new trial. (6-ER-1010, 1065.) The motions were denied. (1-ER-7.) On August 28, 2023, Ridley-Thomas was sentenced to 42 months in prison and three years of supervised release, and was ordered to pay a $30,000 fine. (1-ER-2.)

## SUMMARY OF ARGUMENT

### A.    Ridley-Thomas's honest services fraud convictions must be reversed.

The government's theory of honest services fraud is invalid as a matter of law. *Skilling* limited the scope of the honest services fraud doctrine to its historic "core"—only the types of bribery and kickback schemes that were criminalized in cases prior to *McNally*. Those traditional schemes involved the acceptance of personal, financial benefits in exchange for official action. None involved a public official's receipt of perceived reputational benefits that enhanced his political brand, public image, or electability. The government's theory is not only unprecedented but also risks turning prosaic exchanges critical to representative government—from ribbon-cutting ceremonies to honorary degrees—into grounds for federal prosecution.

The government's theory is fatally deficient in yet another respect. Prosecutors claimed Ridley-Thomas deprived his constituents of honest services while deceiving USC. But USC was the supposed bribe-payor and recipient of the alleged exchange's ill-gotten benefits, and Ridley-Thomas did not owe a duty of

29

honest services to USC.  No pre-*McNally* conviction rested upon deceit of the bribe-payor.

The government's third-party-deceit theory also violates this Circuit's convergence doctrine, which requires evidence of deception material to the victim. Here, the government was required to prove that Flynn's assistance in funding PRPI was the kind of benefit that Ridley-Thomas's constituents (not USC or some third party) would have found material to good governance.  Yet the government called no County witnesses and adduced no evidence of the public's detrimental reliance.  Ridley-Thomas's honest services fraud convictions cannot stand without it.

The failures of proof discussed above entitle Ridley-Thomas to a judgment of acquittal.  At a minimum, however, a new trial is required for two reasons.  First, the district court misstated the *mens rea* element of § 1346, refusing to instruct the jury that the intent to defraud requires the intent both to deceive *and* cheat.  The instructions omitted any element of deception, which is the essence of fraud, and which this Circuit has always required in honest services fraud prosecutions.

Second, the instructions permitted the government to present a legally invalid "monetization" theory that conflated bribes and gratuities.  Prosecutors told jurors that Ridley-Thomas was guilty of *quid pro quo* corruption if, rather than intending to be influenced, he accepted a reward for official action that he had

30

already determined to take. But that is a gratuity, not a bribe, and gratuities are not proscribed by § 1346. The government's pervasive theory, coupled with the district court's erroneous and incomplete instructions, created an unacceptable risk that Ridley-Thomas was convicted of conduct that the statute does not prohibit.

**B.** **Ridley-Thomas's federal-programs bribery conviction must be reversed.**

The government's contorted bribery theory fares no better under § 666. That statute must be construed *in pari materia* with § 1346, and § 666 does not extend to the acceptance of perceived reputational benefits either. However, should the Court find that § 666 covers a more extensive range of benefits than § 1346, the statutory scheme surrounding § 666(a)(1)(B) makes clear that "thing of value" is no broader than "property." Flynn's assistance to Ridley-Thomas bears no resemblance to a traditional property interest. The government's failure of proof on this element again entitles Ridley-Thomas to a judgment of acquittal.

At a minimum, a new trial is required on the § 666 count as well. The government's invalid "monetization" theory equally infected Ridley-Thomas's federal-programs bribery conviction because § 666, like § 1346, does not encompass mere gratuities. In addition, the district court rejected jury instructions stating that (1) § 666 requires a *quid pro quo*, (2) a gratuity is not a bribe, and (3) goodwill gifts are not criminal. Each was required, and the failure to give these instructions was not harmless beyond a reasonable doubt.

31

**C.** **Ridley-Thomas's conspiracy conviction must be reversed.**

A conspiracy conviction cannot stand where one or both of its objects is invalid.  Because both Ridley-Thomas's honest services fraud and federal-programs bribery convictions must be reversed, his conspiracy conviction must be reversed as well.

**D.** **Ridley-Thomas is entitled to a new trial under *Batson*.**

Over Ridley-Thomas's *Batson* objections, prosecutors exercised their peremptory strikes to eliminate the only two Black women from the jury and offered pretextual justifications for their discriminatory motivations.  Prosecutors' use of race and gender as proxies for juror competence violated Ridley-Thomas's fundamental rights, and Ridley-Thomas's tainted convictions must be reversed.

**ARGUMENT**

**I.** **RIDLEY-THOMAS'S HONEST SERVICES FRAUD CONVICTIONS MUST BE REVERSED.**

**A.** **The honest services fraud statute does not extend to a public official's receipt of perceived reputational benefits that enhance his public image, political brand, or electability.**

Ridley-Thomas was convicted of honest services fraud for accepting a "thing of value" in exchange for official action—namely, Flynn's assistance in donating his ballot committee funds to PRPI in exchange for his vote in favor of the Telehealth amendment.  The *quid* in that supposed *quid pro quo* exchange is unlike any other in the history of the doctrine.  Per the government's theory,

Ridley-Thomas orchestrated the "secret funneling"—which was otherwise legal—because he sought to avoid the nepotistic optics of a direct donation and thereby to shield the Ridley-Thomas brand from "scandal" and promote his "public image[]." (1-ER-122; 6-ER-1111.) "A scandal for the Ridley-Thomas family was just not acceptable," the government argued in closing, because Ridley-Thomas "planned to run for mayor of Los Angeles …." (1-ER-122.)

The government's theory is invalid as a matter of law. The honest services fraud statute does not reach alleged *quid pro quo* exchanges where the *quid* is a perceived reputational benefit that enhances a public official's image, political brand, or electability. After *Skilling*, § 1346 applies only to "paradigmatic" bribery and kickback cases—those involving personal enrichment in exchange for official action. The government's novel theory finds no support in the "core" pre-*McNally* body of law. Well-established precedent compels the conclusion that perceived reputational benefits are not the kind the law proscribes. To conclude otherwise would have far-reaching consequences that could turn every ribbon-cutting ceremony into grounds for a federal investigation and grind policymaking as we know it to a halt.

### 1. Standard of review.

This Court reviews *de novo* whether the conduct of conviction fits the statutory definition of a crime. *United States v. Sarkisian*, 197 F.3d 966, 984 (9th

Cir. 1999); *United States v. Yates*, 16 F.4th 256, 264 (9th Cir. 2021).  Where the Court's resolution of legal issues rests on disputed facts, the evidence must be viewed in the light most favorable to the government.  *Yates*, 16 F.4th at 271-72.

### 2.    *Skilling* is fatal to the prosecution.

Congress enacted § 1346 after *McNally v. United States*, 483 U.S. 350 (1987), held that the federal mail and wire fraud statutes protect only property rights, not the intangible right to honest services.  *Id.* at 358.  Although § 1346 temporarily revived the honest services theory, *Skilling v. United States*, 561 U.S. 358 (2010), limited the statute's expansive sweep to its "core": "paradigmatic" pre-*McNally* cases involving "bribes and kickbacks."  *Id.* at 409, 411.[6]

Traditional bribery involves the exchange of a thing of value (the *quid*) for official acts (the *quo*), including a public official's agreement to accept things of value in exchange for official action.  *McDonnell v. United States*, 579 U.S. 550, 562-63 (2016).  However, neither the honest services fraud statute, nor the "federal

---

[6] In *Skilling*, the Supreme Court considered a vagueness challenge to § 1346 brought by the then-CEO of Enron, who had misled shareholders about the company's fiscal health.  He contended that § 1346 did not provide fair notice of the conduct it prohibits and that its "standardless sweep" enabled arbitrary prosecutions.  561 U.S. at 403 (quoting defendant's brief).  Recognizing the constitutional due process concerns raised by § 1346, including fair notice and vagueness, the Court chose to narrow the statute, rather than invalidate it, to "preserve what Congress certainly intended the statute to cover"—that is, "fraudulent schemes to deprive another of honest services through bribes or kickbacks …."  *Id.* at 404.

statutes proscribing … similar crimes," define the phrase "thing of value." *Skilling*, 561 U.S. at 412.

It is plain, nonetheless, that the receipt of a perceived reputational benefit that enhances one's professional standing cannot provide the predicate for a conviction under § 1346 post-*Skilling*. A review of the pre-*McNally* honest services fraud case law reveals that, at no point, has the *quid* in a *quid pro quo* bribery or kickback scheme ever been a perceived reputational benefit (such as the avoidance of nepotistic optics) that enhances the alleged bribe-recipient's image, political brand, or electability. Rather, each conviction involved a tangible, objectively-valuable *quid* that afforded the recipient personal enrichment, including:

- **Cash**, *see United States v. Qaoud*, 777 F.2d 1105, 1107 (6th Cir. 1985); *United States v. Murphy*, 768 F.2d 1518, 1527 (7th Cir. 1985); *United States v. Conner*, 752 F.2d 566, 569 (11th Cir. 1985); *United States v. Alexander*, 741 F.2d 962, 963 (7th Cir. 1984); *United States v. Gorny*, 732 F.2d 597, 599-600 (7th Cir. 1984); *United States v. Gann*, 718 F.2d 1502, 1503-04 (10th Cir. 1983); *United States v. Primrose*, 718 F.2d 1484, 1486-87 (10th Cir. 1983); *United States v. Bruno*, 809 F.2d 1097, 1099-1100 (5th Cir. 1987); *United States v. Whitt*, 718 F.2d 1494, 1495-96 (10th Cir. 1983); *United States v. Pecora*, 693 F.2d 421, 423 (5th Cir. 1982); *United States v. Bottom*, 638 F.2d 781, 782 (5th Cir. 1981); *United States v. Craig*, 573 F.2d 455, 463-64 (7th Cir. 1977); *United States v. Rauhoff*, 525 F.2d 1170, 1172 (7th Cir. 1975); *United States v. Staszcuk*, 502 F.2d 875, 877 (7th Cir. 1974); *Shushan v. United States*, 117 F.2d 110, 114-15 (5th Cir. 1941);

- **Commissions**, *see United States v. Margiotta*, 688 F.2d 108, 113-14 (2d Cir. 1982); *United States v. Bohonus*, 628 F.2d 1167, 1169 (9th Cir.

