No. 23-2200

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MARK RIDLEY-THOMAS

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Central District of California
No. 21-cr-485 (Fischer, J.)

**BRIEF OF BLACK LAW PROFESSORS AND HISTORIANS AND
JUSTICE CENTERS AS AMICI CURIAE IN SUPPORT OF DEFENDANT-
APPELLANT**

x

ROBERT S. CHANG
FRED T. KOREMATSU CENTER FOR LAW
AND EQUALITY
SEATTLE UNIVERSITY SCHOOL OF LAW*
901 12th Ave.
Seattle, WA 98122
Telephone: (206) 398-4025

STAN CHIUEH
ELIZABETH BIERUT
DANIA BARDAVID
CAROLINE MCHUGH
FRIEDMAN KAPLAN SEILER
 ADELMAN & ROBBINS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 833-1100

February 1, 2024

* University affiliation is listed solely for informational purposes.

## CORPORTATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the undersigned counsel for amici curiae makes the following disclosures. The Fred T. Korematsu Center for Law and Equality, the Gibson-Banks Center, the Loyola Law School Anti-Racism Center, the Community Equity Lab, the Center for Law, Equity and Race, the Center for Racial and Disability Justice, and the Center on Race, Inequality, and the Law are not publicly-held corporations, do not issue stock, and do not have parent corporations and consequently no publicly-held corporation owns ten percent or more of the stock of any of the aforementioned entities.

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

IDENTITY AND INTEREST OF AMICI CURIAE ...............................................1

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ...............................................................................5

I.    This Court should recognize intersectional race-and-gender groups, such as Black women, as a protected class under *Batson* .................................................................5

    A.    The Ninth Circuit has acknowledged that intersectional groups should be legally recognized as a cognizable class under *Batson*, and no procedural hurdle prevents this Court from so holding here ...........5

    B.    Recognizing intersectional race-and-gender groups as a protected class under *Batson* would bring the Ninth Circuit in accord with other courts that have already done so ..........................................................9

    C.    Protecting intersectional groups aligns with the goals and intent of *Batson* ...............................................................11

        1.    Batson prohibits discrimination in jury selection because such discrimination both reflects and exacerbates discrimination in society as a whole .........................................11

        2.    Rooting out discrimination against Black women, or other intersectional groups, fits squarely within Batson's protective purposes ...............................................14

        3.    Acknowledging that intersectional groups are a protected class under Batson closes the loophole that permits discrimination on the basis of race and gender simply by disclaiming discrimination on the basis of race or gender .......17

II.    This Court should reject the pretextual reasons given to strike the Black women jurors in this case and give clear and unambiguous guidance to prevent the use of such pretextual reasons in the future................................19

A.    Striking a juror based on demeanor should be deemed presumptively invalid ...................................................................................19

B.    Striking a juror based on employment status should be deemed presumptively invalid ..........................................................................23

C.    Striking a juror in a protected group for a reason equally applicable to a juror outside of that protected group should be presumptively invalid ...................................................................................................25

CONCLUSION ...........................................................................................27

APPENDIX A ..............................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Batson v. Kentucky*,
476 U.S. 79 (1986).........................................................................*passim*

*Commonwealth v. Jordan*,
785 N.E.2d 368 (Mass. 2003) ...............................................................11

*Cooperwood v. Cambra*,
245 F.3d 1042 (9th Cir. 2001) ................................................................6

*Drake v. State*,
800 So.2d 508 (Mo. 2001) .....................................................................11

*Edmonson v. Leesville Concrete Co., Inc.*,
500 U.S. 614 (1991)...............................................................................12

*Glasser v. United States*,
315 U.S. 60 (1942)..................................................................................12

*Harris v. Hardy*,
680 F.3d 942 (7th Cir. 2012) .................................................................20

*J.E.B. v. Alabama ex rel. T.B.*,
511 U.S. 127 (1994)........................................................................6, 11, 12

*Jefferies v. Harris Cnty. Cmty. Action Ass'n*,
615 F.2d 1025 (5th Cir. 1980) .................................................................7

*Kesser v. Cambra*,
465 F.3d 351 (9th Cir. 2006) .................................................................26

*Lam v. Univ. of Haw.*,
40 F.3d 1551 (9th Cir. 1994) .............................................................7, 12

*Miller-El v. Dretke*,
545 U.S. 231 (2005)................................................................................26

*Nguyen v. Frauenheim*,
45 F.4th 1094 (9th Cir. 2022) .......................................................*passim*

iii

*People v. Armstrong*,
    6 Cal. 5th 735 (2019) ........................................................10

*People v. Cleveland*,
    32 Cal. 4th 704 (2004) ......................................................10

*People v. Garcia*,
    217 A.D.2d 119 (App. Div. N.Y. 1995) ............................11

*People v. Gray*,
    87 Cal. App. 4th 781 (Ct. App. 2001), *as modified on denial of
    reh'g* ....................................................................................10

*People v. Watson*,
    141 A.D.3d 23 (App. Div. N.Y. 2016) ..............................10

*People v. Wheeler*,
    22 Cal. 3d 258 (1978) ..........................................................9

*Powers v. Ohio*,
    499 U.S. 400 (1991) ...........................................................11

*Robinson v. U.S.*,
    878 A.2d 1273 (Ct. App. D.C. 2005).............................10, 12

*Sanchez v. Roden*,
    753 F.3d 279 (1st Cir. 2014) ...............................................9

*Smith v. Texas*,
    311 U.S. 128 (1940)............................................................13

*Strauder v. West Virginia*,
    100 U.S. 303 (1880)..............................................................1

*Tolbert v. Gomez*,
    190 F.3d 985 (9th Cir. 1999) ..........................................6, 17

*Tolbert v. Page*,
    182 F.3d 677 (9th Cir. 1999) ...............................................5

*Turner v. Marshall*,
    63 F.3d 807 (9th Cir. 1995) ...............................................5, 6

iv

*United States v. Alcantar*,
  897 F.2d 436 (9th Cir. 1990) ..............................................................20