35

1980); *United States v. Bryza*, 522 F.2d 414, 416-17 (7th Cir. 1975); *United States v. Barrett*, 505 F.2d 1091, 1095-97 (7th Cir. 1974); *United States v. George*, 477 F.2d 508, 510 (7th Cir. 1974); and,

- ***Miscellaneous financial perks***, *see United States v. Lovett*, 811 F.2d 979, 985 (7th Cir. 1987) (5% interest in cable franchise); *United States v. Price*, 788 F.2d 234, 235-36 (4th Cir. 1986) (monies in excess of union membership fees); *United States v. Bonansinga*, 773 F.2d 166, 168 (7th Cir. 1985) (wrongfully diverted auto-supplies, plus cash); *United States v. Venneri*, 736 F.2d 995, 996 (4th Cir. 1984) (a piano); *United States v. Boffa*, 688 F.2d 919, 935-36 (3d Cir. 1982) (payment of monthly car lease); *United States v. Washington*, 688 F.2d 953, 955-56 (5th Cir. 1982) (gift certificates and merchandise); *United States v. Mandel*, 591 F.2d 1347, 1356 (4th Cir. 1979) (jewelry, men's clothing, and investment shares); *United States v. Isaacs*, 493 F.2d 1124, 1146 (7th Cir. 1974) (stock at a heavily discounted price).[7]

Ridley-Thomas, by contrast, derived no personal enrichment, as that concept is traditionally understood, from the so-called "secret funneling." Ridley-Thomas's donation to USC did not line his own pockets. Quite the opposite—Ridley-Thomas donated $100,000 *from* his ballot committee so that PRPI could hire a fulltime staff member and begin its work of polling Black Angelenos about their legislative priorities.

---

[7] In *Skilling*, the government identified the decisions cited above as the "core" pre-*McNally* bribery and kickback cases, with the addition of *United States v. Schwartz*, 785 F.2d 673 (9th Cir. 1986), which construed the phrase "thing of value" in 18 U.S.C. § 1954, rather than § 1346. *See* Brief for the United States at 42 n.4, *Skilling v. United States*, 561 U.S. 358 (2010) (No. 08-1394). Counsel has identified no other pre-*McNally* bribery or kickback case involving a perceived reputational *quid* in a *quid pro quo* exchange.

Under the government's theory, Ridley-Thomas effectuated the donation in a way that would deflect questions about his son's departure from the State Assembly, while also avoiding the nepotistic optics of donating directly from his ballot committee to a nonprofit that his son directed.  (1-ER-171.)  USC's assistance thus helped avoid "a scandal" and preserved Ridley-Thomas's "political future."  (1-ER-121.)

Flynn's facilitation of Ridley-Thomas's donation to PRPI had "value," then, insofar as it safeguarded Ridley-Thomas's professional reputation and enhanced his electability.  But no pre-*McNally* bribery scheme is even remotely analogous. Each involved tangible, personal enrichment taken at the victim's expense. Because the government's honest services fraud theory is premised upon a "non-traditionally recognized form of bribery" that does not survive *Skilling*, it is fatally deficient.  *United States v. Abdelaziz*, 68 F.4th 1, 27 (1st Cir. 2023) (reversing defendants' honest services fraud convictions where government's theory found no support in "core" pre-*McNally* case law).

This Court need proceed no further.  Under *Skilling*, the government failed to prove an essential element of the honest services fraud charges it alleged. Ridley-Thomas's convictions under § 1346 must be reversed and the case remanded for entry of a judgment of acquittal.  *See Abdelaziz*, 68 F.4th at 33; *see also United States v. James*, 987 F.2d 648, 650 (9th Cir. 1993) (reversing

37

convictions where government adduced fatally insufficient proof of an essential element).

### 3. Well-established precedent also dooms the government's theory.

Well-established precedent yields the same conclusion: the honest services fraud statute does not extend to the receipt of perceived reputational benefits.

*Skilling* made clear that "§ 1346 criminalizes *only* the bribe-and-kickback core of the pre-*McNally* case law." 561 U.S. at 409 (emphasis in original). "Bribery," as that concept has long been understood, involves not only the receipt of valuable consideration but also personal advantage. *See* Bribery, Black's Law Dictionary (11th ed. 2019) (defining "bribery" as the "corrupt payment, receipt, or solicitation of a private favor for official action"). For this very reason, the First Circuit recently declined to endorse the government's theory that *professional* benefits qualify as private favors, calling it "at best a stretch." *Abdelaziz*, 68 F.4th at 31 (university insiders who benefitted professionally from parents' corrupt payments to their employers' athletic departments were not bribed).

Consistent with these principles, the only federal courts of appeals to have considered whether the receipt of perceived professional benefits violates the honest services fraud statute have rejected that theory. In reversing the defendants' honest services fraud convictions, *Abdelaziz* relied upon *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), a case wherein the government charged a

civil servant with honest services fraud after she rigged the bidding process for a lucrative contract for "political reasons" and, in exchange, received a raise. *Id.* at 878-79. The government theorized that the defendant "'misused' her office when she lent it to political ends … and obtained a 'private gain' when she got a raise." *Id.* at 882. On review, the court disagreed. *Id.* It found no support for the proposition that a psychic benefit ("an addition to one's peace of mind") or a professional benefit ("an increase in salary for doing what one's superiors deem a good job") qualifies as "a 'private benefit' for the purpose of § 1346." *Id.* at 884 ("The United States has not cited, and we have not found, any appellate decision holding that an increase in official salary, or a psychic benefit such as basking in a superior's approbation (and thinking one's job more secure), is the sort of 'private gain' that makes an act criminal under § 1341 and § 1346.").[8]

---

[8] In *United States v. Inzunza*, 638 F.3d 1006 (9th Cir. 2011), this Court rejected a line of pre-*Skilling* Seventh Circuit precedent by holding that "private gain" is not an element of honest services fraud that must be pleaded in the indictment. *Id.* at 1018. But *Inzunza* has no bearing on traditional notions of bribery. The case was briefed, argued, and decided pre-*Skilling* (though amended post-*Skilling*), and it makes no mention of the limitations that *Skilling* placed on the honest services fraud doctrine. Rather, *Inzunza* rejected the defendant's argument that a "private gain" element must be implied in § 1346 to save it from fatal vagueness, finding that "careful attention to the intent element dispels concerns about the statute's overbreadth." *Id. Skilling* disagreed, and adopted a limiting construction that *Inzunza* did not address: only core, pre-*McNally* bribery-and-kickback schemes remain cognizable. *Inzunza*, moreover, involved a cash-for-votes scheme that fits

In *Yates*, this Court also rejected the government's attempt to premise liability on the receipt of professional benefits. The *Yates* defendants were bank executives who misled their board of directors about the bank's financial condition and faced prosecution for property fraud, *inter alia*, on the theory that they "sought to deprive the bank of their salaries and bonuses." 16 F.4th at 262-63, 266. This Court deemed that theory "legally invalid," reasoning that *Skilling* had rejected the "salary-maintenance theory" of honest services fraud, and the Supreme Court did not intend "'to let in through the back door the very prosecution theory that [it] tossed out the front.'" *Id.* at 267 (citation omitted).

Likewise, in *United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015), the court reversed the honest services fraud convictions of the former Illinois Governor after he attempted to exchange "political favors" with then-President Elect Barack Obama. *Id.* at 735. The government theorized that Blagojevich had engaged in an illicit *quid pro quo* when he offered to appoint President Obama's preferred Senate nominee to a soon-to-be-vacant seat in exchange for his own appointment to a Cabinet post in the Obama administration. *Id.* at 736-37. Citing *Skilling*, the court disagreed, holding that "political favors" (also known as "logrolling") are not the

---

comfortably within the pre-*McNally* bribery paradigm, and bears no resemblance to the perceived reputational benefit at issue here. *See id.* at 1010-11.

kind of personal benefits that § 1346 proscribes. *Id.* at 737. Holding otherwise, the court reasoned, would turn commonplace political activity into a federal crime. *Id.* ("If the prosecutor is right that a public job counts as a private benefit, then the benefit to a politician from improved chances of election to a paying job such as Governor—or a better prospect of a lucrative career as a lobbyist after leaving office—also would be a private benefit, and we would be back to the proposition that all logrolling is criminal.").