*People v. Motton*,
  39 Cal. 3d 596 (1985) ..........................................................9, 10, 13

**Statutes**

28 U.S.C. § 2254 ....................................................................................7

Cal. Code Civ. Proc. § 231.7 .................................................23, 24, 26

Conn. Gen. Stat. R. Super. Ct. § 5-12 ..................................................23

Fed. R. App. P. 29(a)(4)(E) .....................................................................1

N.J. R. Gen. Application R. 1:8-3A(d)(1) .............................................23

Wash. Rev. Code Gen. R. 37 ...........................................................22, 26

**Other Authorities**

Brianna N. Banks, *The (De)valuation of Black Women's Bodies*, 44
  Harv. J. L. & Gender 329, 351............................................................15

Elissa Krauss & Martha Schulman, *The Myth of Black Juror
  Nullification: Racism Dressed Up in Jurisprudential Clothing*, 7
  Cornell J. L. & Pub. Pol'y 57, 61-65 (1997) .....................................16

J. Celeste Walley-Jean, *Debunking the Myth of the "Angry Black
  Woman,"* 3 Black Women, Gender & Families 68, 83 (Fall 2009) .................21

Jean Montoya, *"What's so Magic[al] About Black Women?"
  Peremptory Challenges at the Intersection of Race and Gender*, 3
  Mich. J. Gender & L. 369, 379 (1996) ...............................................13

Jeffrey Rosen, *One Angry Woman*, The New Yorker (Feb. 16, 1997)....................16

Jessica M. Salerno, Liana C. Peter-Hagene, & Alexander C.V. Jay,
  *Women and African Americans are less influential when they
  express anger during group decision making,* Group Processes &
  Intergroup Relations, 57-79 (May 16, 2017).......................................22

Jocelyn Frye, *Rejecting Business As Usual,* Nat'l P'ship for Women & Fam. (Jul. 2023) ...............................................................24

Kathleen Daly & Michael Tonry, *Gender, Race, and Sentencing,* 22 Crime & Just. 201, 206 (1997) .............................................2

Marilyn Yarbrough & Crystal Bennett, *Cassandra and the "Sistahs": The Peculiar Treatment of African American Women in the Myth of Women as Liars*, 3 J. Gender Race & Just. 625, 636 (2000)........................23

Michelle S. Jacobs, *The Violent State: Black Women's Invisible Struggle Against Police Violence*, 24 Wm. & Mary J. Women & L. 39, 59 (2017) ...............................................................14

National Women's Law Center, *It's Time to Pay Black Women What They're Owed* (Jul. 20, 2023)...............................................15

Nina Totenberg, *Supreme Court Takes on Racial Discrimination in Jury Selection,* Nat'l Pub. Radio (Nov. 2, 2015) ..................16

Patricia Cohen, *Black women were half as likely to be hired for state or local jobs than white men, a report says*, N.Y. Times (Mar. 18, 2021) ...............................................................15

Trina Jones & Kimberly Jade Norwood, *Aggressive Encounters & White Fragility: Deconstructing the Trope of the Angry Black Woman*, 102 Iowa L. Rev. 2017, 2034 (2017) ....................15

Bryce Covert, *The Myth of the Welfare Queen*, The New Republic (Jul. 2, 2019) ...............................................................24

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

Amici curiae submit this brief[2] in support of Defendant-Appellant Mark Ridley-Thomas' appeal from the trial court's denial of his challenges, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to the prosecution's peremptory strikes of all Black women from Dr. Ridley-Thomas's jury. *See* Appellant's Brief ("Br."), Dkt. 18.1, at 75-83.

Amici are centers for race, justice, and civil rights, as well as Black law professors and historians, who research and write about race and gender discrimination at prominent universities and law schools across the country. Drawing from their collective experiences, amici recognize that discrimination against protected groups in jury selection inflicts lasting harm on individuals, our justice system, and society as a whole. The jury plays an essential role in our country's democratic governance. When a potential juror is improperly excluded, it harms the excluded individual, denies due process to the defendant, and erodes public confidence in the judicial system. Since *Strauder v. West Virginia*, 100 U.S. 303 (1880), the Supreme Court has condemned race discrimination in jury

---

[1] A full list of amici is set forth in Appendix A. Amici further affirm, pursuant to Fed. R. App. P. 29(a)(4)(E), that no party's counsel authored this brief in whole or in part, and no party, party's counsel, or person other than amici, their members, and their counsel contributed money that was intended to fund the preparation or submission of this brief.

[2] The Appellant and Appellee have consented to the filing of this brief.

selection. This harm, to the excluded prospective juror, the defendant, and the public, is no less when the exclusion is based on the intersection of race and sex. And it is of no comfort to marginalized mixed race-and-gender groups, also known as intersectional groups,[3] like Black women, to be told they suffered no discrimination in being excluded from jury service because either Black men or White women were permitted to serve.

Amici are keenly aware that Black women have distinct experiences and face unique discrimination on the basis of their race *and* gender, and thus warrant *Batson* protection as an intersectional race-and-gender class. Amici have a strong interest in ensuring that, to fulfill *Batson's* promise of rooting out insidious discrimination in the jury selection process, courts eradicate the discriminatory uses of peremptory strikes, not just on the basis of race *or* gender, but on the basis of intersectional race *and* gender. And amici further have a strong interest in ensuring that such discrimination does not continue to occur under the guise of pretextually neutral reasons.

---

[3] While recognizing that some courts have used nomenclature such as "mixed race and gender" to describe classes of individuals identified by reference to the combination of their race *and* gender – *i.e.*, "Black women" or "Asian men" – amici will, consistent with prevailing academic and legal literature, use "intersection" or "intersectional" to describe such groups. *Compare*, *e.g.*, Kathleen Daly & Michael Tonry, *Gender, Race, and Sentencing*, 22 Crime & Just. 201, 206 (1997) (describing "race-gender intersectionalities") *with Nguyen v. Frauenheim*, 45 F.4th 1094, 1099 (9th Cir. 2022) (describing "a mixed gender and race class").