These cases make clear that professional benefits—such as perceived approbation, continued receipt of one's salary, or improved chances of election—do not fall within § 1346's ambit. *See Blagojevich*, 794 F.3d at 737-38 (explaining that, if § 1346 criminalizes the acceptance of political favors, then "[e]ven a politician who asks another politician for favors only because he sincerely believes that these favors assist his constituents could be condemned as a felon, because grateful constituents make their gratitude known by votes …").[9]

Ridley-Thomas derived only professional benefit, not personal enrichment, from Flynn's assistance in funding PRPI. In avoiding both public scandal and

_____

[9] Ridley-Thomas is aware of cases such as *United States v. Renzi*, 769 F.3d 731 (9th Cir. 2014), stating that "'thing of value' is defined broadly to include 'the value which the defendant subjectively attaches to the items received.'" *Id.* at 744 (citation omitted). To the best of counsel's knowledge, none has involved a perceived reputational benefit that enhances a public official's image or electability. *Renzi*, like *Inzunza*, involved a cash bribe. *Id.*

nepotistic optics, he sought "peace of mind" that his "political future" and "family brand" were secure. *Thompson*, 484 F.3d at 882; (1-ER-121-22.) Receipt of such perceived reputational benefits is not honest services fraud.

### 4. The government's novel theory would chill legitimate policymaking and yield absurd results.

Endorsing the government's novel theory of honest services fraud would "cast a pall of potential prosecution" over everyday interactions between policymakers and their constituents. *McDonnell*, 579 U.S. at 575.[10]

*Skilling* construed § 1346 narrowly to avoid the fair notice and discriminatory enforcement concerns inherent in the statute's overbreadth. 561 U.S. at 412. But while it is "'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud," the same cannot be said for the receipt of perceived reputational benefits. *Id.* (citation omitted). Elected officials regularly accept benefits from constituents that enhance their public image and electability, from participation in ribbon-cutting ceremonies to the receipt of honorary degrees: "that's politics." *Thompson*, 484 F.3d at 883. Criminalizing the acceptance of

---

[10] In *McDonnell*, Virginia's former Governor challenged his honest services fraud convictions, which were predicated upon his receipt of gifts totaling $175,000 in exchange for arranging meetings, hosting events, and contacting other government officials on behalf of a nutritional supplement maker. 579 U.S. at 575-76. The Supreme Court reversed, adopting a narrow construction of the term "official act" that avoided the vagueness, fair notice, and arbitrary enforcement concerns identified in *Skilling*. *Id.* at 576.

such perceived benefits would chill policymaking as we know it. *See McDonnell*, 579 U.S. at 575. There is always the risk that an overzealous prosecutor may convince a jury, through artfully presented timelines and innuendo, of a this-for-that exchange in the most prosaic of interactions—precisely the result *Skilling* sought to avoid. 561 U.S. at 412 (discussing risk of "arbitrary prosecutions").

The government's novel theory creates federalism concerns as well. In *McDonnell*, the Supreme Court cautioned against "constru[ing] a criminal statute on the assumption that the Government will 'use it responsibly,'" lest federal prosecutors assume a role "in setting standards of good government for local and state officials." 579 U.S. at 576-77. Given that Ridley-Thomas violated no County rules or public disclosure obligations, only a narrow construction of the term "thing of value" prevents such abuses. *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 412 (1999) ("[A] statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.").

For all of these reasons, § 1346 does not extend to the solicitation or acceptance of perceived benefits that enhance a public official's image, reputation, or electability. Ridley-Thomas's honest services fraud convictions are invalid as a matter of law and must be reversed.

**B.** **The honest services fraud statute does not extend to schemes to defraud the public by means of deception material only to the bribe-payor or peripheral third parties.**

The government's theory of prosecution is legally invalid in yet another respect. At trial, the government posited that Ridley-Thomas's scheme deceived *USC* and, to a lesser extent, UWC. But Ridley-Thomas owed no duty of honest services to USC or UWC. His duty was one of faithful and unbiased service to the public. USC's wish to know that Ridley-Thomas's funds were destined for PRPI was no substitute for evidence of deception material to the residents of Los Angeles County. Because the government failed to prove this essential element, Ridley-Thomas is entitled to a judgment of acquittal on this second and independent ground.

### 1. Standard of review.

Because Ridley-Thomas's Rule 29 motion preserved his challenge to the sufficiency of the government's proof of materiality, this Court's review is *de novo*. *United States v. Tisor*, 96 F.3d 370, 373 (9th Cir. 1996).

Evidence is insufficient to support a verdict where "there is a 'total failure of proof of [a] requisite' element." *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010) (citation omitted, alteration in original).

## 2.    Yet again, *Skilling* is fatal to the prosecution.

*Skilling* teaches that, from its inception, honest services fraud lacked the congruity of property fraud, "in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." 561 U.S. at 400. The honest services doctrine "targeted corruption that lacked similar symmetry. While the offender profited, the betrayed party suffered no deprivation of money or property; instead, a third party, *who had not been deceived*, provided the enrichment." *Id.* (emphasis added).

Following this traditional pattern, *all* of the cases falling within the pre-*McNally* bribery-and-kickback core involved an offender who deceived the party to whom he owed a duty of honest services, *i.e.*, his employer or the public. *See Bruno*, 809 F.2d at 1099 (official in New Orleans sheriff's office attempted to deceive citizens of New Orleans); *Lovett*, 811 F.2d at 985 (mayor deceived Fox Lake Board of Trustees and citizens of the village of Fox Lake); *Price*, 788 F.2d at 237 (union agents deceived union and its members); *Qaoud*, 777 F.2d at 1113 (state judge deceived citizens of the state of Michigan); *Bonansinga*, 773 F.2d at 168 (member of City Council deceived citizens of Springfield); *Murphy*, 768 F.2d at 1530 (district judge deceived citizens of Cook County); *Conner*, 752 F.2d at 572-73 (employee deceived employer); *Venneri*, 736 F.2d at 996 (subcontractor and employee deceived employer/contractor); *Alexander*, 741 F.2d at 964 (deputies

45

of Board of Appeals deceived members of the Board and citizens of Cook County);
*Gorny*, 732 F.2d at 599-600 (Deputy Commissioner of Cook County Board of Tax
Appeals deceived citizens of Cook County); *Gann*, 718 F.2d at 1505 (county
commissioner deceived citizens of Hughes County); *Primrose*, 718 F.2d at 1486-
87 (county commissioner deceived citizens of Murray County); *Whitt*, 718 F.2d at
1495-96 (county commissioner deceived citizens of Seminole County); *Boffa*, 688
F.2d at 930 (employer deceived union member employees); *Margiotta*, 688 F.2d at
113-14 (Chairman of Republican Committee deceived Town and County officials
and citizens of the town of Hempstead, Nassau County, and New York State);
*Washington*, 688 F.2d at 955-56 (member of the Board of Supervisors deceived
citizens of Pontotoc County); *Bottom*, 638 F.2d at 782 (county commissioners
deceived citizens of Limestone County); *Bohonus*, 628 F.2d at 1169 (employee
deceived employer); *Mandel*, 591 F.2d at 1354 (governor deceived citizens of the
state of Maryland); *Craig*, 573 F.2d at 462 (members of Illinois General Assembly
deceived citizens of the state of Illinois); *Bryza*, 522 F.2d at 415-17 (employee
deceived employer); *Rauhoff*, 525 F.2d at 1175 (Office of Secretary of State
deceived citizens of the state of Illinois); *Barrett*, 505 F.2d at 1095-97 (County
Clerk deceived citizens of Cook County); *George*, 477 F.2d at 510 (employee
deceived employer); *Isaacs*, 493 F.2d at 1150 (governor deceived citizens of
Illinois); *Staszcuk*, 502 F.2d at 877 (alderman deceived citizens of Chicago);

46

*Shushan*, 117 F.2d at 114-15 (member of Levee Board deceived fellow Board members and citizens of Orleans Levee District).[11]

The government's theory turns this "paradigmatic" scenario on its head. The indictment charged Ridley-Thomas with "providing false information to" and "concealing material facts from *University officials*" about the so-called "secret funneling." (6-ER-1117 (emphasis added).) At trial, prosecutors told the district court that the "material … lies" they were relying upon to prove their case were Flynn's, and told the jury that Ridley-Thomas's "lies and deceit" were the "sham-letters," the "lying to USC officials," and the "not telling [UWC] about the true source of the funds." (1-ER-200.) The government adduced no evidence that Ridley-Thomas's constituents would have wanted or expected him to disclose the source of the donation to PRPI, or Flynn's role in facilitating it.

The government thereby minted a novel theory that Ridley-Thomas defrauded the public through deception material to USC—the alleged bribe-payor and beneficiary of the scheme's purportedly ill-gotten benefits—and to third parties who had some role in the donation. That theory finds no support in the pre-*McNally* case law. That alone is fatal to it.

---

[11] The cases cited above are, again, those the government identified in *Skilling* as the pre-*McNally* "core." *See supra* n.7.

The First Circuit recently rejected a similar, asymmetrical application of the honest service fraud statute in *Abdelaziz*. 68 F.4th at 27. There, the court vacated the § 1346 convictions of parents involved in the Varsity Blues scandal who paid bribes to university officials, when those same universities were the bribes' recipients, because no pre-*McNally* case involved the payment of a bribe to the victim of the scheme. *Id.* The First Circuit reasoned that the constitutional guarantees of fair notice and due process require that § 1346 be construed narrowly to encompass only traditional, historical applications of the statute—not novel theories. *Id.* at 32 ("Construing § 1346 to cover conduct not covered by the core pre-*McNally* understanding of 'bribes' would not provide sufficient notice for 'ordinary people [to] understand what conduct is prohibited[,]' … raising the same concern which motivated the Supreme Court in *Skilling* ….") (citation omitted).

As in *Abdelaziz*, because the government's theory of prosecution is unprecedented, Ridley-Thomas could not have been on notice that his conduct violated the honest services fraud statute—particularly because his conduct was otherwise lawful. Ridley-Thomas broke neither County rules nor campaign finance laws. He violated no duty to disclose USC's role in his donation to PRPI. He derived no private enrichment from Flynn's assistance. Nothing about his conduct, in other words, supplied the fair notice that the Constitution requires.