2

## SUMMARY OF ARGUMENT

This case presents a clear opportunity for this Court to, at long last, confirm that intersectional groups, like Black women, are protected as a class for the purposes of preventing discrimination in jury selection under *Batson*. The Ninth Circuit has long acknowledged that such intersectional groups *should* be protected under *Batson*, although it appears that the Ninth Circuit previously had no clear procedural opportunity to do so. Notably, intersectional groups have been protected for purposes of *Batson*, or its state-law equivalent, in numerous other state and federal courts around the country. And the Ninth Circuit has protected intersectional groups in other legal contexts, such as Title VII.

Moreover, recognizing intersectional race and gender groups, like Black women, as a protected *Batson* class furthers the goals and purposes of *Batson*, which seeks to root out discrimination in jury selection against classes that warrant protection due to longstanding societal discrimination against such groups. Such longstanding societal discrimination against Black women is well-documented, ranging from systematic discrimination against Black women in the criminal justice system and in employment, to the pervasive use of past, present, and continued pernicious stereotypes of Black women as purportedly "angry," "lazy," or "incompetent." These stereotypes, unsurprisingly, are precisely the ones used (including in this case) to justify the wrongful and discriminatory exclusion of

3

Black women, specifically, from serving on a jury.

In addition, *failing* to protect intersectional race and gender groups opens discriminatory loopholes in the trial courts' application of *Batson* jurisprudence, where one side can purportedly and repeatedly justify the peremptory exclusion of *all* Black women from a jury just by asserting that Black men and/or white women were not all also excluded. It defies logic for *Batson's* jurisprudence to protect Black men because they are Black, and white women because they are women, but not Black women for being both Black and women. Confirming the protection of intersectional groups as a matter of law thus makes *Batson* more effective to remedy the type of discrimination it was intended to protect against.

Separately, this case presents an opportunity for this Court to speak clearly and unequivocally that, under *Batson,* trial courts need to be more vigilant to guard against the use of presumptively pretextual reasons like demeanor or employment status, as well as purported race-neutral reasons that are used to strike members of protected groups but not members of other groups. Amici urge this Court to adopt presumptions and rules against the use of such pretextual reasons in peremptory challenges similar to those adopted in several states, including two in the Ninth Circuit (Washington and California).

# ARGUMENT

## I.    This Court should recognize intersectional race-and-gender groups, such as Black women, as a protected class under *Batson.*

This case presents a straightforward and long-overdue opportunity for the Ninth Circuit to recognize intersectional race-and-gender groups—here, Black women—as a protected class under *Batson*. The Ninth Circuit has acknowledged numerous times, including as recently as 2022, the importance of protecting intersectional groups as a separate class. *See, e.g.*, *Nguyen,* 45 F.4th at 1099-100. However, until now, procedural hurdles have prevented this Court from stating so. This case clears those procedural hurdles. It squarely presents, on direct appeal, the issue of intersectionality in connection with a prima facie *Batson* violation—every Black woman was stricken from the prospective jury pool. Amici respectfully urge this Court to officially recognize that which it has long previously acknowledged as being "worthy of consideration": that intersectional groups, such as Black women, are a cognizable protected class under *Batson*.

### A.    The Ninth Circuit has acknowledged that intersectional groups should be legally recognized as a cognizable class under *Batson*, and no procedural hurdle prevents this Court from so holding here.

Since at least *1995* (almost three decades ago), this Court has acknowledged that intersectional groups may be required to be legally protected under *Batson*. *See Turner v. Marshall,* 63 F.3d 807, 812 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999); *Nguyen*, 45 F.4th at

1100. In *Turner*, just five years after the Supreme Court, in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994), applied *Batson* to a gender discrimination claim, the Ninth Circuit observed that "the issue of whether African-American men could constitute a *Batson* class likely is worthy of consideration." *Turner*, 63 F.3d at 812. However, this Court then held that, because such a rule had not yet been established, this rule could not be retroactively applied to protect petitioner in the habeas corpus proceeding that was then before the Court. *Id.*; *see also Cooperwood v. Cambra*, 245 F.3d 1042, 1046 (9th Cir. 2001) ("If we were to determine today that African-American males form a cognizable group, it would be too late to help [Petitioner], because the new rule could not be applied retroactively to petitioner's case."); *Tolbert v. Gomez*, 190 F.3d 985, 988 n.1 (9th Cir. 1999).

This same pattern repeated itself just last year in *Ngyuen v. Frauenheim*, where again the Ninth Circuit observed that intersectional groups likely form a cognizable class under the *Batson* framework given that "the Supreme Court's rationale in *J.E.B.* [] link[ed] race and gender." *Nguyen*, 45 F.4th at 1100. In *Nguyen*, this Court noted that protecting intersectional race and gender groups was not breaking new legal ground. Such groups are *already* understood to be a protected class in other contexts—most notably, under Title VII. *Id.*

As the Title VII cases described by the *Nguyen* court make clear, "where two bases for discrimination exist, they cannot be neatly reduced to distinct

6

components. Rather than aiding the decisional process, the attempt to bisect a person's identity at the intersection of race and gender often distorts or ignores the particular nature of their experiences." *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir. 1994). And, as other Title VII cases have noted, recognizing intersectional classes—for instance, Black women—protects the class from the absurd argument that an employer can freely discriminate against Black women so long as it does not also discriminate against white women and Black men:

> The essence of [appellant's] argument is that an employer should not escape from liability for discrimination against black females by a showing that it does not discriminate against blacks and that it does not discriminate against females. We agree that discrimination against black females can exist even in the absence of discrimination against black men or white women. . . . If both black men and white women are considered to be within the same protected class as black females . . . *no remedy will exist for discrimination which is directed only toward black females*.

*Jefferies v. Harris Cnty. Cmty. Action Ass'n*, 615 F.2d 1025, 1032-33 (5th Cir. 1980) (emphasis added).