48

Finally, endorsing the government's novel theory risks turning innocent conduct into a federal crime. When elected to office, public servants do not assume an omnibus duty under federal criminal law of total candor in their private dealings. If Ridley-Thomas is guilty of honest services fraud because he made only those public disclosures required by law, and thus did not share his plan to fund PRPI with USC or UWC, so too are innumerable law-abiding citizens who have declined to share the full story with those who have no right to know. The Supreme Court has rejected such overbroad constructions of the honest services fraud statute, time and again. *See McDonnell*, 579 U.S. at 576 ("Under the 'standardless sweep' of the Government's reading, public officials could be subject to prosecution, without fair notice, for the most prosaic interactions.") (citation omitted); *see also Kelly v. United States*, 140 S.Ct. 1565, 1574 (2020) ("If U.S. Attorneys could prosecute as property fraud every lie a state or local official tells," "the result would be … 'a sweeping expansion of federal criminal jurisdiction.'") (citation omitted).

In short, the honest services fraud statute applies only to public officials' schemes to deceive their constituents—not the alleged bribe-payor or ancillary third parties. Because the government introduced insufficient proof establishing a scheme to deceive Ridley-Thomas's constituents, his honest services fraud convictions must be reversed.

### 3. The government's novel theory violates this Circuit's convergence doctrine.

In *United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012), this Court held that, post-*Skilling*, in addition to a scheme involving bribes or kickbacks, there are five "limitations to the conduct susceptible to prosecution" under § 1346, including that "the defendant must 'misrepresent or conceal a material fact.'" *Id.* at 726 (citation omitted). A fact is material if it has "a natural tendency to influence, or is capable of influencing," a person or entity's acts. *Neder v. United States*, 527 U.S. 1, 16 (1999).

Prosecutors' novel claim that they could meet their burden of proving materiality with evidence that Ridley-Thomas misrepresented or omitted facts material to USC and UWC contravenes well-established precedent. (2-ER-432; 6-ER-1049.)

Both property fraud and honest services fraud require proof of deception (*i.e.*, a material misrepresentation or omission) and deprivation (of property or honest services). *See Neder*, 527 U.S. at 16 ("actionable 'fraud'" involves "a misrepresentation or concealment of material fact"); *Milovanovic*, 678 F.3d at 727 (same). This Circuit also requires convergence: the intent of the scheme "must be to obtain money or property from the one who is deceived …." *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (vacating mail fraud convictions of immigration attorney who submitted falsified applications because the evidence

showed that the government was deceived, while the attorney's clients, who were not deceived, were deprived of money or property).

Like in *Lew*, the government here failed to prove that the intent of Ridley-Thomas's scheme was both to deceive his constituents *and* deprive them of his honest services. Prosecutors adduced no evidence of deception material to the public, relying exclusively on misrepresentations and omissions it alleged were material to USC and third parties.

While *Lew* is a property fraud case, ample authority demonstrates that proof of the victim's detrimental reliance—be it an employer or the public—is required to satisfy § 1346's materiality element. *See Milovanovic*, 678 F.3d at 727 (in private sector case, government must adduce proof of "reasonable employer['s]" detrimental reliance); *United States v. Sawyer*, 239 F.3d 31, 47-48 (1st Cir. 2001) (in public sector case, government must prove that defendant-official "inten[ded] to deceive the public" through material misrepresentations or omissions); *United States v. Rybicki,* 354 F.3d 124, 146 (2d Cir. 2003) (materiality element is satisfied where "the victim's knowledge of the scheme would tend to cause the victim to change his or her behavior."); *United States v. Holzer*, 816 F.2d 304, 307 (7th Cir. 1987) ("A public official is a fiduciary toward the public … and if he deliberately conceals material information from them he is guilty of fraud."), *vacated and*

*remanded for reconsideration in light of McNally v. United States*, 483 U.S. 350 (1987).

USC was no stand-in for the public because its idiosyncratic concerns and byzantine rules governing fiscal sponsorship were irrelevant to the public's right to Ridley-Thomas's unbiased representation.

The government, moreover, did not so much as argue that the public would have found the true source of USC's donation to PRPI, or Flynn's role in facilitating the donation, to be material. Nor is it obvious that the public would have found those facts material. Unlike the traditional *quid* (cash payments, commissions, or other forms of personal enrichment), nothing in the record demonstrates that Ridley-Thomas's indirect donation to PRPI was the kind of benefit that his constituents would have found relevant to good governance. *See Rybicki*, 354 F.3d at 146 ("We doubt that the failure to disclose to an employer a *de minimis* 'bribe'—the free telephone call, luncheon invitation, or modest Christmas present—is a *material* misrepresentation ….") (emphasis in original).

Belatedly recognizing as much, the government sought to call Supervisor Hahn in rebuttal, to ask whether she would have voted differently had she known about Flynn's assistance in funding PRPI (though the district court held the government to its burden and declined). (2-ER-383.) That misstep is fatal. *See United States v. Jennings*, 487 F.3d 564, 582 (8th Cir. 2007) ("The government

would be hard pressed to prove [materiality] without asking whether the undisclosed information would have affected the decision maker's analysis.").

Because the government adduced no evidence that Ridley-Thomas's constituents would have found the so-called "secret funneling" material, his honest services fraud convictions must be reversed.[12]

### C.     At a minimum, Ridley-Thomas's convictions must be reversed and the case remanded for a new trial.

In addition to the failures of proof discussed above, the district court gave erroneous instructions that misstated the *mens rea* element of § 1346 and permitted Ridley-Thomas's conviction under a legally invalid gratuities theory.  A new trial is therefore required.

---

[12] In denying Ridley-Thomas's Rule 29 motion, the district court endorsed the government's ill-conceived argument that § 1346's materiality element is synonymous with its "official act" requirement.  It isn't.  Section 1346 requires both official action *and* a material misstatement or omission.  *Milovanovic*, 678 F.3d at 726.  Conflating those separate elements effectively lowered the government's burden of proof.  (1-ER-10-12 (finding that Ridley-Thomas's vote in favor of the Telehealth amendment satisfied both § 1346's "official act" and "materiality" elements).  *See Ratzlaf v. United States*, 510 U.S. 135, 140-41 (1994) (lower court erred in construing criminal statute to render an element "mere surplusage").  Worse still, by conflating the two elements, the district court upheld the verdict on a basis never presented to the jury.  Prosecutors never argued that Ridley-Thomas's votes proved materiality, and the district court instructed the jury that the deceptive conduct necessary to meet § 1346's materiality element did "not need to be the same" as the "official act."  (6-ER-1102.)  The Supreme Court has repeatedly cautioned that courts should not affirm on grounds never presented and thereby "assume … the function … of a jury."  *Ciminelli*, 598 U.S. at 317.

### 1. The district court erroneously instructed the jury that honest services fraud requires no proof of deception.

Relying on *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), Ridley-Thomas proposed instructing the jury that honest services fraud, like mail and wire fraud, requires the intent to "deceive and cheat." (5-ER-956.) The government countered that "honest services fraud is different," and requires only the intent to deprive the public of its right to honest services—*i.e.*, to cheat. (5-ER-957.) The district court erroneously accepted the government's position.

Honest services fraud is *not* different. For decades, this Court has recognized that honest services fraud, like all fraud offenses, requires deception as well as deprivation. The district court's denial of an instruction setting forth both requirements misstated the elements of § 1346 and lowered the government's burden of proof. This Court should reverse.

#### i. Standard of review.

This Court reviews *de novo* whether the jury instructions correctly state the elements of the offense. *Miller*, 953 F.3d at 1101.

#### ii. Honest services fraud requires the intent to deceive and cheat.

This Court held, more than forty years ago, that honest services fraud requires the "specific intent" to "deceive persons of ordinary prudence and comprehension." *Bohonus*, 628 F.2d at 1172. Since *Bohonus*, every decision to

54

consider whether honest services fraud requires deception has concluded it does. *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 945-46 (9th Cir. 2009) (affirming jury instructions requiring government to prove public official engaged in "fraudulent and deceptive" conduct, and defining "intent to defraud" as "reasonably calculated to deceive persons of ordinary prudence and comprehension"); *Milovanovic*, 678 F.3d at 726 (stating § 1346 requires that defendant "misrepresent or conceal a material fact"); *see also United States v. Wilkes*, 662 F.3d 524, 544 (9th Cir. 2011) (finding sufficient evidence of honest services fraud where alleged "scheme involved both *quid pro quo* bribery and material misrepresentations").

This Circuit is not alone in requiring deceptive intent. The First, Eleventh, and Eighth Circuits all echo *Miller* and require that the government prove the intent to deceive *and* cheat in § 1346 prosecutions. *See United States v. Sawyer*, 85 F.3d 713, 729 n.12, 732 (1st Cir. 1996) ("To establish mail fraud—in cases involving honest services fraud …—the alleged scheme must involve deception in the deprivation of … the right to honest services. … In addition to *deceit* (the gravamen of 'fraud'), the government must also show the intent to *harm* (in this case, to deprive of honest services).") (emphasis in original); Eleventh Circuit Pattern Jury Instructions, Criminal Cases, Instruction O50.2 ("To act with 'intent to defraud' means to act knowingly and with the specific intent to use false or

fraudulent pretenses, representations, or promises to cause loss of honest services. Proving intent to deceive alone, without the intent to cause loss of honest services, is not sufficient to prove intent to defraud."); Eighth Circuit Criminal Model Instruction No. 6.18.1346 ("To act with intent to defraud means to act knowingly and with the intent to deceive someone for the purpose of causing some loss of the right to honest services.").