But again, the Ninth Circuit in *Nguyen* held that it was prevented from explicitly holding that such groups are protected under *Batson* because the case was on appeal as a state habeas corpus proceeding under 28 U.S.C. § 2254. *Nguyen*, 45 F.4th at 1098, 1100. Thus, the *Nguyen* Court again declined to clearly state that an intersectional group was a cognizable protected class under *Batson*. *Id.*

at 1100.

This case, however, now squarely presents on direct appeal the question that this Court acknowledged was "worthy of consideration" in *Turner* and then again in *Nguyen*, *Gomez, Cooperwood*—whether an intersectional group is a cognizable protected class under *Batson*—but could not answer each time because of habeas procedural hurdles.

Here, Dr. Ridley-Thomas contends that "prosecutors' discriminatory exclusion of Black women from the jury denied Ridley-Thomas a fair trial" in violation of *Batson*, necessitating vacatur of his conviction and new trial. Br. at 75. There is no question, and no dispute, that the prosecution utilized two of its first four peremptory challenges against Black women (4-ER-800-16-19), and that the final jury did not have *any Black women on the panel* (4-ER-808-19-21). It is further undisputed that, when the defense raised their *Batson* challenges with respect to the peremptory strikes of the two Black women, the Court credited the presence of *other* Black individuals on the panel as evidence *against* the prosecutors' discriminatory intent. (4-ER-792-11-12; 4-ER-802-15-17.)

No procedural hurdle thus exists here to prevent this Court from stating, clearly and unambiguously, that an intersectional group—Black women—is a cognizable protected class under *Batson*.

**B.** **Recognizing intersectional race-and-gender groups as a protected class under *Batson* would bring the Ninth Circuit in accord with other courts that have already done so.**

The Ninth Circuit would not be alone if it were to recognize intersectional groups as a cognizable protected class under *Batson*. Other federal courts have already done so. *See Sanchez v. Roden*, 753 F.3d 279, 306 (1st Cir. 2014) (concluding that a prima facie case of discrimination had been made where "the Commonwealth had peremptorily challenged every young, black man in the jury pool" but "allowed other individuals who were young, male, and white or who were young and female to sit on [the] jury").

Likewise, California state courts have recognized intersectional groups as a protected class under *People v. Wheeler*, 22 Cal. 3d 258 (1978), the California "state equivalent" for *Batson*,[4] for *almost forty years.* Even before the Supreme Court recognized, in *J.E.B.*, that *Batson* protections applied with equal force to gender-based discrimination, the California Supreme Court held, back in *1985*, that "black women constitute a cognizable group" under *Batson* and *Wheeler*. *People v. Motton*, 39 Cal. 3d 596, 605 (1985). In so ruling, the California Supreme Court observed that "black women face discrimination on two major counts—*both race and gender*—and their lives are *uniquely marked by this combination*." *Id.* at 606

---

[4] *See Nguyen*, 45 F.4th at 1097.

(emphasis added). Thus, the California Supreme Court held that Black *women* specifically, as opposed to Black *people* generally, "share a common perspective arising from their life experience" that may contribute to a "a basic similarity in attitudes or ideas or experience," an experience which "should be represented on jury panels." *Id.* at 605, 606.

In the four decades since *Motton* was decided, California courts have consistently treated the protection of "groups lying at the intersection of race *and* gender" as "[s]ettled law." *People v. Armstrong*, 6 Cal. 5th 735, 768, 769 (2019) (emphasis in original); *see also People v. Gray*, 87 Cal. App. 4th 781, 788 (Ct. App. 2001), *as modified on denial of reh'g* ("Black women are a cognizable subgroup for *Wheeler.*")); *People v. Cleveland*, 32 Cal. 4th 704, 734 (2004) (noting that "Black women are a cognizable group for *Wheeler.*").

Other courts around the country have followed suit. *See, e.g. People v. Watson*, 141 A.D.3d 23, 28-29 (App. Div. N.Y. 2016) ("It would indeed be incongruous to consider race and gender as cognizable statuses, but not a combined race and gender status. The wholesale exclusion of black men from the jury gives rise to a mandatory inference of discrimination at the first step of the *Batson* inquiry."); *Robinson v. U.S.*, 878 A.2d 1273, 1284 (Ct. App. D.C. 2005) ("If it is impermissible to exclude jurors because of their race *or* their gender, it is impermissible to exclude jurors because of their race *and* their gender.") (emphasis

10

in original); *see also Commonwealth v. Jordan*, 785 N.E.2d 368, 380 (Mass. 2003);

*Drake v. State*, 800 So.2d 508, 515 (Mo. 2001); *People v. Garcia*, 217 A.D.2d 119,

122 (App. Div. N.Y. 1995).

    In other words, this Court need not be concerned that, by holding that *Batson*

protects intersectional groups, this Court is somehow deviating from the practice of

courts around the country.

> **C.    Protecting intersectional groups aligns with the goals and intent of *Batson*.**

    Protecting intersectional groups from discriminatory peremptory strikes also

aligns with, and vindicates, the protective purposes laid out in *Batson*.

> 1.    Batson *prohibits discrimination in jury selection because such discrimination both reflects and exacerbates discrimination in society as a whole.*

    Excluding prospective jurors based on race- and gender-based stereotypes

demeans the individual juror's dignity and decreases public faith in the justice

system as a whole. *See, e.g., Powers v. Ohio*, 499 U.S. 400, 402 (1991). "Striking

individual jurors on the assumption that they hold particular views simply because

of" their race or sex "is 'practically a brand upon them, affixed by the law, an

assertion of their inferiority.'" *J.E.B.*, 511 U.S. at 131 (1994); *Batson*, 476 U.S. at

104-05 (Marshall, J. concurring) ("Exclusion of blacks from a jury, solely because

of race, can no more be justified by a belief that blacks are less likely than whites

to consider fairly or sympathetically the State's case against a black defendant than

11

it can be justified by the notion that blacks lack the intelligence, experience, or moral integrity to be entrusted with that role.") (internal quotation marks and citations omitted); *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 630 (1991) ("[I]f race stereotypes are the price for acceptance of a jury panel as fair, the price is too high to meet the standard of the Constitution.").