Even the government acknowledged that proof of Ridley-Thomas's intent to deceive was required.  (*See* 6-ER-1107 (noting that § 1346's intent and materiality elements involve "deceptive conduct" and that "[t]he deceptive conduct is often false statements or the concealment and non-disclosure of the bribe offered in connection with the *quid pro quo*").)  Yet the instructions, which required jurors to find that Ridley-Thomas "acted with the intent to defraud by depriving the residents of the County of their right of honest services" (1-ER-68), conveyed only the requirement that Ridley-Thomas intend to cheat his constituents, not deceive them.

The district court's refusal to instruct the jury that honest services fraud requires deception was error.

> ### iii. *The district court's erroneous* **mens rea** *instruction was not harmless.*

"'The basic misconception of an essential element of the crime charged generally compels reversal of the conviction ....'"  *United States v. Wallen*, 874

56

F.3d 620, 632 (9th Cir. 2017).  This Court will affirm only where the error is

harmless beyond a reasonable doubt.  *United States v. Saini*, 23 F.4th 1155, 1164

(9th Cir. 2022).  The Supreme Court has made clear that, "where the defendant

contested the omitted element and raised evidence sufficient to support a contrary

finding, the court should not find the error harmless."  *Neder*, 527 U.S. at 19.

That exacting standard is not satisfied here.  Ridley-Thomas's intent was *the
key* disputed issue at trial.  He argued in opening that the alleged "funneling" was

"legal" and "done in good faith" (9-ER-1772-73), negating any deceptive intent.

He presented expert testimony consistent with good faith, and thus innocence, as

well.  As Ravel explained, Ridley-Thomas's donation to USC complied with state

campaign finance laws and public disclosure requirements; he could have lawfully

donated directly to UWC for the benefit of PRPI; and, a donation made to USC

with the intent that it be directed elsewhere was lawful as well.  (2-ER-303-05,

332).  Though prosecutors derided Ravel's testimony as "crazy," they presented no

evidence undermining her conclusions.  (1-ER-190-91.)

The government, for its part, relied upon evidence that Ridley-Thomas made

material misstatements to USC in a "sham" letter that told Flynn she could use the

donation at her discretion.  But Ridley-Thomas disputed whether the letter was in

fact deceptive, noting that the word "discretion" merely indicated that the donation

was destined for Flynn's "discretionary" account, as opposed to her "office"

account.  (22-ER-4195-96.)  But even if the letter was deceptive, it is of no aid to the government.  As explained above, the only deception that can support Ridley-Thomas's convictions is deception of the *victim*.  *See Lew*, 875 F.2d at 222.  The government presented no evidence that Ridley-Thomas made affirmative misrepresentations to his constituents.

As for Ridley-Thomas's omission—his failure to publicly disclose that the donation to USC was intended for PRPI—"a nondisclosure can support a wire fraud charge only where there exists an independent duty that has been breached by the person so charged."  *United States v. Shields*, 844 F.3d 819, 822 (9th Cir. 2016).  While Ridley-Thomas *owed* a fiduciary duty to the public, the government presented no evidence that his nondisclosure *breached* any such duty.  The record is devoid of evidence—be it a County rule, an ethical obligation, or otherwise— that disclosure of his indirect donation to PRPI was required.

A properly instructed jury would likely have recognized these fundamental deficiencies in the evidence and voted to acquit.  The district court's error therefore cannot be found harmless beyond a reasonable doubt.

> **2.    The government secured Ridley-Thomas's conviction under a legally invalid "monetization" theory.**

At the heart of the government's case was its theory that Ridley-Thomas "monetized the power from []his elected office to get privileges to preserve his family's political brand in exchange for his influence and his votes on county

58

business." (9-ER-1749.) Prosecutors gave the term "monetize" an expansive

definition that conflated bribes and gratuities, arguing repeatedly that Ridley-

Thomas was guilty of bribery if, rather than intending to be influenced, he solicited

benefits as a reward for official action he had already determined to take.

The Supreme Court made clear over two decades ago, however, that "a

reward for some future act that the public official … may already have determined

to take" is a gratuity, not a bribe. *United States v. Sun-Diamond Growers of Cal.*,

526 U.S. 398, 405 (1999). A bribe *requires* the "intent … 'to be influenced.'" *Id.*

at 404.

It is beyond dispute that § 1346 does not proscribe the receipt of mere

gratuities, *see McDonnell*, 579 U.S. at 574 (stating that § 1346 requires a *quid pro*

*quo*), yet the government's invalid theory sought conviction on precisely that basis.

Because the jury returned a general verdict that may have rested on a legally

invalid gratuities theory, Ridley-Thomas's convictions cannot stand.[13]

The Supreme Court has held that "constitutional error occurs" when a jury

"returns a general verdict that may rest on a legally invalid theory." *Skilling*, 561

U.S. at 414; *Yates v. United States*, 354 U.S. 298, 312 (1957); *see also United*

---

[13] Although the Ninth Circuit has yet to address the issue, as discussed *infra*, it is
clear § 666(a)(1)(B) requires proof of a *quid pro quo* as well. Should the Court
agree, the government's "monetization" theory was legally invalid on all counts.

*States v. Barona*, 56 F.3d 1087, 1098 (9th Cir. 1995) ("Where the jury is presented with a legally inadequate theory, as opposed to a factually inadequate theory, *Yates* requires that the conviction be vacated.").

In *Yates*, this Court vacated the defendants' convictions following the government's presentation of legally invalid theories that "were the focus of the entire prosecution from beginning to end," and the jury instructions "did nothing … to preclude conviction under [those] theories, despite the defendants' request for an instruction" that correctly stated the law. 16 F.4th at 269.

This case is on all fours. The government's "monetization" theory—which told jurors that mere gratuities were bribes—was the focus of both its opening and closing, as well as Special Agent Adkins' lengthy, pseudo-expert testimony defining the term. Adkins opined that "monetizing" includes the solicitation of benefits for action a public official was "already … planning to take"—conduct that would amount to acceptance of a gratuity, not receipt of a bribe. (19-ER-3554-55, 3558.) *See United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993) (unlike a bribe, a gratuity involves a "situation in which the offender gives the gift without attaching any strings, intending it instead as a reward for actions the public official … is already committed to take."); *United States v. Patel*, 32 F.3d 340, 344-45 (8th Cir. 1994) (in order to prove a gratuity, "the government must prove … that the defendant intended to reward [the official] for past action or

action [the official] was already committed to take"); *Jennings*, 160 F.3d at 1014 (unlike bribery, which requires the corrupt intent to induce official action, "gratuities … may be conveyed before the occurrence of the act so long as the payor believes the official has already committed himself to the action").

Prosecutors echoed Adkins' testimony, arguing that "public officials don't get to monetize their public service" through benefits "in connection with that thing [they]'re already going to do." (1-ER-130-31.) Their closing was replete with similar arguments. *See* (1-ER-203 ("[P]ublic officials do not … get to monetize their public service…. Doesn't matter if they always intend to vote for something or do something."); 23-ER-4491 ("[E]ven if he were going to do certain things, if he did those things and he accepted a reward for those things, it's still bribery"); 1-ER-133-34 (arguing that "monetizing," by soliciting benefits in exchange for action a public official already "intend[s] to do," is honest services fraud); *see also* 1-ER-129; 23-ER-4551-52.)

But bribes and gratuities are different, and Ridley-Thomas was not guilty of honest services fraud if he solicited Flynn's assistance intending to be rewarded for supporting the Telehealth amendment—an action he had determined to take months prior. (7-ER-1194 (telling Flynn, in response to her request for his support for the Telehealth amendment, "Your wish is my command.").) The government's legally invalid theory precluded this defense.

Compounding the error, the district court refused to instruct the jury that a gratuity is not a bribe. (5-ER-928 (rejecting defense's proposed instruction stating that, "A benefit made to reward a politician for an act he has already taken or has already determined to take is not a bribe.").) While the court did instruct that a *quid pro quo* is required under § 1346, prosecutors told jurors throughout the trial that it was no defense to any charge in the indictment if Ridley-Thomas accepted a reward for a vote he already planned to take. Nothing in the instructions said otherwise.[14]

Accordingly, the government's pervasive reliance upon a legally invalid "monetization" theory was not harmless. Ridley-Thomas's convictions must be reversed and his case remanded for a new trial.

## II. RIDLEY-THOMAS'S FEDERAL-PROGRAMS BRIBERY CONVICTION MUST BE REVERSED.

### A. Section 666(a)(1)(B) does not criminalize the solicitation or acceptance of perceived reputational benefits.

A perceived reputational benefit, such as the avoidance of scandal or nepotistic optics, is not a "thing of value" under 18 U.S.C. § 666(a)(1)(B) either. The government's proof that Ridley-Thomas committed federal-programs bribery is therefore fatally deficient as a matter of law.

---

[14] Because acceptance of gratuities does not violate § 1346, the instructional errors discussed *infra* (*see* § II(B)(3-4)) entitle Ridley-Thomas to a new trial on all counts.

### 1. The phrase "thing of value" should be construed coextensively in §§ 1346 and 666(a)(1)(B).

Any limiting construction applied to the concept of "thing of value" as incorporated in § 1346 applies with equal force to § 666(a)(1)(B). As the Supreme Court explained in *Skilling*, the honest services fraud statute "draws content … from federal statutes proscribing—and defining—similar crimes," including § 666. 561 U.S. at 412. Under the limiting construction placed on the statute in *Skilling*, § 1346 essentially borrows the phrase "thing of value" from § 666, rendering it nonsensical to construe that phrase differently in the two statutes.