Likewise, failing to protect against discrimination against intersectional groups erases the experiences of those who live at this intersection. *See Lam,* 40 F.3d at 1562 ("Asian women are subject to a set of stereotypes and assumptions shared neither by Asian men nor by white women."); *Robinson*, 878 A.2d at 1284 ("Two bad partial reasons for a peremptory strike do not add up to a good reason; they simply equate to a reason that is doubly bad."). The goal of *Batson* is not simply to prohibit *some* discriminatory conduct, but rather to guarantee *to all citizens* equal protection of the law. *See J.E.B.*, 511 U.S. at 146. Unless and until intersectional groups are recognized as a cognizable class, the promise of *Batson* cannot be realized.

Diverse juries also protect the integrity of our legal system. *Id.* ("When persons are excluded from participation in our democratic processes solely because of race or gender, this promise of equality dims, and the integrity of our judicial system is jeopardized."). A jury, at its core, is a democratic institute and one that is only effective if it honestly reflects the community that it represents. *See Glasser*

12

*v. United States*, 315 U.S. 60, 85 (1942) ("Our notions of what a proper jury is have developed in harmony with our basic concepts of a democratic society and a representative government. [And thus,] '[i]t is part of the established tradition in the use of juries as *instruments of public justice* that the jury be a body *truly representative of the community.*'") (citing *Smith v. Texas*, 311 U.S. 128, 130 (1940)) (emphasis added)); *Motton*, 39 Cal. 3d at 606 ("[P]articipation [of members of intersectional groups] on a jury enhances the likelihood that the jury will be representative of significant community attitudes" and their inclusion creates the "ideal cross-section of the community that should be represented on jury panels.").

As such, when cognizable intersectional groups are discriminatorily excluded from juries, "the effect is to remove from the jury room *qualities of human nature* and *varieties of human experience*, the range of which is unknown and perhaps unknowable." *Motton*, 39 Cal. 3d at 606. (emphasis in original). Such discriminatory strikes "render[] the prospect of heterogeneous juries elusive, perpetuates stereotypes and prejudices, and subordinates socially significant minority groups." Jean Montoya, *"What's so Magic[al] About Black Women?" Peremptory Challenges at the Intersection of Race and Gender*, 3 Mich. J. Gender & L. 369, 379 (1996).

13

2. *Rooting out discrimination against Black women, or other intersectional groups, fits squarely within Batson's protective purposes.*

In this case, the categorical, discriminatory, and unjustified exclusion of Black women from Dr. Ridley-Thomas's jury panel both improperly deprived Dr. Ridley-Thomas and the jury of the unique lived experiences of Black women and further perpetuated the stigma of singling out Black women as being purportedly unfit for jury service. These are precisely the harms that *Batson* was aimed to prevent.

An abundance of empirical and academic research recognizes the unique lived experience of, and discrimination against, Black women. In the criminal justice context, Black women are more likely to be arrested than white women for similar crimes and are not taken as seriously when they themselves are victims of a crime. *See* Daly, *Gender, Race, and Sentencing*, *supra* at 213; *see also* Michelle S. Jacobs, *The Violent State: Black Women's Invisible Struggle Against Police Violence*, 24 Wm. & Mary J. Women & L. 39, 59 (2017) ("Black women in San Francisco make up 5.8 percent of the population but they constitute 45.5 percent of women arrested"); *id.* ("the rate of arrest for Black women is 2.8 times the arrest rate of White women"); *id.* at 76 ("Sexual assaults against Black women are under-reported, under-investigated, and under-prosecuted, in comparison to cases where White women are attacked."). Likewise, Black women who present a "battered

14

women defense" after killing their abusers "face an extra burden because stereotypes depict these women as aggressive and hostile, which directly contradicts the image of an abused woman as 'white, blonde, small, and meek.'" Brianna N. Banks, *The (De)valuation of Black Women's Bodies*, 44 Harv. J. L. & Gender 329, 351 (2021).

In a professional context, Black women are often underestimated and assumed to hold lower-level positions. *See* Trina Jones & Kimberly Jade Norwood, *Aggressive Encounters & White Fragility: Deconstructing the Trope of the Angry Black Woman*, 102 Iowa L. Rev. 2017, 2034 (2017) ("Professional Black women are frequently assumed to be secretaries, clerical assistants, or service personnel in professional settings."). Black female doctors are "often mistaken for nurses or nursing assistants and are asked to clean rooms, get dinner trays, and help patients to the bathroom." *Id.* And Black female law professors "report being queried, questioned, and challenged by White law students, usually males, in ways that their White male colleagues are not." *Id.* at 2035.

Black women are also less likely to be hired in the first place. *See* Patricia Cohen, *Black women were half as likely to be hired for state or local jobs than white men, a report says*, N.Y. Times (Mar. 18, 2021). And, even if hired, Black women get paid less than Black men. *See* National Women's Law Center, *It's Time to Pay Black Women What They're Owed* (Jul. 20, 2023).

15

As applied to jury selection, these stereotypes of Black women's demeanor and competence have led to further longstanding and inaccurate stereotypes that Black women, *as a specific group*, are more likely to purportedly engage in jury nullification and thus should be peremptorily stricken from potential jury panels. *See* Jeffrey Rosen, *One Angry Woman*, The New Yorker (Feb. 16, 1997). These stereotypes have persisted, and continue to persist, even in the face of academic work and evidence debunking this myth of Black juror nullification. *See, e.g.*, Elissa Krauss & Martha Schulman, *The Myth of Black Juror Nullification: Racism Dressed Up in Jurisprudential Clothing*, 7 Cornell J. L. & Pub. Pol'y 57, 61-65 (1997) (discussing perpetuation of this myth in mainstream media sources). In a stunningly visceral moment caught on tape, an infamous training video made by an assistant district attorney in Philadelphia in the late 1980s, post-*Batson*, advised trainees to be particularly vigilant against permitting young Black women onto their juries, going so far as to say: "young black women are very bad, maybe because they're downtrodden on two respects . . . they're women and they're blacks." Nina Totenberg, *Supreme Court Takes on Racial Discrimination in Jury Selection*, Nat'l Pub. Radio (Nov. 2, 2015).