Basic principles of statutory construction underscore this conclusion. "'[S]tatutes addressing the same subject matter' should be construed *in pari materia*." *California v. Trump*, 963 F.3d 926, 947 n.15 (9th Cir. 2020) (citation omitted). "Under that doctrine, related statutes should 'be construed as if they were one law.'" *Id.* (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)).

Applying that canon here, the term "thing of value" must have a single meaning for both statutes. Because perceived reputational benefits are not things of value under § 1346, they are not things of value under § 666 either. The government therefore adduced fatally insufficient proof that Ridley-Thomas violated § 666 as a matter of law. His conviction on Count 2 must be reversed and the case remanded for entry of a judgment of acquittal.

### 2. The phrase "thing of value" in 666(a)(1)(B) can be no broader than traditional notions of property.

Should the Court disagree and find that § 666 covers a broader range of benefits than § 1346, the statutory scheme surrounding § 666(a)(1)(B) makes clear that "thing of value" cannot have a broader meaning than "property."  It therefore does not encompass perceived benefits that enhance a politician's reputation or electability.

Section 666 proscribes fraud and corruption perpetrated by "state and local officials employed by agencies receiving federal funds."  *Salinas v. United States*, 522 U.S. 52, 58 (1997).  Section 666(a) contains two subparts.  Subpart (1)(A) prohibits the fraudulent appropriation or embezzlement of "property" that "is valued at $5,000 or more," while subpart (1)(B) prohibits the corrupt solicitation or demand of "anything of value" in connection with a transaction involving "any thing of value of $5,000 or more."  "Property" and "thing of value" are thus essentially interchangeable.  The companion theft, embezzlement, and conversion statute, 18 U.S.C. § 641, likewise equates a "thing of value" to property, such as a "record, voucher, [or] money."

"Thing of value" can therefore be no broader than "property."  *See Yates v. United States*, 574 U.S. 528, 544-45 (2015) (applying *noscitur a sociis* and *ejusdem generis* canons of statutory construction to conclude that the term "tangible object," when it appears as "the last in a list of terms that begins 'any

record [or] document,'" is "appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents").

The Supreme Court has curtailed the use of federal property fraud statutes, including § 666, to target schemes to deprive their victims of non-traditional property rights. In *Kelly*, the Court held that the defendants' scheme to commandeer lanes on the George Washington Bridge as political retribution did not aim to obtain property, and thus did not violate the federal-programs fraud or wire fraud statutes. 140 S.Ct. at 1572-74. In *Ciminelli v. United States*, 598 U.S. 306 (2023), the Court abrogated a long line of cases in holding that "'valuable economic information' 'necessary to make discretionary economic decisions'" (*i.e.*, the right-to-control theory) is not a property interest under § 1343. *Id.* at 308. Both decisions narrowed the scope of federal fraud statutes to crimes targeting "only traditional property interests," so "that the fraud statutes do not vest a general power in 'the Federal Government … to enforce (its view of) integrity in broad swaths of state and local policymaking.'" *Id.* at 312 (quoting *Kelly*, 140 S.Ct. at 1574).

A similar analysis applies here. Because "thing of value" cannot have a broader meaning than "property," the perceived reputational benefit Flynn bestowed upon Ridley-Thomas does not bring his conduct within § 666's ambit.

65

That perceived benefit bears no resemblance to a traditional property interest. If anything, the so-called "secret funneling" is closely analogous to the economic information at issue in *Ciminelli*, because Flynn and Ridley-Thomas's alleged deception deprived USC of "the right to control its assets by depriving it of information necessary to make discretionary economic decisions," 598 U.S. at 313, *i.e.*, whether to make a donation to PRPI, though the donation was intended to fund Smith's salary in violation of University policy.

"To rule otherwise would undercut" the Supreme Court's "oft-repeated instruction" that federal prosecutors may not use the fraud statutes to set "standards of disclosure and good government for local and state officials." *Kelly*, 140 S.Ct. at 1574. That cautionary note is particularly apt here, because the government's theory risks criminalizing quotidian interactions between constituents and their elected officials.

Finally, it is immaterial that Count 2 charged Ridley-Thomas with the receipt of other alleged "things of value," such as Sebastian's scholarship and professorship. The jury's verdict reflects a wholesale rejection of the government's theory on that score. But to the extent the conviction on Count 2 conceivably embraced those alleged benefits, the verdict must be set aside because it may have rested (and almost certainly did) on a legally invalid theory. *See Zant v. Stephens*, 462 U.S. 862, 881 (1983) ("[A] general verdict must be set aside if the

66

jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground."); *Griffin v. United States*, 502 U.S. 46, 59 (1991) ("Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question … fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.").

Here, moreover, because the district court did not give a specific unanimity instruction on Count 2, the basis of the jury's verdict is all the less clear. As the court explained in *United States v. Newell*, 658 F.3d 1 (1st Cir. 2011), "the baseline unit of prosecution" for § 666 is transactional, and where a single count joins multiple transactions, each of which would independently violate the statute, only a specific unanimity instruction ensures that jurors reach agreement that a single offense was committed. *Id.* at 23-26. Count 2 alleged that Ridley-Thomas committed federal-programs bribery by corruptly soliciting four separate things of value in connection with County contracts—Sebastian's admission to USC, the scholarship, the professorship, and the "secret funneling." But those were four separate alleged crimes, and the last of them is legally insufficient for conviction.

67

Like in *Newell*, absent a specific unanimity instruction, there is no basis for this Court to conclude that jurors reached agreement as to *which* alleged benefit Ridley-Thomas accepted, let alone that Count 2 rested on some *quid* other than Flynn's assistance.

Ridley-Thomas's conviction on Count 2 cannot stand.

**B.    At a minimum, Ridley-Thomas is entitled to a new trial because the district court's instructional errors undermined the verdict.**

**1.    Standard of review.**

When the defendant properly objects to a jury instruction, this Court "review[s] *de novo* whether the instructions given 'accurately describe the elements of the charged crime.'"  *United States v. Munguia*, 704 F.3d 596, 598 (9th Cir. 2012) (citation omitted).

The district court's "failure to give a defendant's requested instruction that is supported by law and has some foundation in the evidence 'warrants *per se* reversal,' unless 'other instructions, in their entirety, adequately cover that defense theory.'"  *United States v. Marguet-Pillado*, 648 F.3d 1001, 1006 (9th Cir. 2011) (citations omitted).

**2.    Like honest services fraud, federal-programs bribery requires *quid pro quo* corruption.**

The defense requested a jury instruction stating that § 666 requires proof of a *quid pro quo*.  (5-ER-838.)  The district court's refusal to give that instruction was error.

Section 666(a)(1)(B) makes it unlawful for public officials corruptly to solicit or accept things of value "intending to be influenced or rewarded" in connection with government business. The quoted language has given rise to a Circuit split over whether the statute covers only bribes, or both bribes and gratuities, and the Supreme Court has granted *certiorari* to resolve that split. *See United States v. Snyder*, 71 F.4th 555 (7th Cir. 2023), *cert. granted*, No. 23-108 (U.S. Dec. 13, 2023). The statute's text and history make clear, however, that only bribes fall within its ambit.

The Supreme Court has twice held that the "intent to influence" requires a *quid pro quo* exchange. *McDonnell*, 579 U.S. at 574; *Sun-Diamond*, 526 U.S. at 404-05. Thus, the word "reward," as used in the statute, "does not create a separate gratuity offense in § 666, but rather serves a more modest purpose: it merely clarifies 'that a bribe can be promised before, but paid after, the official's action on the payor's behalf." *United States v. Fernandez*, 722 F.3d 1, 23 (1st Cir. 2013) (citation omitted).

Section 666's history further dispels any doubt. The statute was amended in 1986 to add the "influenced or rewarded" requirement to clarify that § 666 "prohibits bribery," and "to avoid its possible application to acceptable commercial and business practices"—*i.e.*, lobbying and gift-giving. H.R. Rep. No. 99–797 at 30 (1986), reprinted in 1986 U.S.C.C.A.N. 6138. "This change is especially

69

notable, as the pre-amendment language was similar to that found in 18 U.S.C. §

201(c)—§ 201's gratuity provision." *Fernandez*, 722 F.3d at 21-22. "Section

666's post-amendment[] language is much closer to that found in 18 U.S.C. §

201(b)—§ 201's bribery provision." *Id.* at 22.

Finally, the "dramatic discrepancy in maximum penalties between § 666 and

§ 201(c) makes it difficult to accept that the statutes target the same type of

crime—illegal gratuities." *Id.* at 24. The former permits a term of imprisonment

up to ten years, while the latter sets a two-year maximum penalty. *Id.* To the

extent any doubt remains, the rule of lenity requires this Court to adopt the

narrower view of § 666's scope. *Sun-Diamond*, 526 U.S. at 412.

Section 666(a)(1)(B) therefore penalizes only *quid pro quo* corruption, and

mere gratuities fall beyond its reach. The district court's denial of an instruction

on that essential element of the offense was error.[15]

The error was not harmless because the evidence was far more consistent

with receipt of a gratuity than a *quid pro quo* exchange. Ridley-Thomas and Flynn

---

[15] In *United States v. Garrido*, 713 F.3d 985 (9th Cir. 2013), this Court held that §
666 does not require an "official act," but did not address whether the statute
penalizes mere gratuities. *Id.* at 998-99. While the court noted that "Section 666
sweeps more broadly than either § 201(b) or (c)" because it "does not require a
jury to find a specific *quid pro quo*," that statement, rather than embracing a
gratuities theory, acknowledges that § 666 covers "retainer," "as opportunities
arise," and "stream of benefits" theories of bribery. *United States v. Roberson*, 998
F.3d 1237, 1245 n.10 (8th Cir. 2021).

first discussed a role for USC in funding PRPI more than two months *after* Ridley-Thomas had already agreed to support the Telehealth amendment. (7-ER-1194.) The government, moreover, advocated vociferously for Ridley-Thomas's conviction under a gratuities theory, creating an unacceptable risk that the jury did exactly that.