All this, and more, vividly illustrates the longstanding and systematic discrimination in our society, specifically against Black women, that amply justifies the need to protect Black women (and intersectional groups generally) as

16

an intersectional class under *Batson*.

      3.    *Acknowledging that intersectional groups are a protected class under Batson closes the loophole that permits discrimination on the basis of race <u>and</u> gender simply by disclaiming discrimination on the basis of race <u>or</u> gender.*

Moreover, expressly protecting Black women as an intersectional group avoids the legal loophole that arises when courts consider discrimination only on race-*or*-gender, rather than race-*and*-gender grounds. Only the latter formulation can prevent the law from providing lesser protection for Black women than it does for Black men or for white women.

For example, in *Tolbert v. Gomez*, the Ninth Circuit held that, because the District Court relied on a prima facie case of *race*-based discrimination for its *Batson* analysis, "[w]hether the cross-section of gender and race proposed by [appellant] constitutes a cognizable class is irrelevant." 190 F.3d at 988. As a result of the Court's narrow view, it declined to consider powerful evidence suggesting that discrimination based on membership in an intersectional group had occurred, including that "[appellant] and the venireperson were *also* members of another cognizable group, i.e., African-American males." *Id.* (emphasis in original).

This same pattern repeated itself in this case. When counsel for Dr. Ridley-Thomas challenged the peremptory strike of Juror 13, a Black woman, (*see* 4-ER-784-13-14), the trial court found that there was "no prima facie case at this point," (4-ER-794-1-2), in part because "[t]he panel is mostly nonwhite," (4-ER-793-6).

17

In other words, the Court purported[5] to use only one variable—race—as proof of purported non-discrimination against an intersectional race and gender group— Black women.  But at the time of the first peremptory challenge, only two of the eighteen jurors seated were both Black and women. If the Court had considered Black women as a protected class, the prosecution would have been unable to refute the *Batson* challenge by pointing at the other minorities on the panel. That excuse would simply not have been available.

Moreover, when the Court concluded that the prosecution's peremptory strike of Juror 1 did not violate *Batson*, it did so in part because "it's difficult to exercise a challenge statistically without exercising a challenge against a member of a minority." (4-ER-807-25- 808-2.) But defense counsel raised the *Batson* challenge specifically due to the juror's status as "the second *Black female* and the only remaining *Black female* on the jury," not simply because she was Black. (4-ER-801-8-12 (emphasis added).) (*See also* 4-ER-808-19-21 (whereby defense counsel noted "[w]e are now talking about striking the only other Black *woman* on the panel") (emphasis added).) The Court simply *did not consider* the juror's

---

[5] Amici use the word "purported" here because the trial court further mistakenly claimed that no racial discrimination could have occurred simply because the trial court had "never seen a panel with this few white people." (4-ER-793-7-8.) The notion that race-based *Batson* violations can be ignored by clumping the community into "white" and "non-white" groups, as opposed to more authentically diverse groupings like Black, Asian, or Latino, has no basis in *Batson* or its progeny.

membership in the intersectional class and thus overlooked powerful evidence that the prosecution, in striking the only other Black woman on the panel, discriminated against Black women as an intersectional class.

## II. This Court should reject the pretextual reasons given to strike the Black women jurors in this case and give clear and unambiguous guidance to prevent the use of such pretextual reasons in the future.

In addition to protecting intersectional race and gender groups under *Batson* this Court further has an opportunity, in this case, to squarely reject the pretextual reasons proffered by the prosecution to strike all Black women from Dr. Ridley-Thomas's jury pool. Just as importantly, this Court has an opportunity to provide clear, unambiguous guidance that would deter similarly pretextual reasons from being used to undermine *Batson*'s application in future cases.

The justifications offered by the prosecution in this case—demeanor, employment status, and using a facially neutral reason to *only* strike jurors from a protected group—are not only pretextual, but they are so often used as pretextual justifications for discriminatory strikes that several state legislatures and courts have deemed them "presumptively invalid." This Court should likewise deem the foregoing justifications to be presumptively invalid under *Batson*.

### A. Striking a juror based on demeanor should be deemed presumptively invalid.

Here, Juror 1 was struck in part because "she was shaking her head and she had her head tilted downward," and because she was wearing tinted glasses until

19

the court asked her to take them off. (*See* 4-ER-802-5-14.) The defense counsel disputed these characterizations of Juror 1's demeanor. Yet the trial court not only accepted these characterizations as fact, but ruled that such demeanor-based traits were acceptable reasons to overrule the *Batson* challenge. (4-ER-810-25- 811-13.) The trial court's uncritical acceptance of a demeanor-based reason for overruling the *Batson* challenge was error.

Federal courts have long recognized that striking a juror based upon "demeanor" smacks of pretext and warrants heightened scrutiny by the Court evaluating the *Batson* challenge. As Justice Marshall put it in his concurring opinion in *Batson*: "A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically." *See Batson*, 476 U.S. at 106 (Marshall, J., concurring). Justice Marshall went on to observe that a "judge's own conscious or unconscious racism may lead him to accept such an explanation"—*i.e.*, a characterization of the prospective Black juror as "sullen" or "distant"—"as well supported." *Id.* As such, "[d]emeanor-based explanations for a strike are particularly susceptible to serving as pretexts for discrimination." *Harris v. Hardy*, 680 F.3d 942, 965 (7th Cir. 2012); *see also United States v. Alcantar*, 897 F.2d 436, 439 (9th Cir. 1990) (reliance upon struck juror's "anger may have been a cover for a racially-based decision").