### 3. The jury instructions failed to distinguish bribery from gratuities.

Defense instruction 37(d) requested that the jury be instructed that gratuities are not bribes. (5-ER-928 ("A benefit made to reward a politician for an act he has already taken or has already determined to take is not a bribe.").) The district court erred in refusing an instruction on this noncontroversial proposition. *See Sun-Diamond*, 526 U.S. at 405. If Ridley-Thomas accepted a gratuity for voting to support the Telehealth amendment, he was not guilty of any charge against him. *See United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 822 (9th Cir. 1985) ("[P]roof of a gratuity does not establish the requisite corrupt intent for a bribery conviction.").

Not only was the proposed instruction a correct statement of the law, it was also firmly grounded in the evidence. Ridley-Thomas made his support for the Telehealth amendment clear, both to Flynn and his staff, well in advance of his request that Flynn help him donate funds to PRPI. While prosecutors argued that Flynn *believed* that she had to supply benefits to Ridley-Thomas to secure his vote,

71

because the evidence was also consistent with Ridley-Thomas's acceptance of gratuities, an instruction explaining the difference was required. *See Hsieh Hui Mei Chen*, 754 F.2d at 825 (vacating convictions where district court refused to instruct jury on gratuities theory and reasoning that, although evidence that one witness characterized supposedly corrupt payment as a "tip" "was not strong enough to compel a judgment of acquittal, it was sufficient to require a jury instruction"); *cf. Fernandez*, 722 F.3d at 20 (holding that § 666 covers only bribery, not gratuities, and vacating § 666 convictions where evidence was "consistent" with both bribery and gratuities theories and jury instructions permitted conviction on both grounds).

Because no instruction explained that acceptance of a gratuity is not bribery, the district court's refusal to give the defense's proposed instruction "warrants *per se* reversal." *Marguet-Pillado*, 648 F.3d at 1006 (citation omitted).

### 4. The jury instructions failed to distinguish bribery from lawful ingratiation.

The district court denied the defense's request for an instruction that goodwill gifts—including those "given to curry favor" and "with the generalized hope or expectation of future benefit"—are not bribes. (5-ER-928.) The instruction was yet another non-controversial statement of the law. *See, e.g.*, *Harwin v. Goleta Water Dist.*, 953 F.2d 488, 495 (9th Cir. 1991) ("Not every gift, favor or contribution to a government or political official constitutes bribery.");

*United States v. Frega*, 179 F.3d 793, 807 (9th Cir. 1999) ("A gift or favor bestowed on a [public official] solely out of friendship, to promote good will, or for motives wholly unrelated to influence over official action does not violate the bribery statutes."). Refusal to give it was error.

Jury instructions omitting any explanation of goodwill gifts do not adequately instruct the jury on the intent required for bribery. *See Kincaid-Chauncey*, 556 F.3d at 946 (finding instructions on *mens rea* for honest services fraud were sufficient because they instructed that jurors "could not convict for mere influence or political friendships," and "prevented a conviction based on the type of legitimate 'influence' that is necessary to the functioning of any political system"); *Sawyer*, 85 F.3d at 741 ("Where the difference between lawful and unlawful [benefits] turns primarily on intent, and the lawful conduct is itself most unattractive, we think the jury *needs to be told specifically* that the defendant has not … committed honest services fraud[] if his intent was limited to the cultivation of business or political friendship.") (emphasis added).

Without an instruction defining goodwill gifts, "there is no discernable way to distinguish between an elected official responding to legitimate lobbying"—such as favors offered "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future," *Sun–*

*Diamond*, 526 U.S. at 406—"and a corrupt politician selling his votes to the highest bidder." *Kincaid-Chauncey*, 556 F.3d at 943.

Here, no instruction explained that lobbying and ingratiation are not crimes, although ample evidence demonstrated that Flynn and USC had good reason to curry favor with Ridley-Thomas, who frequently collaborated with the University on various initiatives throughout his lengthy tenure, including child safety, homelessness, access to healthcare, and more. The government even pointed to Flynn's lobbying report as evidence of an illicit *quid pro quo*. (1-ER-180; 15-ER-2999-3000.)

The omission of any theory-of-defense instruction was particularly prejudicial because the district court gave a robust instruction explaining what was *not* a defense.[16] The instructions never said what *was*.

Because no instruction explained that lobbying and ingratiation are lawful, the district court's refusal to give the proposed instruction "warrants *per se* reversal." *Marguet-Pillado*, 648 F.3d at 1006 (citation omitted).

---

[16] *See* (1-ER-67 ("It is not a defense that any acts taken were good for the community or were acts that defendant would have or should have taken without the bribe.")).

## III.   RIDLEY-THOMAS'S CONSPIRACY CONVICTION HAS NO VALID OBJECT AND MUST BE REVERSED.

A conspiracy conviction cannot stand without a legally valid object. *See United States v. Choy*, 309 F.3d 602, 608-09 (9th Cir. 2002) ("The jury returned a general verdict of guilty on the multi-count conspiracy charge…. Because one of the counts—bribery—was based on a 'legally inadequate theory' … the conviction cannot stand."); *see also United States v. Manarite*, 44 F.3d 1407, 1413-14 (9th Cir. 1995) (reversing a conspiracy conviction because two of the objects presented to the jury were legally infirm and it was impossible to determine from the general verdict whether the jury based the conviction on a legally inadequate basis); *United States v. DeLuca*, 692 F.2d 1277, 1281 (9th Cir. 1982) ("If the judge instructs the jury that it need find only one of the multiple objects, and the reviewing court holds any of the supporting counts legally insufficient, the conspiracy count also fails.").

Because Ridley-Thomas's federal-programs bribery and honest services fraud convictions are legally infirm, his conspiracy conviction must also be reversed.

## IV.   PROSECUTORS' DISCRIMINATORY EXCLUSION OF BLACK WOMEN FROM THE JURY DENIED RIDLEY-THOMAS A FAIR TRIAL.

"Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a

trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986).

Both "race" and "gender" are "unconstitutional prox[ies] for juror competence and

impartiality," *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994), and where,

as here, the prosecution exercises its peremptory challenges in a discriminatory

manner, the convictions must be vacated.[17]

## A.    **Standard of review.**

This Court "generally review[s] a district court's *Batson* determination for

clear error because of the intrinsically factual nature of the claim." *United States v.

Collins*, 551 F.3d 914, 919 (9th Cir. 2009). "However, where the district court

applies the wrong legal standard," review is "*de novo*." *Id.*

---

[17] This Court has yet to apply *Batson*'s framework to the purposeful exclusion of jurors based on race *and* gender. It should do so now. The California Supreme Court recognizes race-and-gender-based *Batson* challenges. *People v. Motton*, 39 Cal. 3d 596, 606 (1985) ("Black women face discrimination on two major counts—both race and gender—and their lives are uniquely marked by this combination. Their exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented."). So too does the District of Columbia Court of Appeals. *Robinson v. United States*, 878 A.2d 1273, 1284 (D.C. 2005). This Court, for its part, has long "recognized mixed race and gender classes in the Title VII context," and called the question whether it should recognize the same in the *Batson* context "worthy of consideration." *Nguyen v. Frauenheim*, 45 F.4th 1094, 1099 (9th Cir. 2022). The question is not close: there is no principled reason that discrimination based on two protected characteristics, rather than just one, should pass constitutional muster.

**B.** **The district court erred in its application of *Batson*'s burden-shifting framework.**

"To determine when the use of peremptory strikes amounts to unconstitutional discrimination," *Batson* established "a three-part, burden-shifting test." *Nguyen*, 45 F.4th at 1099. "First, the defendant must make a *prima facie* showing that the totality of the circumstances give rise to an inference of discrimination." *Id.* (citation omitted). Second, the "'burden shifts to the [prosecution] to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Id.* (quoting *Batson*, 476 U.S. at 94). "Third, the trial court evaluates the prosecution's explanation for pretext and determines if the defendant established purposeful discrimination." *Id.* "'If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.'" *Gonzalez v. Brown*, 585 F.3d 1202, 1207 (9th Cir. 2009) (citation omitted).

This Court has "established a separate three-part test for step one." *Nguyen*, 45 F.4th at 1099. "Under that test, to show a *prima facie* case: (1) the prospective juror must be a member of a cognizable group, (2) the prosecutor must use a peremptory strike to remove that juror, and (3) the totality of the circumstances must raise an inference that race or gender motivated the prosecutor to strike." *Id.* The *prima facie* threshold "is quite low." *Boyd v. Newland*, 467 F.3d 1139, 1145

(9th Cir. 2006).  The defendant need only produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."  *Johnson v. California*, 545 U.S. 162, 170 (2005).

### 1.    The strike of Juror 13 was pretextual.

While a "pattern of striking panel members from a cognizable racial group is probative of discriminatory intent," a *prima facie* case "does not require a pattern because 'the Constitution forbids striking even a single prospective juror for a discriminatory purpose.'"  *Collins*, 551 F.3d at 919 (citations omitted).