20

Academic and empirical literature likewise have long documented how protected groups—specifically, intersectional groups, and even more specifically to this case, Black women—become stereotyped to certain negative "demeanor" traits, which are then used as purportedly neutral justifications for a peremptory strike. One pervasive demeanor-based stereotype for Black women, in particular, is that she is "angry"—*i.e.*, uncooperative, hostile, and defiant. *See, e.g.*, J. Celeste Walley-Jean, *Debunking the Myth of the "Angry Black Woman,"* 3 Black Women, Gender & Families 68, 83 (Fall 2009) ("Although it does not have empirical support, the stereotype of the angry black woman is alive and well [and] has the eventual effect of influencing the way in which African American girls and women are perceived and treated by society.").

Moreover, this stereotypical perception of Black women as "angry" is specifically used to negate or discredit the credibility or accomplishments of Black women (or, in this case, as an excuse to bar them from the jury box). This is supported both by anecdotal evidence—Michelle Obama, for instance, has written powerfully about being "taken down as an 'angry black woman,'" *see* Michelle Obama, *Becoming* (2018) ("I've wanted to ask my detractors which part of that phrase matters to them the most- is it 'angry' or 'black' or 'woman'?")—as well as by empirical studies showing that expressions of "anger" or "fear" are "selectively used to discredit and decrease influence *only for women and African Americans*."

21

Jessica M. Salerno, Liana C. Peter-Hagene, & Alexander C.V. Jay, *Women and African Americans are less influential when they express anger during group decision making*, Group Processes & Intergroup Relations, 57-79 (May 16, 2017) (emphasis added).

Against this backdrop, state courts and legislatures—including in the Ninth Circuit—have been leading the way in setting rules and procedures that would effectively require heightened scrutiny for demeanor-based peremptory strikes. And they have not been shy in stating why. For example, a Washington state court rule expressly states that "allegations that the prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor, or provided unintelligent or confused answers" have been "historically . . . associated with improper discrimination in jury selection in Washington State." Wash. Rev. Code Gen. R. 37. To combat this, Washington requires "timely" notification of any demeanor-based behavior that may later be used for a peremptory strike, as well as "corroboration by the judge or opposing counsel verifying the behavior" before such behavior can be used to justify a strike. *Id.*

Similarly, California law also identifies demeanor-based reasons as historically associated with improper discrimination in jury selection and thus presumptively invalid justifications for peremptory strikes: being "inattentive, or

22

staring or failing to make eye contact"; exhibiting "either a lack of rapport or problematic attitude, body language, or demeanor"; and providing "unintelligent or confused answers." Cal. Code Civ. Proc. § 231.7.[6]

Amici urge the Ninth Circuit to hold that it is presumptively invalid to strike a juror because of the juror's demeanor, and to enact a process similar to that enacted by the California legislature to adequately determine whether the demeanor-based reason is valid or is mere pretext.

**B.     Striking a juror based on employment status should be deemed presumptively invalid.**

The trial court further accepted the prosecution's reason that Juror 1 was permissibly struck because she was unemployed, (4-ER-802-5-14), finding this to be a "facially neutral" reason for the strike. (4-ER-810-15-18.)

This, too, was error.  In fact, the prosecution's so-called neutral reason is tethered to a long and sordid history of stereotyping Black women, in particular, as "lazy." There is literally a term (also technically "facially neutral," and yet indelibly tied to Black women specifically as a class) made for just this stereotype: "welfare queens." *See, e.g.*, Marilyn Yarbrough & Crystal Bennett, *Cassandra and the "Sistahs": The Peculiar Treatment of African American Women in the Myth of*

---

[6] Similar rules have been enacted in other states as well.  *See* Conn. Gen. Stat. R. Super. Ct. § 5-12; N.J. R. Gen. Application R. 1:8-3A(d)(1) (Comment).

*Women as Liars*, 3 J. Gender Race & Just. 625, 636 (2000) (describing a so-called "welfare queen" as a Black woman that "shuns work and passes bad values onto her children"); *see also* Bryce Covert, *The Myth of the Welfare Queen*, The New Republic (Jul. 2, 2019) ("While Reagan never used Taylor's name, nor even directly racialized her, he didn't need to. The 'woman from Chicago' who wore furs and drove a Cadillac while receiving government checks was clearly black to his white supporters.").

Moreover, striking jurors based on their "lack of employment" affects Black women disproportionately. *See* Jocelyn Frye, *Rejecting Business As Usual*, Nat'l P'ship for Women & Fam. (Jul. 2023) ("Even as unemployment has decreased, Black women are still more likely to be unemployed than other groups of women – in June 2023, Black women over the age of 20 had an unemployment rate of 5.4 percent compared to 2.6 percent for white women, 3.2 percent for Asian women, and 4.1 percent for Latinas.").

Here, too, state legislatures, including those in the Ninth Circuit, have taken the lead in demanding heightened scrutiny to root out the pretextual use of "underemployment" or "lack of employment" in peremptory strikes. California, for instance, has a rule stating that peremptory challenges based on a juror's "underemployment" or "lack of employment" are presumptively invalid. *See, e.g.*, Cal. Code Civ. Proc. § 231.7 (deeming a peremptory challenge based on the juror's

"lack of employment" or "underemployment" as "presumptively invalid"). And to overcome this presumption, California demands that the party striking the juror on this ground "show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity, gender, gender identity . . . and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case." *Id.*

Amici urge this Court to rule that federal courts in this Circuit should similarly express skepticism of bare assertions of unemployment or underemployment as purportedly "neutral" reasons to strike a Black woman juror, and instead adopt the approach of state legislatures and courts in finding "lack of employment" to be a presumptively invalid reason for a peremptory challenge.

### C. Striking a juror in a protected group for a reason equally applicable to a juror outside of that protected group should be presumptively invalid.

Finally, this Court should clearly and unambiguously state that otherwise neutral reasons should be found presumptively pretextual if a reason is given to strike a member of the protected class, but not other members, from the jury pool. In this case, a clear-cut example occurred when a juror's views on legacy admissions was used as a purportedly neutral reason to strike one of the Black women from the jury, but the same issue was not used to strike a potential white juror who gave the same answer. (*See* 4-ER-769-776.)