In *Collins*, the defense made a *Batson* motion after the government struck the sole remaining Black juror from the venire.  *Id*.  The district court denied the motion, stating, "No pattern."  *Id.* at 920.  On review, the court reversed, concluding that the trial judge "applied an improper standard by requiring [the defendant] to demonstrate a pattern of strikes."  *Id.*  At the *prima facie* stage, the court explained, the defendant need only point to circumstances giving rise to an "inference of discrimination."  *Id*. at 921-23.  The evidence surpassed that "low" threshold because the prosecutor "retained white jurors who gave answers similar to those given by [the struck juror]."  *Id.*

This case is strikingly similar.  The trial judge denied Ridley-Thomas's first *Batson* challenge at step one, reasoning that it was "rather early in the process to

make any real analysis." (4-ER-792-93.) The court, in other words, found no pattern of discrimination and went no further. That alone was error.

Had the court conducted the requisite comparative analysis, an "inference of discrimination" readily arose. Juror 13, a Black woman, told prosecutors in response to questioning about the propriety of legacy admissions that she believed legacy admissions were both lawful and commonplace. (4-ER-768 ("Affirmative action currently is the law and so a lot of universities do consider race when it comes to college admissions and legacy—a lot of institutions have legacy admissions so it's a current practice.").) Juror 16, a white woman, said she thought "legacy is okay when determining admission." (4-ER-768-69.) Both women confirmed that, despite their views, they could render a fair and impartial verdict. (*Id*.) Yet the government made no move to strike Juror 16—she was allowed to serve, although her answers did not meaningfully differ from Juror 13's.

Prosecutors claimed that race played no role in the strike of Juror 13 because they were "interested in knowing" her opinion about legacy admissions, but she expressed none. (4-ER-789.) Prosecutors asked no follow-up questions of Juror 16, however. Only Juror 13's opinions were subjected to scrutiny. In other words, despite their purported "interest in knowing" a Black woman's opinion, prosecutors had no "interest in knowing" a white woman's opinion on the same

subject.[18]

Like in *Collins*, "[c]omparison of Juror [13]'s characteristics with the characteristics of other similarly situated panel members who were allowed to serve reveals little distinction that could account for the prosecutor's strike of Juror [13]." 551 F.3d at 922. None of Juror 13's answers suggest a legitimate "reason for her removal: nothing she said indicated a predisposition toward the defendant or a bias against the government." *Id.* at 922-23. "Consequently, the district court erred by not advancing to step two of the *Batson* inquiry." *Id.*

### 2. The strike of Juror 1 was pretextual.

At step three, a defendant "need not prove that all of the prosecutor's race-neutral reasons were pretextual, or even that the racial motivation was 'determinative.'" *Currie v. McDowell*, 825 F.3d 603, 605 (9th Cir. 2016). Instead, "the defendant must demonstrate that 'race was a substantial motivating factor.'" *Id.* at 606 (citation omitted). To this end, the district court must evaluate each of the prosecution's justifications "one at a time" and assess if *any* is pretextual. *Ali v. Hickman*, 584 F.3d 1174, 1182 (9th Cir. 2009). The government's proffer of a single pretextual explanation "'naturally gives rise to an inference of

---

[18] Prosecutors' secondary justification, that Juror 13 had experience in local government, fares no better. (4-ER-803.) Juror 15, an Asian-American male, had extensive experience in local government, yet prosecutors did not strike him. (4-ER-772-73.)

discriminatory intent,' even where other potentially valid explanations are offered." *Id.* at 1192 (citation omitted).

The government claimed that it struck Juror 1—the sole remaining Black woman in the venire—because she was "shaking her head," "had her head tilted downward," was wearing tinted sunglasses until the court asked her to take them off, and was unemployed. (4-ER-802.) The defense team, who sat facing the jury box, was best positioned to observe Juror 1's demeanor, however, and did not witness the head-shaking incident. (4-ER-806.) The trial judge didn't either. (4-ER-811.) In fact, the judge complimented Juror 1's responses to questions posed during *voir dire*, stating, "you have done a fine job of showing everybody else how this should be done." (4-ER-743.) Nevertheless, the court summarily rejected Ridley-Thomas's *Batson* challenge, finding "no reason to discredit the statements of the two prosecutors of what they observed." (4-ER-811.)

That was error. It is not enough for the district court to find a race-neutral explanation "plausible," *United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003), particularly since demeanor-based justifications merit heightened scrutiny for pretext. *See Batson*, 476 U.S. at 106 (Marshall, J., concurring) ("A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically."); *United States v.*

81

*Alcantar*, 897 F.2d 436, 439 (9th Cir. 1990) (reliance upon struck juror's "anger may have been a cover for a racially-based decision"); *Harris v. Hardy*, 680 F.3d 942, 965 (7th Cir. 2012) ("Demeanor-based explanations for a strike are particularly susceptible to serving as pretexts for discrimination.").

Had the district court viewed the government's explanation with the skepticism that it deserved, Ridley-Thomas's motion would have been granted. First, not only were the government's proffered justifications inherently suspect, they were "logically implausible," *Ali*, 584 F.3d at 1182—those best positioned to observe Juror 1's allegedly problematic demeanor, including the judge, did not.

Second, had prosecutors truly been concerned with Juror 1's demeanor, or even her employment status, presumably they would have asked her questions to elicit her views. But prosecutors struck Juror 1 without asking her a *single* question, although she was the "only remaining [Black female] panel member." *Collins*, 551 F.3d at 922; *see also United States v. Esparza-Gonzalez*, 422 F.3d 897, 905 (9th Cir. 2005) ("Although the prosecutor has no obligation to question all potential jurors, his failure to do so [before] removing a juror of a cognizable group … may contribute to a suspicion that this juror was removed on the basis of race.").

Finally, *none* of the proffered justifications related to the subject matter of the case. As with Juror 13, nothing Juror 1 "said indicated a predisposition toward

the defendant or a bias against the government." *Collins*, 551 F.3d at 922-23.

Only Juror 1's race and gender bore a relationship to the charges Ridley-Thomas faced. Had she been permitted to serve, Juror 1 would have learned that the sole contract at issue in the case was the Telehealth amendment, which extended the duration of a mental health program aimed to provide much-needed services to low-income, at-risk, and predominately minority youth in Ridley-Thomas's district. Juror 1 was Black, unemployed, and a single mother to a teenage daughter. The prosecution's use of her race and gender as a "proxy" for "competence and impartiality" violated Ridley-Thomas's constitutional rights. *J.E.B.*, 511 U.S. at 129.

By crediting the prosecution's stated reasons for striking Juror 1 without further analysis, the district court "turn[ed] a blind eye to purposeful discrimination obscured by race-neutral excuses." *Kesser v. Cambra*, 465 F.3d 351, 359 (9th Cir. 2006).

Ridley-Thomas deserves a new trial.

## CONCLUSION

Ridley-Thomas's convictions must be reversed and the case remanded for entry of a judgment of acquittal.  At a minimum, Ridley-Thomas is entitled to a new trial on all counts.

Dated:  January 25, 2024      **COHEN WILLIAMS LLP**

By:  ___*/s/ Alyssa D. Bell*___

Alyssa D. Bell
Michael V Schafler
Neil S. Jahss

Paul J. Watford
**WILSON SONSINI GOODRICH & ROSATI**

Erwin Chemerinsky
**UNIVERSITY OF CALIFORNIA, BERKELEY SCHOOL OF LAW**

*Attorneys for Mark Ridley-Thomas*

## <u>CERTIFICATE OF RELATED CASES</u>

To the best of Appellant's knowledge, the following related case (which raises the issue of whether § 666 covers only bribes, or bribes and gratuities) is pending before this Court: *United States v. Shen Zhen New World I, LLC*, Case No. 23-972. Appellant is aware of no other pending, related cases.

Dated: January 25, 2024       **COHEN WILLIAMS LLP**

By:    *<u>/s/ Alyssa D. Bell</u>*
         Alyssa D. Bell
         Attorneys for Mark Ridley-Thomas

85

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that this opening brief is proportionally spaced, has a typeface of 14 points and contains approximately 18,538 words.  A motion seeking leave to file an oversize brief will be filed concurrently with this brief.

Dated:  January 25, 2024 **COHEN WILLIAMS LLP**

By: */s/ Alyssa D. Bell*
Alyssa D. Bell
Attorneys for Mark Ridley-Thomas

86

# STATUTORY ADDENDUM

# CIRCUIT RULE 28-2.7 ADDENDUM
# TABLE OF CONTENTS

## STATUTES

18 U.S.C. § 666.................................................................................................2

18 U.S.C. § 1346.............................................................................................3

# STATUTES

**18 U.S.C. § 666**

**(a)** Whoever, if the circumstance described in subsection (b) of this section exists—

**(1)** being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

**(A)** embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that—

**(i)** is valued at $5,000 or more, and

**(ii)** is owned by, or is under the care, custody, or control of such organization, government, or agency; or

**(B)** corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

**(2)** corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

**(b)** The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

**(c)** This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

**(d)** As used in this section—

**(1)** the term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative;

**(2)** the term "government agency" means a subdivision of the executive, legislative, judicial, or other branch of government, including a department, independent establishment, commission, administration, authority, board, and bureau, and a corporation or other legal entity established, and subject to control, by a government or governments for the execution of a governmental or intergovernmental program;

(**3**) the term "local" means of or pertaining to a political subdivision within a State;
(**4**) the term "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and
(**5**) the term "in any one-year period" means a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense.

**18 U.S.C. § 1346**
For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.