25

Both the Supreme Court and the Ninth Circuit have found facially neutral reasons given in the *Batson* context to be clearly pretextual after conducting comparative jury analyses and finding that the same reasons were not used to strike members outside of the protected class. *See Miller-El v. Dretke,* 545 U.S. 231, 244-45 (2005); *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) ("If a prosecutor's proffered reason for striking a minority panelist applies just as well to an otherwise-similar nonminority who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.").

State legislatures and courts have likewise recognized that race-neutral reasons that lead to the peremptory challenge of jurors in a protected group but not those outside the group should be deemed presumptively invalid. *See* Cal. Code Civ. Proc. § 231.7; Wash. Rev. Code Gen. R. 37 (considering, *inter alia*, "whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party").

As illustrated here, the prosecution struck a Black woman juror purportedly based on her views about "legacy admissions" even though a white woman juror gave virtually the same answer. (4-ER-789-1- 790-13.) Moreover, the government asked the Black woman juror follow-up questions but did not pursue and further questions of the white woman juror. (*Id.*)

26

## **CONCLUSION**

Given the foregoing, and the well-established law and legal principles set forth by the Supreme Court, Ninth Circuit, and state courts and legislatures, this Court should likewise reaffirm and clearly state that applying facially neutral justifications in discriminatory ways to target Black women and other protected groups presumptively violates *Batson*.

Dated: New York, New York
       February 1, 2024

                              Respectfully Submitted,

                              FRIEDMAN KAPLAN SEILER
                               ADELMAN & ROBBINS LLP


                              _____/s/ Stan Chiueh_____

ROBERT S. CHANG                STAN CHIUEH
FRED T. KOREMATSU CENTER FOR   ELIZABETH BIERUT
LAW AND EQUALITY               DANIA BARDAVID
SEATTLE UNIVERSITY SCHOOL OF   CAROLINE MCHUGH
LAW[7]                         FRIEDMAN KAPLAN SEILER
901 12th Ave.                   ADELMAN & ROBBINS LLP
Seattle, WA 98122              7 Times Square
Telephone: (206) 398-4025      New York, NY 10036
                               Telephone: (212) 833-1100

                               *Counsel for amici curiae*

---

[7] University affiliation is listed solely for informational purposes.

28

## APPENDIX A[8]

The Fred T. Korematsu Center at Seattle University School of Law works to advance justice through research, advocacy, and education to, among other things, understand and remedy the inequality that plagues our criminal justice system.

The Gibson-Banks Center at the University of Maryland Francis King Carey School of Law works collaboratively to reimagine and transform institutions and systems of racial and intersectional inequality, marginalization, and oppression.

The Loyola Law School Anti-Racism Center at LMU Loyola Law School connects scholarship, research, and on-the-ground clinical work to confront and dismantle individualized and structural racism.

The Community Equity Lab at New York University School of Law supports programs committed to challenging entrenched racial inequality in the United States, including through research, advocacy, and community partnerships.

The Center for Law, Equity and Race at Northeastern University School of Law supports projects that have a common goal of building from historical memory and working to address the racial injuries of the past.

The Center for Racial and Disability Justice at Northwestern Pritzker School of Law works to promote the rights and voices of marginalized people, including

---

[8] Each amicus states that they are filing this brief in their respective individual capacity, and does not, in this brief or otherwise, represent the views of their respective affiliated institution, which is listed for identification purposes.

to prevent racism and ableism from impacting the day-to-day lives of people, especially disabled people of color.

The Center on Race, Inequality, and the Law at New York University School of Law confronts the laws, policies, and practices that lead to the oppression and marginalization of people of color.

Priscilla Ocen is a professor of law at Loyola Law School, where she teaches criminal procedure, reproductive justice, and a seminar on race, gender, and the law.

Gregory Parks is a professor of law at Wake Forest Law School, where his research focuses on race, social science, and legal issues.

Khiara Bridges is a professor of law at University of California Berkeley School of Law, where she has written many articles concerning race, class, reproductive rights, and their intersection.

Sarah Haley is an associate professor at Columbia University, where she researches the history of gender and women, carceral history, Black feminist history and theory, prison abolition, and feminist archival methods.

Michele Goodwin is an associate professor at Georgetown University Law Center who, among other things, established the first law center focused on race and bioethics.

Angela Onwuachi-Willig is dean and a professor of law at Boston University

School of Law and a renowned legal scholar and expert in critical race theory, employment discrimination, and family law.

Dorothy E. Roberts is a professor of law and sociology at the University of Pennsylvania Carey Law School and an acclaimed scholar of race, gender and the law.

Angela P. Harris is a professor of law at the University of California Davis School of Law where she writes widely in the field of critical legal theory.

Darren Hutchinson is a professor of law at Emory University School of Law, where his research examines a broad range of legal doctrines and social justice matters.

Adrienne Davis is a professor of law at Washington University in St. Louis School of Law, where she writes and teaches on gender and race relations, theories of justice and reparations, feminist and critical race theory, and law and popular culture.

Kaaryn Gustafson is a professor of law at the University of California, Irvine School of Law, where she conducts interdisciplinary research on race, ethnicity, gender and socioeconomic inequality.

India Thusi is a professor of law at the Indiana University Maurer School of Law, where her research examines racial and sexual hierarchies as they relate to policing, race, and gender.

31

Trina Jones is a professor of law at Duke University School of Law and a leading expert on racial, socio-economic, and gender inequality, including as it relates to intersectionality.

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number:** No. 23-2200

I am the attorney or self-represented party.

**This brief (including Appendix A) contains _____6841_____ words,** including __0__ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

> [ ] it is a joint brief submitted by separately represented parties.

> [ ] a party or parties are filing a single brief in response to multiple briefs.

> [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

33

**Signature** ___/s/ Stan Chiueh_____        **Date:** February 1, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

_/s/ Stan Chiueh_
