No. 23-2200

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

MARK RIDLEY-THOMAS,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. CR 21-485-DSF-1*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

LINDSEY GREER DOTSON
ELANA SHAVIT ARTSON
THOMAS F. RYBARCZYK
MICHAEL J. MORSE
Assistant United States Attorneys

1500 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-4443
Email: lindsey.dotson@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## TABLE OF CONTENTS

**DESCRIPTION**                                                    **PAGE(S)**

I    INTRODUCTION.................................................................1

II   ISSUES PRESENTED ......................................................4

III  STATEMENT OF THE CASE .......................................5

    A.   Jurisdiction, Timeliness, and Bail Status ............................5

    B.   Statement of Facts and Procedural History..........................5

          1.   The USC admission, scholarship, and professorship ...............................................................9

               a.   Defendant solicits benefits for his son by dangling the carrot of County contracts...............9

               b.   Flynn memorializes the *quid pro quo* deal in a hand-delivered letter to defendant.............10

               c.   Flynn works to deliver on her side of the bargain ...............................................................12

               d.   Defendant votes for the Vermont Reentry Center and Probation University .......................13

               e.   The Assembly's sexual harassment investigation prompts Sebastian's sudden resignation under the guise of "health"..............14

               f.   Defendant's demands to Flynn escalate after it becomes clear that his son must resign......................................................16

               g.   After securing the admission, scholarship, and professorship, defendant tells Flynn regarding the Telehealth contract: "Your wish is my command" ........................................20

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                      **PAGE(S)**

2. The $100,000 payment from USC to Sebastian's nonprofit ............................................................22

   a. Defendant attempts to donate $100,000 in campaign funds to support his son's new job, but it fails due to concerns about nepotism ............................................................23

   b. In exchange for the Telehealth contract, defendant solicits a $100,000 payment from USC to his son's nonprofit ..................................25

   c. After Flynn orchestrates the $100,000 payment, defendant delivers the Telehealth contract ............................................................32

   d. Flynn admits a "side deal" with defendant and his son to secure the Telehealth contract ............................................................33

3. USC makes a criminal referral after a whistleblower exposes defendant's bribery scheme with Flynn ............................................................34

4. Indictment ............................................................35

5. Defendant's trial theory ............................................................35

6. Trial and convictions ............................................................37

7. Post-trial litigation ............................................................38

8. Sentencing ............................................................38

IV SUMMARY OF ARGUMENT ............................................................39

V ARGUMENT ............................................................44

iii

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                              **PAGE(S)**

A.  The Honest Services Fraud Convictions Are Legally
    Valid and Supported by Sufficient Evidence .......................44

   1.  Standard of review .......................................................44

   2.  Defendant's claim that "reputational benefit" was
       the *quid* is contrary to the record and court's
       instructions ...............................................................46

       a.  "Reputational benefit" was the motive, not
           the *quid* .............................................................46

       b.  *Skilling* and related cases are irrelevant ...........55

       c.  The government's paradigmatic bribery
           theory will not chill legitimate policymaking.....59

   3.  Amply sufficient evidence demonstrates
       materiality..................................................................63

       a.  Defendant's acts were capable of influencing
           the County, its employees, and the public .........63

       b.  The theory of materiality here was not novel ....72

   4.  The court properly instructed the jury regarding
       the *mens rea* for honest services fraud .......................74

   5.  The government's references to defendant
       "monetizing" his public office were not legal error......78

       a.  The government did not argue a gratuity
           theory .................................................................78

       b.  Any error cannot support reversal because
           the jury instructions required a *quid pro
           quo* ...................................................................82

iv

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                **PAGE(S)**

B.     Defendant's Federal Program Bribery Conviction Should Be Affirmed ................................................................ 86

       1.      Standard of review ........................................................ 86

       2.      Reputational benefit was a motive, not the charged thing of value ................................................. 86

       3.      The court properly instructed the jury ........................ 89

             a.      Binding precedent does not require a *quid pro quo* for section 666 bribery .......................... 89

             b.      The court did not abuse its discretion in declining to give defendant's proposed instruction 37(d) ................................................. 91

                   i.    Gratuity ......................................................... 92

                   ii.   Ingratiation .................................................. 94

             c.      Any error was harmless ...................................... 98

C.     Defendant's Conspiracy Conviction Is Valid ........................ 98

D.     The District Court Properly Denied Defendant's *Batson* Challenges .......................................................................... 99

       1.      Facts ............................................................................. 99

             a.      Initial voir dire .................................................. 99

             b.      Juror 13 *Batson* challenge ............................... 101

             c.      Further challenges .......................................... 106

             d.      Juror 1 *Batson* challenge ................................ 107

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                    **PAGE(S)**

e.   The final jury.....................................................110

2.   *Batson's* framework.......................................112

3.   Standard of review........................................114

4.   Defendant failed to establish a prima facie case of purposeful discrimination as to Juror 13 .............115

5.   The strike of Juror 1 was not pretextual...................122

VI   CONCLUSION................................................128

vi

# TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

*Cases*

*Batson v. Kentucky,*
   476 U.S. 79 (1986)........................................................ passim

*Burton v. United States,*
   196 U.S. 283 (1905)...........................................................52

*Ciminelli v. United States,*
   598 U.S. 306 (2023)...........................................................89

*City of Columbia v. Omni Outdoor Advert., Inc.,*
   499 U.S. 365 (1991)...........................................................81

*Davis v. Ayala,*
   576 U.S. 257 (2015).........................................................123

*Griffin v. United States,*
   502 U.S. 46 (1991)............................................................98

*Hernandez v. New York,*
   500 U.S. 352 (1991).........................................................112

*Hoyos v. Davis,*
   51 F.4th 297 (9th Cir. 2022) ....................................119, 121

*Jackson v. Virginia,*
   443 U.S. 307 (1979)...........................................................46

*Johnson v. California,*
   545 U.S. 162 (2005).........................................................115

*Kelly v. United States,*
   140 S. Ct. 1565 (2020).......................................................89

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                      **PAGE(S)**

*McDermott v. Johnson,*
  85 F.4th 898 (9th Cir. 2023) ........................................................... 116

*McDonnell v. United States,*
  579 U.S. 550 (2016) ....................................................... 49, 61, 62, 79

*McNally v. United States,*
  483 U.S. 350 (1987) ......................................................................... 57

*Miller v. Gammie,*
  335 F.3d 889 (9th Cir. 2003) ............................................................ 90

*Miller-El v. Dretke,*
  545 U.S. 231 (2005) ........................................................................ 117

*Neder v. United States,*
  527 U.S. 1 (1999) .............................................................. 63, 71, 83, 91

*Nguyen v. Frauenheim,*
  45 F.4th 1094 (9th Cir. 2022) .......................................... 113, 115, 121

*Percoco v. United States,*
  598 U.S. 319 (2023) .......................................................................... 61

*Purkett v. Elem,*
  514 U.S. 765 (1995) ................................................................ 122, 125

*Rice v. Collins,*
  546 U.S. 333 (2006) ........................................................ 114, 123, 124

*Rowell v. Ferreira,*
  830 F. App'x 698 (2d Cir. 2020) ...................................................... 123

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                      **PAGE(S)**

*Sifuentes v. Brazelton,*
    825 F.3d 506 (9th Cir. 2016) ............................................................ 123

*Skilling v. United States,*
    561 U.S. 358 (2010) ....................................................... 40, 55, 57, 82

*Snyder v. Louisiana,*
    552 U.S. 472 (2008) ....................................................................... 118

*Snyder v. United States,*
    144 S. Ct. 536 (2023) ....................................................................... 90

*Thaler v. Haynes,*
    559 U.S. 43 (2010) ......................................................................... 124

*Tolbert v. Gomez,*
    190 F.3d 985 (9th Cir. 1999) ............................................................ 113

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976) .......................................................................... 45

*United States v. Abdelaziz,*
    68 F.4th 1 (1st Cir. 2023) ................................................ 49, 56, 57, 87

*United States v. Alanis,*
    335 F.3d 965 (9th Cir. 2003) ............................................................ 125

*United States v. Alvarez-Ulloa,*
    784 F.3d 558 (9th Cir. 2015) ............................................................ 120

*United States v. Blagojevich,*
    794 F.3d 729 (7th Cir. 2015) .............................................................. 58

*United States v. Bohonus,*
    628 F.2d 1167 (9th Cir. 1980) ................................................ 65, 72, 76

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

*United States v. Bonanno,*
    852 F.2d 434 (9th Cir. 1988)................................................................84

*United States v. Cervantes,*
    542 F.2d 773 (9th Cir. 1976)................................................................92

*United States v. Chen,*
    754 F.2d 817 (9th Cir. 1985)........................................................93, 94

*United States v. Collins,*
    551 F.3d 914 (9th Cir. 2009).................................... 114, 115, 122, 127

*United States v. Crozier,*
    987 F.2d 893 (2d Cir. 1993) ........................................................53, 88

*United States v. Cruz-Escoto,*
    476 F.3d 1081 (9th Cir. 2007)....................................................113, 126

*United States v. Edouard,*
    485 F.3d 1324 (11th Cir. 2007)........................................................125

*United States v. Esparza-Gonzalez,*
    422 F.3d 897 (2005) ...............................................................122, 127

*United States v. Foxworth,*
    334 F. App'x 363 (2d Cir. 2009) ........................................................65

*United States v. Frega,*
    179 F.3d 793 (9th Cir. 1999).................................................51, 60, 70

*United States v. Galecki,*
    89 F.4th 713 (9th Cir. 2023) .............................................................83

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                 **PAGE(S)**

*United States v. Garrido*,
713 F.3d 985 (9th Cir. 2013) ...................................................... passim

*United States v. George*,
420 F.3d 991 (9th Cir. 2005) .............................................................. 95

*United States v. Gillam*,
167 F.3d 1273 (9th Cir. 1999) ......................................................... 126

*United States v. Gonzalez*,
906 F.3d 784 (9th Cir. 2018) .............................................................. 99

*United States v. Gorman*,
807 F.2d 1299 (6th Cir. 1986) ............................................. 53, 87, 88

*United States v. Guerrero*,
595 F.3d 1059 (9th Cir. 2010) ...................................................120, 121

*United States v. Hernandez*,
2021 WL 3579386 (9th Cir. 2021) ............................................. 76, 121

*United States v. Hernandez-Garcia*,
44 F.4th 1157 (9th Cir. 2022) ................................... 112, 120, 125, 127

*United States v. Hernandez-Quintania*,
874 F.3d 1123 (9th Cir. 2017) ........................................................ 121

*United States v. Herrera-Rivera*,
832 F.3d 1166 (9th Cir. 2016) ........................................................ 119

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) ........................................................ 114

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**          **PAGE(S)**

*United States v. Hong,*
   938 F.3d 1040 (9th Cir. 2019).........................................44, 45

*United States v. Inzunza,*
   638 F.3d 1006 (9th Cir. 2011).........................................50, 96

*United States v. Jacobs,*
   506 F. App'x 558 (9th Cir. 2013)......................... 64, 65, 66, 67

*United States v. Jannotti,*
   673 F.2d 578 (3d Cir. 1982) ..................................................82

*United States v. Kaplan,*
   836 F.3d 1199 (9th Cir. 2016).........................................75, 95

*United States v. Kimbrew,*
   944 F.3d 810 (9th Cir. 2019)...........................................66, 95

*United States v. Kincaid-Chauncey,*
   556 F.3d 923 (9th Cir. 2009).................................76, 77, 97

*United States v. Koziol,*
   993 F.3d 1160 (9th Cir. 2021)..............................46, 86, 98

*United States v. Langford,*
   647 F.3d 1309 (11th Cir. 2011)...........................................72

*United States v. Lew,*
   875 F.2d 219 (9th Cir. 1989)...............................................63

*United States v. Lonich,*
   23 F.4th 881 (9th Cir. 2022) .............................................77

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                             **PAGE(S)**

*United States v. Lopez-Lukis*,
   102 F.3d 1164 (11th Cir. 1997)..............................................66

*United States v. Lovett*,
   811 F.2d 979 (7th Cir. 1987)......................................51, 60

*United States v. Mandel*,
   591 F.2d 1347 (4th Cir. 1979)...................................51, 60

*United States v. Marguet-Pillado*,
   648 F.3d 1001 (9th Cir. 2011)............................................96

*United States v. McNair*,
   605 F.3d 1152 (11th Cir. 2010)..................................51, 60

*United States v. Mende*,
   43 F.3d 1298 (9th Cir. 1995)...........................................54

*United States v. Mikhel*,
   889 F.3d 1003 (9th Cir. 2018)...........................113, 124, 126

*United States v. Miller*,
   953 F.3d 1095 (9th Cir. 2020)..........................................75

*United States v. Milovanovic*,
   678 F.3d 713 (9th Cir. 2012)..................................63, 70, 71

*United States v. Munoz*,
   233 F.3d 1117 (9th Cir. 2000)..........................................70

*United States v. Nagin*,
   810 F.3d 348 (5th Cir. 2016)...........................................81

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                         **PAGE(S)**

*United States v. Nevils*,
  598 F.3d 1158 (9th Cir. 2010)......................................46, 71

*United States v. Olano*,
  507 U.S. 725 (1993)...........................................................45

*United States v. Oreto*,
  37 F.3d 739 (1st Cir. 1994) ..............................................92

*United States v. Quinn*,
  359 F.3d 666 (4th Cir. 2004)............................................81

*United States v. Renzi*,
  769 F.3d 731 (9th Cir. 2014)....................................passim

*United States v. Reyes*,
  660 F.3d 454 (9th Cir. 2011).............................................54

*United States v. Rubio-Villareal*,
  967 F.2d 294 (9th Cir. 1992).............................................45

*United States v. Rybicki*,
  354 F.3d 124 (2d Cir. 2003) ..............................................73

*United States v. Schwartz*,
  785 F.2d 673 (9th Cir. 1986)............................................88

*United States v. Siegelman*,
  640 F.3d 1159 (11th Cir. 2011)....................................51, 60

*United States v. Silver*,
  948 F.3d 538 (2d Cir. 2020) ..............................................81

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**            **PAGE(S)**

*United States v. Spano,*
421 F.3d 599 (7th Cir. 2005)......................................................50, 60

*United States v. Stinson,*
647 F.3d 1196 (9th Cir. 2011)........................................................114

*United States v. Sullivan,*
797 F.3d 623 (9th Cir. 2015).................................................44, 78, 86

*United States v. Sun-Diamond Growers of California,*
526 U.S. 398 (1999)..........................................................................84, 92

*United States v. Swinney,*
870 F.2d 494 (8th Cir. 1992)............................................................125

*United States v. Thompson,*
484 F.3d 877 (7th Cir. 2007)........................................................57, 58

*United States v. Wilkes,*
662 F.3d 524 (9th Cir. 2011)..................................................90, 91, 98

*United States v. Woods,*
335 F.3d 993 (9th Cir. 2003)............................................................70

*United States v. Yijun Zhou,*
838 F.3d 1007 (9th Cir. 2016).................................................44, 78, 86

*Wade v. Terhune,*
202 F.3d 1190 (9th Cir. 2000).........................................115, 120, 121

*Yates v. United States,*
354 U.S. 298 (1957)............................................................................78

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**      **PAGE(S)**

*Statutes*

18 U.S.C. § 201 ................................................................ 51, 90, 93

18 U.S.C. § 371 ...................................................................... 35

18 U.S.C. § 666 ................................................................. passim

18 U.S.C. § 1341 .................................................................... 35

18 U.S.C. § 1343 .................................................................... 35

18 U.S.C. § 1346 ................................................... 35, 49, 57, 70

28 U.S.C. § 1291 ..................................................................... 5

28 U.S.C. § 3231 ..................................................................... 5

*Other Authorities*

Ninth Circuit Model Criminal Jury Instruction No. 15.34
    (Mail Fraud—Scheme to Defraud—Deprivation of
    Intangible Right of Honest Services—18 U.S.C. §§ 1341, 1346) ........ 75

*Rules*

Fed. R. Crim. P. 30(d) ............................................................. 46

Fed. R. Crim. P. 52(b) ........................................................ 46, 78

No. 23-2200

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

MARK RIDLEY-THOMAS,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA DISTRICT COURT NO. CR 21-485-DSF-1*

## GOVERNMENT'S ANSWERING BRIEF

# I

# INTRODUCTION

While an elected Los Angeles County Supervisor, defendant-appellant Mark Ridley-Thomas abused the power of his public office for private gain. He engaged in a shakedown of a university dean in dire need of defendant's votes and support to secure lucrative County contracts for the dean's graduate school. But as defendant made abundantly clear, his help came with strings attached.

Those strings came in the form of landing spots for defendant's son, who was the target of a not-yet-public sexual harassment investigation and needed to resign his post as a California State Assemblymember to avoid a scandal during the MeToo movement. To help his son and preserve his own political ambitions, defendant engineered his son's abrupt resignation under the guise of "health" concerns and tapped the dean (among others) to deliver prestigious post-Assembly jobs, degrees, and titles for his son.

In this classic *quid pro quo* exchange, the *quids* and the *quos* were well-defined—indeed, memorialized in multiple emails and a confidential letter the dean had hand-delivered to defendant. Defendant demanded from the dean four benefits for his son: (1) admission to the university for a dual master's degree; (2) a full-tuition scholarship; (3) a paid professorship; and (4) a $100,000 payment from the university to his son's nonprofit. In exchange, defendant pledged his votes and political support for three matters the dean desperately needed to remedy her school's multimillion-dollar budget deficit: (1) a County contract to train employees of the Department of Children and Family Services; (2) the university's

involvement in a neighborhood parole office and County contract with the Probation Department; and (3) the renewal and expansion of an existing County contract whereby the university provided online mental health services to at-risk youth through its Telehealth Clinic.

Both sides delivered. The dean lavished defendant's son with preferential treatment unlike anything in school history and in violation of university policy. Defendant, in return, co-sponsored and voted favorably on motions to support the dean's desired County business and directed his staff and high-level County department heads to move the contracts forward.

Ultimately, after a university whistleblower and subsequent investigation exposed the scheme, the school made a criminal referral to the Federal Bureau of Investigation and United States Attorney's Office. Following almost two weeks of witness testimony and the admission of nearly 500 government exhibits, a jury convicted defendant of conspiracy, the single charged count of federal program bribery, and five counts of honest services mail and wire fraud. This Court should affirm.

# II

## ISSUES PRESENTED

A.    Regarding honest services fraud, whether (1) the government's theory was plainly erroneous where the evidence proved a classic *quid pro quo* and defendant mischaracterizes the record to claim otherwise, (2) sufficient evidence proved materiality, (3) the jury was correctly instructed regarding *mens rea*, or (4) the government's references to defendant's monetization of his public office advanced a plainly impermissible gratuity theory.

B.    Regarding federal program bribery, whether (1) the government's theory was plainly erroneous where reputational benefit was defendant's motive, not the "thing of value" he derived from his scheme, or (2) the district court erred or abused its discretion in instructing the jury.

C.    Whether defendant's conspiracy conviction is valid where its objects are all legally sound.

D.    Whether the district court clearly erred in rejecting defendant's *Batson* challenges.

# III

# STATEMENT OF THE CASE

## A.    Jurisdiction, Timeliness, and Bail Status

The district court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291.

The court entered judgment on September 1, 2023.  (CR-417.)[1] Defendant filed a timely notice of appeal on September 11, 2023.  (CR-419.)  Defendant is not in custody.  (6-ER-1003-04.)

## B.    Statement of Facts and Procedural History

For over 30 years, defendant wielded influence as a prominent politician in Los Angeles and the State of California.  (15-ER-2878-80, 2882-87.)  From 2008 to 2020, defendant served on the Los Angeles County Board of Supervisors, where he and four other Supervisors— known as the "Five Kings and Queens of Los Angeles"—controlled the purse strings to the County's $30 billion budget.  (7-ER-1294; 15-ER-2878, 2882-87; 21-ER-4018; 4-SER-940.)  In 2017, defendant's power

---

[1] "CR" refers to the district court docket sheet.  "AOB" refers to defendant's opening brief.

swelled when he became the chairman of that influential body. (15-ER-2887-88.)

Defendant's son Sebastian Ridley-Thomas followed in his father's political footsteps, becoming a member of the California State Assembly in 2013. (4-SER-1137.) But by 2017, a crisis was unfolding. Sebastian[2] was the target of a not-yet-public sexual harassment investigation—a toxic political threat for politicians during the MeToo movement. (15-ER-2895-98 (all trial exhibits marked 201 through 367 are from defendant's personal email account); 7-ER-1225; 2-SER-516-19, 529, 532, 536, 539, 550; 3-SER-583-93, 631, 688-89, 693 (defendant bcc'd), 710-16, 729, 731, 739, 741, 744; 4-SER-952-57, 1137.) Beyond rendering Sebastian potentially unemployable, a sexual harassment scandal risked tainting defendant by association and hurting his political ambitions, which included a possible run for mayor of Los Angeles. (15-ER-2928-29; 4-SER-961.)[3] To help his son and preserve his own

---

[2] Because defendant and his son share a last name, this brief refers to Sebastian Ridley-Thomas by his first name.

[3] Eight days after Sebastian received a federal subpoena for records related to USC's $100,000 payment to his nonprofit, defendant announced he would not run for mayor. (15-ER-2928-29; 4-SER-961.)

political brand, defendant facilitated Sebastian's quiet exit from state politics. Citing "health issues" as the purported reason for his abrupt resignation, a coordinated legal and public relations team aimed to end the Assembly's internal investigation and avoid a scandal. (7-ER-1189-91, 1291; 15-ER-2931; 2-SER-521-22, 544-45, 560-62; 3-SER-564-65, 568-78, 583-93, 612 ("Named Accusers/Publicized Accusations" listed as task for attorney to address), 620 (same), 622, 631, 693 (defendant bcc'd), 704-60; 4-SER-1137, 1140.) Meanwhile, defendant worked to secure landing spots for his son—advanced degrees, prestigious titles, and paying jobs—to deflect suspicion from Sebastian's sudden resignation and to help him tackle mounting personal debt. (7-ER-1187-88; 15-ER-2931-35; 2-SER-520, 523-28, 530, 537-38, 542-49, 555-58; 3-SER-578-82, 594-625, 629-30, 632-34, 640-46; 4-SER-958.) One of the people defendant leaned on to secure those landing spots was someone he knew needed his help—Marilyn Flynn.

Flynn was the dean of the Suzanne Dworak-Peck School of Social Work ("Social Work School") at the University of Southern California ("USC"), which sat within defendant's district. (7-ER-1295.) In 2017, following her two decades of leadership, a multimillion-dollar budget

7

deficit threatened the graduate school's viability and, in turn, Flynn's deanship, six-figure salary, and legacy. (9-ER-1887-93; 2-SER-513.) To resurrect the school's finances, Flynn needed defendant—a powerful County official and USC alumnus—to help secure lucrative County contracts, which she saw as the school's fiscal lifeline. (9-ER-1892-95; 10-ER-2086; 14-ER-2768, 2776-77; 21-ER-3991.) But defendant's help came at a price.

Over the course of a year, defendant repeatedly turned to Flynn, demanding and soliciting the following benefits for his son: (1) USC admission for a dual master's degree; (2) a full-tuition scholarship; (3) a paid professorship to teach at USC while simultaneously a student; and (4) a $100,000 payment from USC to the Policy, Research & Practice Initiative ("PRPI"), a nonprofit Sebastian spearheaded. The total value of these benefits exceeded $250,000.[4] In exchange, defendant offered Flynn his votes and other acts to move forward lucrative contracts between the County and USC.

---

[4] The scholarship was worth at least $100,000 (14-ER-2684), and the half-time professorship salary was $50,000 (14-ER-2763; 2-SER-401).

### 1. The USC admission, scholarship, and professorship

#### a. Defendant solicits benefits for his son by dangling the carrot of County contracts

In May 2017, defendant contacted Flynn with an ask—his son wanted a master's degree from USC. (7-ER-1146-48; 2-SER-345-46.) At first, Flynn thought Sebastian could "audit" a class, but admission and a "free ride" seemed off the table. (2-SER-347; 15-ER-2991-92.) Defendant persisted. He emailed Flynn an article about his son and suggested a meeting, telling Flynn, "Lots to catch up on." (2-SER-348.) This simple email carried heft and subtext. Defendant and Flynn were not friends and did not speak regularly, as their emails and toll records confirmed. (15-ER-2962-64, 2992-93.) Their infrequent communications pertained to County business alone and increased exponentially in 2017 and 2018 at times when defendant needed things for his son. (*See id.*) From defendant's email, Flynn understood he was seeking assistance with his son's ask and reminding her that he was positioned to help her with County business. She immediately responded, accepting the meeting invitation and offering a "joint degree" for Sebastian. (2-SER-348.) She then emailed Sebastian too, promising him admission to USC to pursue a joint degree, a

9

scholarship, and the ability to attend classes online, despite the fact that no online program existed. (7-ER-1149; 11-ER-2268-70; 15-ER-2995.)

Over the coming months, Flynn worked tirelessly to ensure that Sebastian received almost anything he or defendant wanted, and she tasked employees with fulfilling their requests. (*See e.g.*, 7-ER-1161; 2-SER-350-51, 367, 372-73, 375-83, 389-94, 397, 401-11.) Irrespective of Sebastian's academic qualifications and potentially poor grades, Flynn sought to "open every door" for "the son of Supervisor Mark Ridley Thomas." (7-ER-1147-48.) Flynn characterized her intended exchange as a "full scholarship for our funds"—that is, a full-tuition scholarship in exchange for County funds to benefit the Social Work School. (7-ER-1150; 15-ER-2997-99.)

### b. *Flynn memorializes the* quid pro quo *deal in a hand-delivered letter to defendant*

On June 23, 2017, defendant met with Flynn privately in her office. (2-SER-349, 505; 15-ER-2999.) During this meeting, the two discussed Sebastian's future at USC and County contracts. (7-ER-1155-59.) Flynn then went on a lengthy vacation. (15-ER-3000.)

10

Upon her return, Flynn directed a Social Work School employee to hand-deliver a letter to defendant's office containing "confidential information." (7-ER-1155-59; 2-SER-352.) The employee testified that this request was unusual and that Flynn had never before or subsequently tasked her with this kind of sensitive assignment. (9-ER-1819, 1825; *see* 9-ER-1897.)

The July 23 letter memorialized defendant's *quid pro quo* arrangement with Flynn from their June meeting. Flynn wrote, "I am prepared to follow up on our discussion in my office." (7-ER-1155-59.) "I look forward to working with Sebastian," she said, and will "take steps with him to plan the road ahead." (*Id.*) In the very next sentence, Flynn confirmed the "matters" with which defendant had agreed to assist: (1) "Blocked movement of USC's Title IVe contract with DCFS"; (2) "USC role involvement in [a] refurbished neighborhood parole office [the "Vermont Reentry Center"] and current negotiations for possible IVe contract with Department of Probation ["Probation University"]"; and (3) "Stalled movement of USC Telehealth contract with Mental

Health." (*Id*.)[5]  The first two "matters" involved new or amended contracts with the County whereby the Social Work School would train County employees from the Department of Children and Family Services ("DCFS"), the Department of Mental Health ("DMH"), and the Probation Department ("Probation") in return for taxpayer dollars.  (7-ER-1155-59; 9-ER-1896-1907, 1948-49; 14-ER-2698-2710, 2731-32, 2737-38.)  Regarding the third item, Social Work School students were already providing online mental health services through the USC Telehealth Clinic ("Telehealth") to patients referred by the County; Flynn sought to expand the scope of clients able to be treated, which could substantially increase the number of clients served and thereby boost the school's revenue.  (7-ER-1155-59; 9-ER-1901-07.)

### c.  *Flynn works to deliver on her side of the bargain*

Flynn began carrying out her part of the bargain but encountered numerous obstacles.  For instance, arranging the joint master's degree from the Social Work School and the USC Sol Price School of Public

---

[5] As she told defendant, Flynn believed Title IV-E of the Social Security Act would allow federal funds to flow through the County to USC for these training services.  (7-ER-1155-59; 9-ER-1899, 1901-02.)

Policy ("Public Policy School") proved difficult due to the "specific and very rigid sequence of courses" at the two schools and Sebastian's desire to attend online. (2-SER-350.) Three days after Flynn sent defendant the confidential, hand-delivered letter, she emailed an associate dean to make an "exception" for Sebastian and to "tackle this enigma" so that he could take classes online and out of the required order. (*Id.*)

### d.   *Defendant votes for the Vermont Reentry Center and Probation University*

On August 1, 2017, just a week after the July 23 hand-delivered letter, defendant took official action with respect to Flynn's request for "USC role involvement in [a] refurbished neighborhood parole office." (7-ER-1155-59.) Defendant co-sponsored and voted in favor of an item on the Board of Supervisors' agenda announcing "Recommendations on a Memorandum of Understanding to establish a partnership with the University of Southern California's School of Social Work to enhance services, particularly around health, homelessness and case management," which related to the Vermont Reentry Center in USC's neighborhood. (7-ER-1283, 1285-86.) Upon seeing this agenda item, Flynn emailed a colleague: "Yes, I talked with Mark [defendant] about

this, and I am very happy to see that he was *as good as his word*." (2-SER-354 (emphasis added).)

Following that vote, defendant took official action to facilitate an eventual partnership between the Social Work School and Probation. Defendant co-sponsored an item on the Board of Supervisors' agenda to advance "Probation University." (7-ER-1287-90; 9-ER-1909-12; 4-SER-867-70.) The motion instructed high-level County officials to prepare a report about the feasibility of Probation University and to identify "funding streams" to pay for it. (7-ER-1287-90.) Upon learning that this motion was on the Board's agenda, Flynn emailed a colleague: "I am holding my breath... *MRT [defendant] is really trying to deliver here*." (2-SER-358 (emphasis added).) On October 17, 2017, defendant publicly spoke in support of Probation University and voted in favor of it. (7-ER-1287-90; 4-SER-867-70.)

### e. *The Assembly's sexual harassment investigation prompts Sebastian's sudden resignation under the guise of "health"*

Meanwhile, Sebastian was the subject of two non-public sexual harassment allegations in the Assembly for conduct in 2016 and early 2017. (4-SER-1137.) On November 28, 2017, Sebastian received a

14

letter formally notifying him that the Assembly's investigation had significantly progressed and his interview was imminent. (4-SER-955-57; *see* 4-SER-1032 (calls between defendant and Sebastian that day), 1133.)

In response, dozens of emails show defendant carefully orchestrating his son's resignation and cover story with lawyers, a public relations team, consultants, and Sebastian himself. (*See, e.g.*, 7-ER-1189-91, 1225, 1291; 15-ER-2918 (public relations and legal team assembled to "address the sexual harassment allegations"); 19-ER-3608 (same); 2-SER-521-22, 529, 532, 536, 539, 544-45, 550, 558, 560-62; 3-SER-564-65, 568-78, 583-93, 611-12 ("Named Accusers/Publicized Accusations" listed as a task for attorney to address), 620 (same), 622, 631, 693 (defendant bcc'd), 704-60; 4-SER-1137, 1140.) As rumors began percolating in December 2017 that Sebastian could be the "Next #MeToo to Go" (2-SER-539; 3-SER-714-16; *see also* 2-SER-529; 3-SER-704-05), exaggerated claims about Sebastian's health became the "plausible alternate narrative" to explain away his abrupt resignation (*see, e.g.*, 3-SER-584). The "health issues" pretext served to assuage the public that nothing scandalous prompted the resignation and gave

lawyers a means to undermine the investigation. (*See, e.g.*, 3-SER-693 (defendant bcc'd), 750-51; 15-ER-2942-45.)

While Sebastian certainly had health issues in prior years, he took leave as needed, kept his elected post, and maintained his six-figure salary and health benefits. (15-ER-2951-52; 17-ER-3207; 20-ER-3901-02; *see* 3-SER-585.) Prior to the November 28 Assembly letter, there were no emails discussing plans for resignation, nor any suggesting that Sebastian had a health issue so serious that he would need to resign, let alone within weeks. There was also no planned surgery. (15-ER-2941; 20-ER-3905.) Sebastian elected to have a surgical procedure after receiving the November 28 Assembly letter and scheduled the one-day procedure for December 18, 2017 (the same day the Assembly investigator sought to interview him). (3-SER-693 (defendant bcc'd); 4-SER-952; 15-ER-2941, 2948; 20-ER-3879-80, 3904-05, 3908; *see also* 15-ER-2936, 2940-48.) Sebastian resigned from the Assembly on December 31, 2017. (15-ER-2930-31.)

## f. *Defendant's demands to Flynn escalate after it becomes clear that his son must resign*

Within days of learning about the Assembly investigation's progress, defendant and his son began working to secure multiple

16

landing spots (despite public claims that Sebastian was too ill to work). (*See, e.g.*, 7-ER-1187-88; 2-SER-520, 526-28, 530, 537-38, 542, 546-47, 555-58; 3-SER-600-04, 611-12, 619-22, 629-30.) Chief among their efforts were demands to Flynn to expedite the USC admission, scholarship, and professorship. (7-ER-1160, 1161, 1166; 16-ER-3064-65, 3067-72, 3077-79, 3080-81, 3083-86, 3096-3100, 3104-07, 3118-19; 2-SER-360-409, 530, 537-38, 542, 549, 551-56, 559; 3-SER-616-18, 634-39, 641-42; 4-SER-1032-1044 (*see* defendant's calls with Sebastian, Flynn, and DMH Director Jonathan Sherin from November 29, 2017 through December 26, 2017).)

On December 5, 2017, Sebastian emailed Public Policy School Dean Jack Knott and bcc'd defendant. (2-SER-530.) Sebastian said he wanted a "Practitioner-In-Residence" title for his professorship, a salary in the range of $25,000 for his "beginning compensation," and to "launch in January." (*Id.*) Knott was caught off guard by the demands and urgency. On December 9, 2017, he responded that he did not believe a January start date was feasible and that he would have to "create a part-time position with a salary," which Knott had not been

17

anticipating. (2-SER-537-38.) Sebastian immediately forwarded Knott's disappointing email to defendant. (*Id.*)

Upon learning that the professorship was stalled, in order to turn the screws on Flynn, defendant contacted key department heads to secure their support for the two remaining contracts itemized in Flynn's confidential, hand-delivered letter. On December 10, 2017, defendant called Flynn multiple times. (4-SER-1037-38.) Two days later, he emailed Flynn with the subject line "Your Innovative Proposal" and wrote: "I spoke with Bobby Cagle today. Are you available to chat for a moment?" (2-SER-549.) Cagle, the director of DCFS, was responsible for the first contract referenced in Flynn's confidential letter. (7-ER-1155-59.) Flynn responded that she was eager to get defendant's update (2-SER-364) and spoke with him shortly thereafter (4-SER-1038).

After speaking with Flynn, defendant twice called DMH Director Sherin (4-SER-1039), whose support was critical for the amended Telehealth contract (7-ER-1155-59). Defendant then emailed Flynn with the subject line "John Sherin" and wrote, "He's ready to go," followed by a winking emoji. (2-SER-551-52.) Defendant attached

18

Sherin's personal cell phone number to the email, signaling that he had greased the wheels for Flynn to follow up with Sherin on the details directly. (*Id.*)

Within minutes of seeing that Sherin was "ready to go," Flynn accelerated efforts to finalize Sebastian's scholarship and professorship. She instructed her staff to give Sebastian's admission and scholarship the "highest priority." (2-SER-367; 9-ER-1913-29.) In an exceedingly unusual move, she instructed her staff to "tap our endowed funds"—a "protected fund" not to be accessed—to award the full-tuition scholarship at a time of great financial hardship for the school. (2-SER-367; 14-ER-2772-73.) She made sure to include Sebastian on that email to show him (and defendant, by extension) that she was working hard to deliver on her end of their bargain.

Within hours of Flynn's email, defendant's deputy (a County employee) emailed Flynn to connect her with Cagle (the DCFS director) to "facilitate a meeting to discuss a partnership among USC, DCFS, DMH, and the Probation Department." (2-SER-374.) Flynn responded by urging Knott (the Public Policy School dean) to "get the offer letter out before the holidays" for Sebastian's professorship "in the interests of

19

showing *MRT [defendant]* that we can *deliver*." (7-ER-1161 (emphasis added).)

The unprecedented exigency to "deliver" for defendant and Sebastian during USC's holiday break, when key faculty and staff were traveling, baffled Flynn's colleagues. (*See, e.g.*, 14-ER-2748-50; 11-ER-2205-11.) Nevertheless, at Flynn's direction, staff worked tirelessly to get the scholarship and professorship approved—despite Sebastian's failure to complete an application or send his transcripts, the non-existence of an online dual degree program, and the fact that his simultaneous student-faculty status would violate USC policy. (*See, e.g.*, 7-ER-1161-65; 9-ER-1912-30, 1947; 10-ER-2068-71; 11-ER-2209-17, 2251-53, 2265-71; 14-ER-2743, 2759-61, 2771-73; 2-SER-369-70, 372-73, 375-83, 386-90, 392, 397-98, 401-09, 489, 503-04, 555-56; 3-SER-594-98.)

> **g.** ***After securing the admission, scholarship, and professorship, defendant tells Flynn regarding the Telehealth contract: "Your wish is my command"***

After Sebastian was admitted with a full scholarship (2-SER-386-90; 3-SER-594-98, 613-14), he received word on February 13, 2018 that USC had agreed to waive its usual hiring process for his professorship,

20

which he promptly reported to defendant (3-SER-634). Within hours, defendant delivered on his end of their bargain, emailing Flynn about County business. He sent her a "Probation Reform motion" and said he wanted to talk. (3-SER-635-37.) He also sent her a "Probation Department overhaul proposal" and said, "Lots to discuss." (3-SER-638.) Defendant bcc'd Sebastian on the latter email, despite his son having no connection to County business other than reaping the benefits of the *quid pro quo* scheme. In response to the former email, Flynn wrote that she had "an excellent meeting last night with John Sherin and Bobby Cagle," the two high-ranking public officials in a position to help Flynn obtain a lucrative amendment to the Telehealth contract (Sherin) and secure the DCFS contract (Cagle), and thanked defendant for facilitating the opportunity. (3-SER-639.)

Several days later, Flynn emailed defendant about "an extremely important request" regarding an amendment to the Telehealth contract that was scheduled for the Board of Supervisors' agenda the following week. (7-ER-1192-93.) Flynn told defendant that the contract needed "to expand billable services and to increase the flat rate for services to a level comparable to other county contract agencies." (*Id.*) Her email

21

outlined five specific amendments necessary for the Social Work School to receive more money from the County under the contract. (*Id.*) In response, defendant once again bcc'd his son (despite his lack of connection to County business or this contract) and promised Flynn that he would deliver on his end of their agreed-upon exchange: "Your wish is my command." (7-ER-1194-95.) (Count 15 wiring.)

Defendant then enlisted the help of two other public officials to move the contract forward. He forwarded the email exchange with Flynn to his deputy for follow up. (7-ER-1196-98.) The deputy reported back to defendant that the amendment would not be on the Board's calendar until sometime around August but that she would stay on top of the issue given the "importance of this contract" and would "take the temperature of the other [B]oard offices" to suss out any opposition to the contract. (*Id.*) In addition, over the next few days, defendant repeatedly called Sherin, a critical stakeholder needed to move the Telehealth contract forward. (16-ER-3122-23; 4-SER-1059-60.)

## 2. *The $100,000 payment from USC to Sebastian's nonprofit*

While dealing with Flynn to secure Sebastian's admission, scholarship, and professorship, defendant was also working on another

22

landing spot for his son—director of a nonprofit. Defendant sought to use his campaign funds to support that endeavor, which initially did not involve USC or Flynn at all. But after defendant had difficulty donating campaign funds to his son because the involved organization (Community Partners) felt uncomfortable with the optics, defendant turned to Flynn, notably at a time when one critical County contract still hung in the balance—Telehealth.

### a. Defendant attempts to donate $100,000 in campaign funds to support his son's new job, but it fails due to concerns about nepotism

Three days after the November 28 Assembly letter arrived, defendant commenced an urgent action plan to donate $100,000 from his campaign funds to the African American Civic Engagement Project ("AACEP") and then have his son quickly step in as its director. (*See, e.g.*, 7-ER-1185-88, 1278-79; 15-ER-2931-32; 2-SER-520, 523-28, 533-535 (Sebastian planning to take over AACEP and hire a deputy director), 540-41 (same), 546-48, 558; 3-SER-566-67; 4-SER-862-64, 941, 1034-50 (calls between defendant and the chief executive officer ("CEO") of Community Partners, Paul Vandeventer, from December 1, 2017 to January 25, 2018).) Community Partners served as AACEP's fiscal

sponsor.  (12-ER-2432, 2435.)  As a fiscal sponsor, Community Partners provided administrative support and allowed AACEP to operate under its tax-exempt status, but it did not provide funding.  (12-ER-2425-27; 13-ER-2541-42.)  To take a salary, obtain healthcare, and hire staff, Sebastian needed to fundraise for AACEP.  (12-ER-2437-38, 2528-29; 13-ER-2542-43; 16-ER-3112-15; 3-SER-623-24 (list of potential donors).)

To support his son, defendant donated $100,000 from his campaign committee, the Mark Ridley-Thomas Committee for a Better L.A., to Community Partners for the benefit of AACEP.  (7-ER-1185-86, 1279; 2-SER-546-48; 3-SER-794.)  However, when defendant tried to install his son as the new director soon thereafter, staff at Community Partners questioned the donation's legality and worried about "nepotism" and the poor "optics" of "dad's campaign funds" being used "to hire his son."  (12-ER-2444, 2450-52, 2457-62, 2465-68, 2479-80; 13-ER-2536-37, 2576, 2597-98.)  Community Partners ultimately rejected defendant's proposal and refunded the $100,000.  (4-SER-865-66, 942; 13-ER-2582-85, 2597-98.)

### b. *In exchange for the Telehealth contract, defendant solicits a $100,000 payment from USC to his son's nonprofit*

Following the roadblocks with Community Partners and AACEP, defendant and his son started a new nonprofit, PRPI, in late January 2018. (7-ER-1204-05; 20-ER-3721-31; 3-SER-625-30, 632-33.) Sebastian was its director, and United Ways of California ("United Ways") soon became its fiscal sponsor. (*Id.*) To donate to PRPI, defendant needed to do so in a more covert way to conceal his connection to the funds and thereby ensure the donation's success. With the Telehealth contract still outstanding, defendant approached Flynn, and the two expanded their *quid pro quo* scheme.

Despite defendant's earlier promises in February when he told Flynn "Your wish is my command" (7-ER-1194-95), the amended Telehealth contract—which was critical to ensure Telehealth's "survival"—had not yet materialized (7-ER-1167-80, 1192-98; 9-ER-1952-65, 2041; 10-ER-2138-39; 16-ER-3128-34; 2-SER-412-17). Flynn and her colleagues were worried. (*Id.*) Flynn stated in early April that the Social Work School was approaching a "very critical point" and

25

needed a "better strategy" to secure the amended contract. (2-SER-412.)

That better strategy presented itself on April 20, 2018 when defendant repeatedly contacted Flynn. (3-SER-647-48; 4-SER-1073.) Two days later, defendant spoke with Sherin, the County department head responsible for the Telehealth contract. (4-SER-1074.) After his call with Sherin, defendant immediately called Flynn, and the two spoke for over 46 minutes. (*Id.*) The following morning, Sherin left Flynn a voicemail.[6] (4-SER-1138.)

On April 26, 2018, defendant and Flynn met in person. (2-SER-498, 510, 514; 4-SER-1139.) Flynn's USC lobbying report listed a meeting with defendant "to influence official action" during which they "discuss[ed] a gift agreement." (2-SER-493, 510.) Shortly after that private meeting, Flynn reported "[g]ood news" to Executive Vice Dean John Clapp: "We're going to get the Telehealth contract," she said, "But I had to do a little favor to get it." (9-ER-1965-68; 10-ER-2041.)

---

[6] Although the court excluded the contents of the voicemail, the fact that Sherin left a voicemail for Flynn on April 23, 2018 was in evidence. (4-SER-1138; 16-ER-3136-38.)

Flynn's "favor" soon became clear. In exchange for defendant's vote and prodding of other public officials (like Sherin) to finally bring the amended Telehealth contract to fruition after many delays, Flynn promised to secure a $100,000 payment from USC to United Ways for the benefit of PRPI and Sebastian. (*See, e.g.*, 7-ER-1181-82, 1199-1201, 1214-15, 1219-24; 10-ER-2040-60; 10-ER-2056-57 (Flynn admits she had a "side deal" with defendant and Sebastian in connection with the Telehealth contract); 2-SER-418-81, 486-87 (Flynn touts "working with [Sherin]" with the "assistance of [defendant]" to obtain a "[m]aster [c]ontract" from DMH), 493 (descriptions of meetings with defendant and Sherin), 495, 502, 510, 514-15; 3-SER-647-87, 694, 703; 4-SER-1073-84 (defendant's calls with Flynn and Sherin from April 20, 2018 to May 12, 2018), 1138-39; Exhibit 432 (voicemail from defendant to United Ways CEO Peter Manzo); Exhibits 440 and 441 (voicemails from Flynn to Manzo).)[7] Defendant agreed to direct a $100,000 "gift" from his campaign account to the Social Work School, and Flynn would then facilitate a $100,000 payment from USC to United Ways. (*Id.*) This

---

[7] The government has filed a Motion to File Digital Exhibits for Exhibits 432, 440, and 441.

circuitous transaction was designed to avoid a repeat of the Community Partners debacle—defendant could publicly report on his Form 460s (as he did) that his campaign funds went to USC, without any mention of the money's ultimate destination, PRPI and his son.  (3-SER-853.)

On May 2, 2018, just six days after their April 26 meeting, defendant "donated" $100,000 to the Social Work School with a letter to Flynn stating that the check represented "tangible acknowledgement of the important work" of the Social Work School and that "these funds can be used at your discretion in order to best facilitate the impressive policy and practical work of the School and its impact in the community."  (7-ER-1181-82.)  But the donation letter was a sham.  In reality, the funds had been earmarked for PRPI and Sebastian—a fact which defendant, now forced to confront the obvious nature of the exposed transaction, acknowledges (AOB 20) but which he concealed from everyone except Flynn and his son at the time (*see, e.g.*, 3-ER-495-97; 17-ER-3236-37; 20-ER-3719, 3747, 3774-76).  Unaware of the deal between defendant and Flynn, USC deposited defendant's check, believing it to be a genuine contribution.  (7-ER-1181-82; 2-SER-502; 4-SER-943-44, 1136.)  (Count 19 wiring.)

The day after defendant sent the sham donation letter and $100,000 check, he instructed Flynn in a private email (with a bcc to Sebastian) to "act with dispatch" to donate $100,000 to United Ways no later than May 15 so that PRPI could hire an employee, Zaneta Smith. (7-ER-1199-1201.) (Count 16 wiring.) Defendant also provided United Ways' IRS exemption letter and United Ways' donor form—information Flynn had "requested" to facilitate their agreed-upon $100,000 payment. (*Id.*) Defendant and his son had obtained that information from United Ways under the guise that USC had awarded Sebastian and PRPI a "grant." (*Id.*) While a significant portion of this $100,000 would be used to hire Smith and thus help PRPI become operational, a portion would also be available to pay Sebastian.[8]

At defendant's insistence, Flynn moved heaven and earth to meet his May 15 deadline. She tasked subordinates and contacted United Ways to quickly expedite the $100,000 payment. (7-ER-1214-15; 16-ER-

---

[8] Smith's total compensation was less than $100,000, which meant that part of USC's $100,000 payment would be available to compensate Sebastian. (3-SER-632-33; 4-SER 958; 15-ER-2926-27.) Sebastian planned to take a half-time salary of either $67,200 or $75,000, plus a benefits package worth up to $18,750. (*Id.*)

3148; 2-SER-419-73; Exhibits 440, 441.)  Flynn urged Adriana

Gonzalez, an administrative assistant at the Social Work School, to get

the $100,000 payment issued quickly, confiding in Gonzalez that she

feared getting "in trouble" with someone (who could have only been

defendant) if USC did not issue the check to United Ways.  (15-ER-

2849-50.)  To conceal the *quid pro quo* deal with defendant and ensure

that USC would issue the check in violation of university policy, Flynn

made numerous misrepresentations to USC—she falsely represented to

USC that United Ways was a "vendor" providing services to the

university, that United Ways planned to use the $100,000 payment for

a "survey," and that United Ways would expend the entire $100,000

payment by June 30, 2018, which was the end of USC's fiscal year.  (3-

ER-605-07; 10-ER-2050; 14-ER-2781-87; 15-ER-2853-66; 17-ER-3222-

23, 3254; 19-ER-3646-51, 3659-60; 20-ER-3755-56, 3770; 21-ER-4330-

31.)  Flynn concealed that the funds were to pay a third party's salary,

which USC policy prohibited.  (14-ER-2786-87.)

Meanwhile, as the guiding hand orchestrating the transaction,

defendant acted with dispatch, too.  He instructed Flynn to call Manzo,

the United Ways CEO, to "assure him of the School's commitment and

30

that you have begun the funds transfer process" and directed Flynn to keep him updated on her progress (3-SER-662), which she did almost daily (*see, e.g.*, 2-SER-423-24; 3-SER-652-53, 668-69, 676, 678). At the same time, defendant lobbied Manzo to allow PRPI to hire Smith, assuring him that "Dean Marilyn Flynn of USC will follow up with you on the financial details" and that "USC financial support comes in at $100k" so that Manzo would approve the hire. (3-SER-657-61, 666-67; Exhibit 432.)

On May 9, 2018, just seven days after defendant directed his $100,000 payment to the Social Work School, USC issued a $100,000 check to United Ways. (7-ER-1214-15.) USC mailed the check to United Ways the following day. (2-SER-477-79; 3-SER-860; 4-SER-1135.) (Count 5 mailing.) United Ways then deposited the check. (7-ER-1216; 4-SER-950-51, 1136.) (Count 20 wiring.) Flynn followed with a sham letter thanking defendant for his "generous support" of the Social Work School. (2-SER-481; 17-ER-3239-41.)

After Flynn told defendant that "[e]verything has been cleared" and the $100,000 check would arrive at United Ways by his May 15 deadline, defendant praised Flynn and told her he looked forward to

31

seeing her at an upcoming meeting on County business. (3-SER-679.)
Flynn responded: "This one was easy. Sort of." (3-SER-680.) (While
the USC admission, scholarship, and professorship had taken months,
Flynn had secured this payment within just one week.) Two days later,
upon learning that United Ways had finally agreed to hire Smith for
PRPI, defendant emailed his son, "My piece is done," followed by a fist
bump emoji. (3-SER-681.)

### c. *After Flynn orchestrates the $100,000 payment, defendant delivers the Telehealth contract*

After Flynn delivered on the $100,000 payment, defendant
delivered on his end of their bargain. On May 10, 2018, the day after
USC issued its $100,000 check to United Ways, Flynn met with Sherin,
DMH's director, to discuss "the timing of renegotiation for our
Telehealth contract." (2-SER-493, 510, 515; 17-ER-3230-31.) After the
meeting, defendant emailed Flynn regarding "Today's Meeting" to
"debrief" "confidentially." (3-SER-685.) He again bcc'd Sebastian,
despite his son having no connection to County business or the
Telehealth contract. (*Id.*; 3-ER-505-06.) The following day, defendant
emailed Flynn to discuss "master contract stuff and somehow use
yesterday's 'discussion' to advance it," a reference to the Telehealth

contract and Flynn's efforts to expand it.  (3-SER-687; 3-ER-508.)  Three days later, on May 14, 2018, Flynn made a big announcement to her colleagues—the Social Work School would, in fact, get the amended, "multimillion dollar" Telehealth contract.  (3-ER-508-09.)

On July 31, 2018, defendant voted in favor of the amended Telehealth contract, which (1) renewed USC's Telehealth contract with the County and (2) did so on every expanded, more beneficial term Flynn had requested from defendant.  (7-ER-1167-80, 1192-98; 17-ER-3256-66; 2-SER-412-17; 4-SER-871-939.)  The motion passed.  (4-SER-939.)

### d.  *Flynn admits a "side deal" with defendant and his son to secure the Telehealth contract*

In early June 2018, prior to any public reporting about the $100,000 transaction, Social Work School faculty voted to remove Flynn as dean for her perceived poor performance.  (10-ER-2052-53; *see also* 9-ER-1886-87.)  In a transition meeting with Clapp to help prepare him to serve as interim dean, Flynn emphasized the importance of the amended Telehealth contract for the Social Work School and said that, at some point, she would need to tell him about her "side deal" with

33

defendant and Sebastian in connection with the Telehealth contract. (10-ER-2055-57.)

### 3. *USC makes a criminal referral after a whistleblower exposes defendant's bribery scheme with Flynn*

After a whistleblower came forward with concerns about the $100,000 payment to United Ways (3-ER-511-13), USC began investigating. When USC initially inquired about the unusual arrangement with the dual degree and professorship, Flynn pushed back, noting that "Mark Ridley-Thomas…understand[s] this as a commitment" from USC. (2-SER-488-92.) As the seriousness of the investigation became more apparent, she later revised her internal lobbying reports to scrub descriptions about the content of her communications with defendant and Sherin, including deleting the reference to the "gift agreement" she discussed with defendant on April 26, 2018 and the details of her discussion with Sherin on May 10, 2018 concerning the Telehealth contract. (17-ER-3247-51; 2-SER-493-98, 507 (revised), 510 (original).)

Ultimately, the investigation revealed that the benefits afforded to Sebastian—at times when defendant was providing critical assistance with County business—were unlike anything even so-called VIPs had

ever received from USC. (10-ER-2083-86.) Upon discovering the

unprecedented arrangement, USC returned the $100,000 donation to

defendant, asked for its money back from PRPI, terminated Sebastian's

scholarship and professorship, and made a criminal referral to the

United States Attorney's Office and Federal Bureau of Investigation.

(7-ER-1183-84; 10-ER-2078, 2127-30; 17-ER-3237-38; 20-ER-3762-64; 2-

SER-500-01; 3-SER-690-92, 695-701.)

### 4.   *Indictment*

A grand jury returned an indictment against defendant and Flynn

for conspiracy, in violation of 18 U.S.C. § 371 (Count 1), federal program

bribery, in violation of 18 U.S.C. § 666 (Count 2 against defendant and

Count 3 against Flynn), and honest services mail and wire fraud, in

violation of 18 U.S.C. §§ 1341, 1343, 1346 (Counts 4-20). (6-ER-1110-

44.) Flynn pled guilty to federal program bribery (Count 3). (6-ER-

1005.)

### 5.   *Defendant's trial theory*

Defendant advanced three primary defenses at trial.

First, defendant argued that his preexisting support for the

County business at issue meant that no one would think they needed to

35

bribe him. (1-ER-224.) Relatedly, defendant contended that he never "changed his position" or "sold his vote" on account of any alleged bribe. (23-ER-4383, 4440; *see* 23-ER-4382-87.)

Second, defendant asserted that USC treated Sebastian like a "VIP" not because of any bribe, but because he was "accomplished" and USC was "interested in admitting him." (23-ER-4393, 4398; *see* 11-ER-2273-74.) Defendant elicited testimony that USC thought it "critically important to have a faculty that is diverse" and Sebastian "brought some of that diversity" to USC. (11-ER-2284.)

Finally, defendant focused on the otherwise "legal" nature of the $100,000 transaction and benefits USC provided to his son. Defendant called a campaign finance expert to opine that the $100,000 transaction was "legal under California's Political Reform Act" and that defendant could have donated $100,000 directly to United Ways. (2-ER-304, 333; 23-ER-4410-12, 4432.) Defendant similarly argued that the four *quids* were legal. (23-ER-4438 ("And what happened at USC was legal. It was the scholarship. It was the admission. It was the professor of practice. It was the $100,000 donation to PRPI.").) He ignored that the

*exchange* of otherwise legal *quids for* otherwise legal *quos* was what rendered the arrangement illegal.

### 6.   *Trial and convictions*

During the 16-day trial, the court admitted nearly 500 government exhibits, including hundreds of emails from defendant's personal email account and USC, phone records, bank documents, County records, documents from the public relations and legal team defendant organized for Sebastian, campaign records, medical files for Sebastian, and summary charts, among other exhibits.  (1-SER-3-82.) The jury convicted defendant of conspiracy (Count 1), federal program bribery (Count 2), honest services mail fraud (Count 5), and honest services wire fraud (Counts 15, 16, 19, and 20).  (1-ER-24-43.)  The jury acquitted on the remaining honest services fraud counts.  (Counts 4, 6-14, 17-18).  (*Id.*)

Defendant asserts that the counts of conviction pertain only to the $100,000 payment from USC to United Ways and that the jury acquitted him of conduct related to the USC admission, scholarship, and professorship.  (AOB 3.)  He is mistaken.  While the honest services fraud verdicts pertained only to the Telehealth contract, the benefits

37

defendant solicited in exchange were not limited to USC's $100,000 donation to United Ways. The honest services wire fraud conviction for Count 15 rested on the February 13, 2018 "Your wish is my command" email that defendant sent Flynn (with a bcc to his son) in which he promised to deliver the amended Telehealth contract (per their prior agreement) immediately after Flynn delivered Sebastian's USC admission, scholarship, and professorship. (6-ER-1143; 7-ER-1194-95.) Any discussion of the $100,000 payment from USC to United Ways did not occur until months later in late April 2018. The only *quids* tied to the "Your wish is my command" email are the USC admission, scholarship, and professorship.

### 7. *Post-trial litigation*

Defendant filed post-trial motions for acquittal and a new trial. The court denied both motions. (1-ER-7-23.)

### 8. *Sentencing*

The court sentenced defendant to 42 months' imprisonment, followed by three years' supervised release, and imposed a $30,000 fine. (1-ER-2.) Having observed the "substantial detail" of the "documentary evidence and testimony" presented at trial (2-SER-307), the court

38

characterized defendant's solicitation of Flynn as a "shakedown" (2-SER-310-11). The court stated that defendant "used his position and power" to demand "benefits for his son who was under scrutiny for claims of sexual harassment while serving as a member of the California State Assembly, a position he had resigned claiming health concerns." (2-SER-308.) Defendant's "motive was purely to help his son and himself," and "he was willing to betray the trust placed in him by this community to do so." (2-SER-322.)

## IV

## SUMMARY OF ARGUMENT

Defendant mounts a robust legal defense for a trial that never happened. He distorts the government's trial presentation, omits jury instructions and critical facts fatal to his claims, and repeats his self-serving narrative the jury heard—and rejected. He fails to appreciate how his challenges to the sufficiency of the evidence are reviewed—drawing all facts and inferences in favor of the government—and instead presents his arguments and assertions as if he is entitled to an appellate retrial. His claims uniformly lack merit.

A.     Defendant's honest services fraud convictions are legally valid and supported by sufficient evidence.

*First*, contrary to defendant's strawman claim erected for the first time on appeal, the government did not proceed on a theory that the *quid* was "a perceived reputational benefit." (AOB 33.) The indictment and jury instructions identified the *quids* in the bribery scheme as the USC admission, scholarship, professorship, and $100,000 payment from USC to United Ways, and both parties argued to the jury based on those *quids* alone. Reputational benefit was merely evidence of defendant's motive. The government's bribery theory—soliciting financial benefits for an official's family member in exchange for a government contract—falls comfortably within the honest services fraud statute as interpreted by *Skilling v. United States*, 561 U.S. 358 (2010).

*Second*, defendant's attack on materiality is similarly divorced from the record. Amply sufficient evidence demonstrated acts by defendant capable of influencing the County, its employees, and the public—the most obvious of which were his solicitation and concealment of bribes, votes on Flynn's coveted County business, and influence over

40

other government officials to move Flynn's sought-after contracts forward.

*Third*, the district court properly instructed on the *mens rea* for honest services fraud by telling the jury it must find that defendant acted with the intent to deprive County residents of their right to his honest services through *quid pro quo* bribery.

*Finally*, the government did not rely on a gratuity theory for the honest services fraud charges. Arguments that defendant "monetized" his public office—that is, traded official acts for private gain—were plain references to *quid pro quo* bribery. It is no defense to bribery that defendant may have, or even should have, performed an official act without the bribe—and saying so did not invite the jury to convict based on a gratuity. Moreover, by requiring a *quid pro quo*, the jury instructions categorically foreclosed conviction on a gratuity theory.

B.    Defendant's attacks on his federal program bribery conviction are equally flawed.

*First*, defendant repeats his newly-invented claim that the government proceeded on a theory that reputational benefit was the "thing of value." As the district court expressly instructed the jury—in

41

an instruction defendant approved yet omits from his opening brief and excerpts of record—the only alleged things of value were the USC admission, scholarship, professorship, and $100,000 payment from USC to United Ways.

*Second*, defendant's challenges to the jury instructions are meritless. This Court's binding precedent does not require a *quid pro quo* for federal program bribery. Additionally, the district court did not abuse its discretion in declining to give defendant's proposed instruction regarding gratuities and currying favor. That instruction was erroneous, confusing, and unnecessary given the other instructions properly articulating the elements of federal program bribery.

*Finally*, any alleged error was harmless because the jury found a *quid pro quo* with its five honest services fraud convictions.

C.    The conspiracy conviction is valid because all its objects are legally sound.

D.    The district court did not clearly or otherwise err in denying defendant's *Batson* challenges to the strikes of two Black jurors. Regarding Juror 13, defendant failed to establish a prima facie case. The court applied the correct legal standard (totality of the relevant

facts), the government's case-specific questioning of numerous jurors showed no pattern of purposeful discrimination, the government offered race-neutral reasons for the strike (including her experience in local government and defense-friendly pronouncements about the legality and commonplace practice of legacy admissions), and the government subsequently struck white jurors with similar advanced-degree credentials. Regarding Juror 1, the court did not clearly err in crediting the prosecutors' explanations for the strike, including that the juror was shaking her head during the reading of the charges, suggesting potential anti-government bias. Significantly, the government did not utilize all its peremptory strikes, and the final jury included two Black men and one Black/Hispanic man, along with at least eight women: three Hispanic, one Hispanic/white, two Asian-American, and two white. A highly diverse jury delivered defendant's convictions. Those convictions should be affirmed.

# V

# ARGUMENT

## A. The Honest Services Fraud Convictions Are Legally Valid and Supported by Sufficient Evidence

### 1. *Standard of review*

"[W]hen a Rule 29 motion is made on a specific ground, other grounds not raised are waived," *United States v. Hong*, 938 F.3d 1040, 1047 (9th Cir. 2019), and reviewed for plain error, *United States v. Sullivan*, 797 F.3d 623, 632 n.5 (9th Cir. 2015). Contrary to his newly-minted appellate claim, defendant never asserted below that the *quid* was something other than the four things of value enumerated in the indictment and jury instructions, nor did he argue that the alleged *quid* was reputational benefit. Defendant cannot circumvent the plain error standard by characterizing that claim as a challenge to the legal validity of his convictions. Even if a pure question of law may be reviewed *de novo*—a proposition to which the government objects—that exception does not apply to mixed questions of law and fact. *United States v. Yijun Zhou*, 838 F.3d 1007, 1010, 1012 (9th Cir. 2016). Whether the government pursued a reputational benefit theory involves a mixed question of law and fact, *i.e.*, "the application of a legal

44

standard to a particular set of facts." *Id.* at 1012 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)) (mixed question of law and fact requiring plain error review exists where this Court must review, among other things, the indictment and transcripts). Defendant's assertion that the government "failed to prove an essential element of the honest services fraud charges" (AOB 37) underscores that his argument necessitates a review of the trial record, thus presenting a mixed question of law and fact that is reviewed for plain error.

Accordingly, defendant must demonstrate that the government "clearly" or "obviously" proceeded solely on a reputational benefit theory. *United States v. Olano*, 507 U.S. 725, 734 (1993) (defendant bears burden of establishing plain error). He also must establish that the alleged error affects substantial rights and the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 732-36.

Defendant's preserved challenge to the sufficiency of the evidence regarding materiality is reviewed *de novo*, *Hong*, 938 F.3d at 1047, but in a manner that is "highly deferential" to the jury's verdict, *United States v. Rubio-Villareal*, 967 F.2d 294, 296 (9th Cir. 1992) (en banc).

45

His challenge fails if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Finally, this Court "review[s] the formulation of jury instructions for abuse of discretion, but review[s] de novo whether those instructions correctly state the elements of the offense and adequately cover the defendant's theory of the case." *United States v. Koziol*, 993 F.3d 1160, 1179 (9th Cir. 2021) (quotations omitted). The question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *Id.* (quotations omitted). Unpreserved instructional challenges are reviewed for plain error. Fed. R. Crim. P. 30(d), 52(b).

### 2. *Defendant's claim that "reputational benefit" was the* quid *is contrary to the record and court's instructions*

#### a. *"Reputational benefit" was the motive, not the* quid

The alleged theory that the *quid* was "perceived reputational benefit" (AOB 33) exists nowhere in the record. From indictment to closing argument, the government's theory was clear—the four things of

46

value (or *quids*) defendant demanded and solicited were the USC admission, scholarship, professorship, and $100,000 payment from USC to United Ways.  (6-ER-1116, 1136, 1138 (indictment); 9-ER-1752 (opening); 1-ER-123-24, 129, 134, 147, 167, 185, 202 (closing); 23-ER-4494 (rebuttal).)  Defendant repeatedly acknowledged in both his closing argument and motion for judgment of acquittal that those four benefits were the alleged *quids*.  (1-ER-204; 23-ER-4438; 6-ER-1073, 1082.)

The court echoed the government's theory.  At the outset of the case, the court told the jury that the "indictment [] alleges" four "benefits" for defendant's son traded in exchange for official acts—the admission, scholarship, professorship, and $100,000 payment from USC to United Ways.  (4-ER-688.)  During deliberations, in a supplemental instruction defendant approved yet fails to acknowledge on appeal, the court instructed the jury that the "thing of value in this case is alleged to be one or more of the following: [1] Admission to the University of Southern California (USC) for Sebastian Ridley-Thomas; [2] A scholarship for Sebastian Ridley-Thomas to attend USC; [3] A paid professorship for Sebastian Ridley-Thomas to teach at USC; or [4] A

$100,000 payment from USC to the United Ways of California." (1-SER-2, 249.) While the instruction enumerated the alleged things of value for the federal program bribery count (*id.*), it equally informed what the *quids* were for the honest services fraud counts. With respect to honest services fraud, the court instructed the jury that it must find the exchange of "a thing of value" for official acts (1-ER-74, 75), and the supplemental instruction contained the only definition of a thing of value the jury received.

Defendant's concerns about the reputation of the Ridley-Thomas political brand simply explained his *motive*—that is, *why* he sought the benefits for his son and *why* he sought to obtain those benefits in a secretive manner. (*See, e.g.*, 1-ER-121-22, 170-71, 180; 6-ER-1111-12; 9-ER-1751; 23-ER-4519-20.) The government argued that the crisis caused by the Assembly's sexual harassment investigation and Sebastian's resignation was defendant's "motive" for escalating his demands on Flynn and that bad political optics were the "real reason" defendant sought to secure the $100,000 payment from USC. (23-ER-4519-20, 4549.) *See United States v. Yates*, 16 F.4th 256, 264 (9th Cir. 2021) (argument that bank officers desired to increase the value of their

48

stock was offered as motive for some of defendants' conduct, "not as an independent theory of the object of the scheme"); *United States v. Kemp*, 500 F.3d 257, 284-85 (3d Cir. 2007) (approving a loan to the defendant, done for purpose of making him "look good," was a bribe).  In denying defendant's motion for acquittal, the court agreed that a desire to conceal the $100,000 payment was defendant's "*motive* for entering into the bribery agreement" but was not the basis of the charge.  (1-ER-14 (emphasis in original).)

Bribery for purposes of the honest services fraud statute, 18 U.S.C. § 1346, involves seeking or accepting anything of value in exchange for an official act.  *See McDonnell v. United States*, 579 U.S. 550, 562 (2016); *United States v. Renzi*, 769 F.3d 731, 744 (9th Cir. 2014).  A "thing of value" has been "interpreted broadly to carry out the congressional purpose of punishing the abuse of public office" and includes "the value which the defendant subjectively attaches to the items received." *Renzi*, 769 F.3d at 744 (quotations omitted).  Money— here, a $100,000 payment from USC to Sebastian's nonprofit—is "indisputably a thing of value." *United States v. Abdelaziz*, 68 F.4th 1, 24 (1st Cir. 2023).  Ignoring that obvious proposition, defendant argues

that the payment did not enrich him personally and had only reputational benefit to him. (*See* AOB 33, 35, 36, 41.) However, a benefit to someone other than the public official, such as a relative, is a legally cognizable—indeed, commonplace—*quid*. "[P]rivate gain is not an element of honest services fraud." *United States v. Inzunza*, 638 F.3d 1006, 1018 (9th Cir. 2011). "A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants." *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005) (internal citations omitted). "[T]he public is deprived of its servants' honest services no matter who receives the proceeds." *Id.*

Federal bribery statutes reject the notion that the public official must have himself personally profited. Federal program bribery occurs where a public official "corruptly solicits or demands for the benefit of *any person*, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B) (emphasis added). Similarly, for bribery of federal public officials, the thing of value need not be given, offered, or

50

promised to the public official himself. 18 U.S.C. § 201(b)(1). Rather, the bribe can be directed to "any other person or entity." *Id.*

Ample precedent confirms that benefits in bribery schemes can flow to someone other than the public official. *See, e.g.*, *United States v. Frega*, 179 F.3d 793, 798 (9th Cir. 1999) (bribe included over "$100,000 in payments and benefits—including automobiles, car repairs, money orders, an apartment, health club memberships, and a queen-sized bed—to the judges or *members of their families*") (emphasis added); *United States v. Siegelman*, 640 F.3d 1159, 1169-72 (11th Cir. 2011) (donation to governor's education lottery foundation); *United States v. McNair*, 605 F.3d 1152, 1198 (11th Cir. 2010) (scholarship for official's son). Several cases defendant cites (AOB 35-36) also involved a benefit for someone other than the public official directly. *See, e.g.*, *United States v. Mandel*, 591 F.2d 1347, 1356 (4th Cir.), *aff'd on reh'g*, 602 F.2d 653 (4th Cir. 1979) (diamond bracelet for public official's wife); *United States v. Lovett*, 811 F.2d 979, 982 (7th Cir. 1987) (interest in cable company for public official's close personal friend).

In passing, defendant suggests that arguments about defendant seeking to funnel his campaign funds through USC signaled that

reputational benefit was the *quid*. (AOB 33, 36.) He is wrong. The reference to funneling the money through USC inherently involved the ultimate $100,000 payment to Sebastian's nonprofit (the *quid*, as instructed by the court and alleged in the indictment for all counts) and offered evidence of the corrupt nature of the exchange, defendant's intent, and his motive.

To the extent defendant suggests that there can be no bribe because USC purportedly lost no money (AOB 37), that argument is wrong both factually and legally. Factually, defendant donated $100,000 to the Social Work School to "facilitate the impressive policy and practical work of the School and its impact in the community" (7-ER-1181)—a donation USC was entitled to keep. *See Burton v. United States*, 196 U.S. 283, 297 (1905) (title of a check passes to its recipient upon delivery of the check). But neither the Social Work School nor any other program at USC ever saw a penny of defendant's "donation" because defendant directed Flynn to immediately send $100,000 from USC to United Ways, and Flynn followed that instruction to obtain defendant's promised actions on the Telehealth contract.

As a legal matter, the $100,000 payment from USC to United Ways involved a thing of value, even if defendant arguably provided the seed money for that payment and USC therefore did not suffer a "loss." A payment that has value to the defendant, including a loan that the official must repay and thus results in no loss to the bribe-payor, is a thing of value. *Kemp*, 500 F.3d at 284-85 (approval of a loan can be a bribe, even if the loan needs to be repaid); *United States v. Crozier*, 987 F.2d 893, 901 (2d Cir. 1993) ("[A]ny payment that the defendant subjectively believes has value, including a loan, constitutes a thing 'of value' within the meaning of § 666(c)."); *United States v. Gorman*, 807 F.2d 1299, 1304-05 (6th Cir. 1986) ("thing of value" in bribery case "must be broadly construed" to include loan). In *Renzi*, this Court rejected the argument that "an equal value exchange cannot constitute 'something of value' because there was no net loss to the victim." 769 F.3d at 743-44. The defendant in *Renzi* demanded that a private business purchase land owned by Renzi's friend (who owed money to Renzi) in exchange for Renzi's promise to support favorable legislation. *Id.* at 737. Even if the business paid a fair market price for the land (and received an offer to resell it at a profit), this Court held that Renzi

53

committed honest services fraud because, in exchange for utilizing his influence to move a bill through Congress, he received money he was not otherwise entitled to receive (early repayment of the friend's debt) that had subjective value to him. *See id.* at 744. Likewise, in exchange for moving the Telehealth contract to fruition, defendant obtained a $100,000 donation to United Ways for his son's nonprofit that he was not otherwise entitled to receive, and the money had subjective value to defendant because it provided employment for his son and paid the PRPI employee's salary.

Accordingly, there is no error, plain or otherwise, related to the fictitious *quid* of reputational benefit premised on a strawman record.[9]

---

[9] Moreover, even if the government had suggested inadvertently that reputational benefit could be a *quid* (it did not), the court instructed the jury that it must follow the court's instructions. (1-ER-45, 48-49.) Because the court expressly enumerated the four items of value solicited as part of the bribery scheme—and reputational benefit was not one of them (1-SER-2)—any error was harmless. "Jurors are presumed to follow the court's instructions." *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011); *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995).

### b.    Skilling *and related cases are irrelevant*

Because the government did not proceed on a reputational benefit theory, defendant's treatise on *Skilling* is immaterial.  (AOB 34-38.)  There, the Supreme Court held that honest services fraud covers only bribery and kickback schemes.  *Skilling*, 561 U.S. at 409.  Other types of schemes, such as those rooted in undisclosed self-dealing, do not fall within the ambit of section 1346.  *Id*. at 410-11.  Because the court instructed, the government argued, and the evidence supported that the honest services fraud scheme must have involved a bribe, *Skilling* is irrelevant.

Specifically, the court instructed the jury that defendant's honest services fraud scheme must have "consisted of a *bribe* in exchange for at least one official act by defendant, with all of you agreeing as to which act." (1-ER-68, 70 (emphasis added).)  The instructions elaborated:

> Bribery involves the exchange of a thing or things of value
> for official acts by a public official, in other words, a "quid
> pro quo" (a Latin phrase meaning "this for that" or "these for
> those").  Bribery also includes offers and solicitations of
> things of value in exchange for official acts.  That is, for the
> payor, bribery includes the offer or agreement to provide a
> thing of value to a public official in exchange for an official
> act.  For the public official, bribery includes the public
> official's solicitation or agreement to accept a thing of value
> in exchange for an official act.  It is not sufficient for the

55

government to prove that defendant failed to disclose a conflict of interest or violated a rule, policy, or contractual obligation of his position; *the government must prove a scheme to deprive the public of defendant's honest services through bribery.*

(1-ER-74-75 (emphasis added).) These instructions incorporated defendant's proposed language. (5-ER-941, 973.)

Defendant takes no issue with the instructions enumerating the bribery requirement, nor does he claim the government incorrectly articulated the law. Indeed, in its closing argument, the government repeatedly emphasized that an honest services fraud scheme must involve bribery. (*See, e.g.*, 1-ER-131-32, 203.) Defendant's extensive discussion of *Skilling* is premised on his mistaken notion that the *quid* was reputational benefit. Because that premise is belied by the record, his *Skilling* discussion is a distraction.

Defendant's other cited cases are equally irrelevant. (AOB 38-42.) In *Abdelaziz*, parents paid a college admissions consultant money to help their children get accepted to universities as athletic recruits under false pretenses, and the consultant, in turn, provided some of the funds to university athletic programs. 68 F.4th at 15-17. The First Circuit ruled that the parents' payments to the universities, whose

56

interests were betrayed by their agents (the coaches), did not constitute bribes for purposes of section 1346. *Abdelaziz* reasoned that section 1346 was adopted to overrule *McNally v. United States*, 483 U.S. 350 (1987), which had rejected the honest services theory of fraud; that *Skilling* held that "§ 1346 criminalizes *only* the bribery-and-kickback core of the pre-*McNally* case law"; and that no pre-*McNally* case involved a purported bribe paid to the victim of the bribery scheme. *Id.* at 28-29 (quoting *Skilling*, 561 U.S. at 409). *Abdelaziz* further rejected as a basis for bribery the fact that the university insiders stood to benefit professionally, noting that an indirect professional benefit such as a salary increase or "psychic" benefit such as approbation from one's superior is not the sort of private gain that makes an act criminal under section 1346. *Id.* at 31 (citing *United States v. Thompson*, 484 F.3d 877, 884 (7th Cir. 2007)).

No such concerns exist here. Unlike in *Abdelaziz*, the bribes in this case were not paid to the defrauded entities (the County and the public) or their agents, and defendant's benefits were not limited to professional or psychic benefits. The bribery scheme here—the

exchange of official acts for monetary benefits for an official's son—falls squarely within the bribery-and-kickback core of pre-*McNally* case law.

Defendant's other cases fare no better. In *Thompson*, unlike here, neither the defendant nor any other public official was accused of taking a bribe or receiving a kickback. 484 F.3d at 881. *Yates*, too, did not involve bribery. That case involved a scheme by bank officials to deceive the bank while continuing to draw their salaries, and this Court held that salary maintenance (as opposed to a scheme whose object was to obtain a new or higher salary) was not a property interest sufficient to support bank fraud. 16 F.4th at 266-67. Finally, *United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015), involving the former governor of Illinois, actually supports the government's theory. There, the court reversed counts where the instructions permitted conviction based on logrolling (the trading of political votes and appointments among politicians) but ruled that the defendant could be retried on the government's alternative theory of making a political appointment (official act) in exchange for a private payment in the form of a large donation to a social welfare organization that the defendant would control. 794 F.3d at 733-38.

58

Accordingly, viewing the evidence in the light most favorable to the government, as defendant concedes this Court must (AOB 34), his contention that the honest services fraud convictions were based on a legally incognizable *quid* is meritless.

### c. The government's paradigmatic bribery theory will not chill legitimate policymaking

Defendant—supported by amici Ninth Circuit Federal Public and Community Defenders and Former California Officials, who parrot his attacks on a fictional trial record—argues that recognizing reputational benefit as a basis for honest services fraud would "grind policymaking as we know it to a halt." (AOB 33.) Because defendant's prosecution was not based on that newly-invented theory, defendant's parade of horribles in which ribbon-cutting ceremonies would subject elected officials to federal prosecution is a myth. (AOB 33, 42-43.) The self-serving narrative that defendant could not have known that his otherwise legal acts transgressed into illegal territory is one the jury heard—and properly rejected. Nothing about the *quid pro quo* scheme here fails to provide "fair notice" to the average official about acceptable political bounds. (AOB 42.) Schemes involving benefits for a public official's relative, close friend, or other third party traded for official

59

acts are plainly illegal and have been for decades. *See, e.g.*, *Frega*, 179 F.3d at 798; *Siegelman*, 640 F.3d at 1169-72; *McNair*, 605 F.3d at 1198; *Kemp*, 500 F.3d at 268, 285-86; *Spano*, 421 F.3d at 603; *Lovett*, 811 F.2d at 982; *Mandel*, 591 F.2d at 1356.

The cross-examination of defendant's former deputy (and chief of staff while he was on the Los Angeles City Council) most clearly dispels this sky-is-falling fiction. (21-ER-4047-48.) Karly Katona testified that she would recuse herself from an official decision or action having any financial tie to a close family member because it is "the right thing to do" and she is not "working for personal gain." (21-ER-4039-40.) Had anyone offered her a "bribe" or "something of value in exchange for [her] taking an action or making a recommendation," she would "report" it. (21-ER-4040.) Even for defendant's fiercely loyal former aide, the crux of this case is simple: trading official acts for financial benefits to one's son is wrong and corrupt.

Amici Former California Officials argue that defendant's donation from his ballot measure committee to the Social Work School was legal under California law, but they ignore that defendant was not prosecuted for his sham donation. Rather, he was prosecuted for

60

soliciting, demanding, accepting, and agreeing that—in exchange for getting Flynn the amended Telehealth contract—Flynn use those funds not for their stated purpose but rather to make an equivalent payment of USC's money to United Ways for PRPI. *Percoco v. United States*, 598 U.S. 319 (2023), is inapposite. *Percoco* rejected the Second Circuit's theory that a private citizen could deprive the public of its intangible right of honest services if he or she had a "special relationship" with the government and had "dominated and controlled" government business. *Id.* at 322 (quotations omitted). That standard—suggesting a private person has a fiduciary duty to the public when their "clout exceeds some ill-defined threshold"—was too vague and did not define the right of honest services "with sufficient definiteness that ordinary people can understand what conduct is prohibited or in a manner that does not encourage arbitrary and discriminatory enforcement." *Id.* at 330-31 (quoting *McDonnell*, 579 U.S. at 576) (quotations omitted). Here, defendant was a public official and his agreement to deliver a government contract in exchange for USC's $100,000 payment for the benefit of PRPI is a long-recognized form of bribery that raises no such danger.

Amici Federal Defenders similarly rest their argument on the false premise that the government relied on the theory that "perceived reputational benefits…qualify as things of value." (Brief (dkt. 23) at 3.) Like amici Former California Officials, their brief makes no reference to USC's $100,000 payment to United Ways for PRPI or the Telehealth contract that defendant promised in exchange. Nor do Federal Defenders contend that university admission, a full-tuition scholarship, or a paid professorship—the *quids* underlying Count 15, *see supra* section III.B.6—do not qualify as things of value under the honest services fraud statute.

In sum, the honest-services-fraud crimes of which defendant was convicted were not based on a novel reputational benefit theory but rather a well-worn bribery theory involving financial benefits in exchange for a government contract. Nothing in this case "'cast[s] a pall of potential prosecution' over everyday interactions" between elected officials and their constituents. (AOB 42 (quoting *McDonnell*, 579 U.S. at 575).) Even if defendant's funneling of $100,000 to United Ways and PRPI through USC would otherwise have been legal, soliciting Flynn to

do so in return for the Telehealth contract was not. The *quid pro quo* trade was paradigmatic bribery and honest services fraud.

### 3.   *Amply sufficient evidence demonstrates materiality*

#### a.   *Defendant's acts were capable of influencing the County, its employees, and the public*

Honest services fraud requires a showing of materiality. *United States v. Milovanovic*, 678 F.3d 713, 727 (9th Cir. 2012) (en banc). An act is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (quotations omitted). For honest services fraud, materiality exists where "misinformation" or an "omission" is "capable of leading a reasonable [decisionmaker] to change its conduct." *Milovanovic*, 678 F.3d at 727 (quotations omitted).

The government agrees that the fraudulent scheme must have been materially deceptive with respect to the parties deprived of honest services, not third parties—what defendant refers to as the convergence doctrine. *Cf. United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989). Ignoring plain evidence to the contrary, defendant asserts that the government failed to prove materiality because it "adduced no evidence

of deception material to the public, relying exclusively on misrepresentations and omissions it alleged were material to USC and third parties." (AOB 51.) That is false. Ample evidence established numerous material acts by defendant capable of influencing the County, its employees, and the public.

Most fundamentally, defendant demanded and accepted a bribe in exchange for supporting the amended and extended Telehealth contract, and he concealed his demand for, and acceptance of, that bribe. The concealed bribe was certainly material. Knowledge of its existence was capable of influencing, for example, the decisions of various County officials who advanced, formulated, and approved the amended Telehealth contract.

Indeed, this Court and others have had no difficulty grasping the obvious proposition that knowledge of a bribe can lead uncorrupted decisionmakers to change their conduct. For instance, in *United States v. Jacobs*, 506 F. App'x 558 (9th Cir. 2013), there was sufficient evidence of materiality because an immigration officer's scheme to take bribes in exchange for immigration information and assistance had a natural tendency to influence, or was capable of influencing, the

64

defendant's employing agency. *Id.* at 559-60. Likewise, in *United States v. Foxworth*, 334 F. App'x 363 (2d Cir. 2009), the Second Circuit found sufficient evidence of materiality because a state senator's non-disclosure of a bribe naturally tended to influence decisionmakers who awarded lucrative contracts to the briber. *Id.* at 366. The same is true of the public at large who elected defendant. *Id.* "When a public official is bribed," the deception lies in the fact that "he is paid for making a decision while purporting to be exercising his independent discretion." *United States v. Bohonus*, 628 F.2d 1167, 1171 (9th Cir. 1980). Knowledge of such deception would be capable of, for example, influencing citizens in choosing their elected representatives or seeking government redress with respect to the contract at issue. As the government told the jury during closing, honest services fraud is a "scheme to deprive *the public* of its right to [defendant's] honest services" and "[t]aking a bribe is the most fundamental violation of that." (1-ER-131 (emphasis added).)

Additionally, defendant performed other material acts beyond his demand, receipt, and concealment of bribes. It is axiomatic that a public official "commits honest-services fraud when [he] sells [his] vote."

*United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997). As the government argued in closing, defendant's "votes" were material since they were capable of influencing County officials and the public (1-ER-203), and the jury rationally could have so found. The district court correctly agreed, concluding that defendant's vote on Telehealth had a natural tendency to influence the County's actions regarding that contract. (1-ER-12.) Indeed, defendant's vote could certainly influence the County in its decision to execute the amended Telehealth contract and eventually pay USC under the amended terms. Defendant's vote was also capable of influencing the residents of Los Angeles in their support for the initiatives the contract involved.[10]

---

[10] Defendant correctly observes that the material act need not be the same as the "official act" required by section 1346. (AOB 53 n.12.) But defendant fails to cite any authority establishing that the same act can never satisfy both requirements. While the scheme or plan must consist of a bribe in exchange for at least one official act, defendant need not perform the official act. *United States v. Kimbrew*, 944 F.3d 810, 815-16 (9th Cir. 2019). It is the *promise* of an official act traded for some benefit that satisfies the second element of honest services fraud. *Id.* But where an official goes further and actually performs the official act, that execution constitutes a material act—indeed, one of the most material there can be: a vote in favor of a measure obviously tends to make the measure more likely to pass. *See Jacobs*, 506 F. App'x at 559-60 (securing the promised immigration benefit satisfied materiality).

Moreover, as the government also argued in closing, material acts included defendant "advising [] other officials." (1-ER-203.) For example, defendant directed his deputy to move the amended Telehealth contract forward on the terms Flynn sought. (7-ER-1196-98.) Defendant also contacted Sherin, the DMH director and critical gatekeeper to Telehealth's advancement, to enlist his support for the contract amendment. (4-SER-1074 (defendant's call with Sherin on April 22, 2018 and a 46-minute call with Flynn immediately afterward), 1138 (Sherin's voicemail to Flynn on April 23, 2018).) While these actions need only be *capable* of influencing County employees, here they actually did. Defendant's outreach to Sherin prompted him to contact Flynn at a key moment when defendant was soliciting the $100,000 payment from her. (*Id.*) And the deputy's reply email shows her taking steps to move the contract forward, just as her boss (defendant) made clear he wanted. (7-ER-1196-98.) *See Jacobs*, 506 F. App'x at 560 (sufficient evidence of materiality where "scheme did in fact influence" subordinate to confer immigration benefits at defendant's direction). What defendant fails to appreciate in suggesting (incorrectly) that the government needed to call a County employee to testify that they *could*

67

have been influenced (*see* AOB 52) is that the government offered evidence that County employees actually *were* influenced. The government's evidence exceeds even what defendant (or the law) demands.

Defendant points to comments in the government's closing argument about lies Flynn told USC to facilitate the university's $100,000 payment for the benefit of PRPI and lies defendant told USC (in his sham donation letter) and United Ways about the $100,000 payment. (AOB 47.) Those comments did not reference materiality— defendant's quoted phrase "material … lies" (AOB 47) appears nowhere on the page he cites (1-ER-200)—and were instead made in the context of arguing that defendant's and Flynn's lies and misrepresentations proved that USC's $100,000 payment to United Ways constituted a bribe, not a legitimate payment (*see* 1-ER-201). With respect to materiality, what the government *actually* argued was that "*defendant's* acts"—that is, his "votes" and "advising of other officials"—"were material." (1-ER-203 (emphasis added).)

At no time during its closing did the government argue that *Flynn's* acts satisfied materiality. Rather, in its opposition to

68

defendant's motion for acquittal, the government told the court that *defendant's* lies and acts with respect to Flynn and USC were among his numerous material acts—and they were. (6-ER-1047-49.) Although not necessary for the jury's finding of materiality given the other evidence of his concealed bribes and official acts, defendant's acts with respect to USC and United Ways were capable of influencing, not just those parties, but the County and public as well. For instance, had the County or public known that defendant lied to USC with his sham donor letter or misled United Ways (which were acts to facilitate and conceal the bribery scheme), those acts could have influenced the County or public in its support of defendant or the Telehealth contract. The jury would not have been irrational in concluding that defendant's acts to further the scheme, as the indictment alleged (6-ER-1116-17, 1139), were material in this regard.

Defendant's challenge to the proof of materiality also rests on the incorrect premise that convicting a public official of honest services fraud requires proof of specific material false statements or omissions beyond defendant's solicitation, acceptance, and concealment of a thing of value in exchange for a government contract. (AOB 50.) No such

proof is required. Section 1346 provides that a scheme "to deprive another of the intangible right of honest services" is a type of "scheme or artifice to defraud," and a scheme to defraud does not require proof of specific false statements. *United States v. Woods*, 335 F.3d 993, 999 (9th Cir. 2003); *United States v. Munoz*, 233 F.3d 1117, 1131 (9th Cir. 2000). Although *Milovanovic* stated that the defendant in an honest services fraud case must "misrepresent or conceal a material fact," 678 F.3d at 726, here, concealment of the bribe is sufficient. *See Frega*, 179 F.3d at 804 ("[B]ribery and concealing bribery are part and parcel of the same scheme.").

Contrary to defendant's claim (AOB 47, 52-53), there is no requirement that the government call a random member of the public or a County official to testify that he or she would have wanted to know the details of the bribery scheme or to explain how that knowledge would have influenced him or her. Tasked with using their reason and common sense in evaluating the evidence (which can be circumstantial) and permitted to draw reasonable inferences from it (*see* 1-ER-47, 50), the jurors could have soundly inferred that defendant's various acts to further and conceal the bribery scheme had a natural tendency to

70

influence the behavior of elected officials and members of the public, and this Court "must presume" that jurors drew that inference, *see Nevils*, 598 F.3d at 1164. And even if some paradoxical rule required a witness to opine about how knowledge of a bribe could have influenced him or her, Katona's testimony suffices—she would have reported the bribe. (*See* 21-ER-4039-40; *see also* 2-ER-271 (Supervisor Janice Hahn believes it is important for a "public servant" to be "ethical," and she strives to be ethical).)

Finally, defendant incorrectly argues that the government was required to prove that a person or entity was *actually* influenced, would have acted differently had they known about the bribe, or relied on defendant's act to their detriment. (AOB 30, 52-53.) As defendant acknowledged in his proposed instructions, the act need only be "capable" of influencing a person or entity. (5-ER-941, 968.) *Neder*, 527 U.S. at 16. *Milovanovic* is not to the contrary—that case does not require actual detrimental reliance, as defendant asserts (AOB 51), but only misinformation or omissions that "would naturally tend to lead or is capable of leading a reasonable [decisionmaker] to change its conduct." 678 F.3d at 727. The totality of the government's evidence,

71

including the timeline and context of defendant's dealings with County players, amply satisfied that standard.

### b.   *The theory of materiality here was not novel*

As demonstrated above, the government did not proceed on the theory that materiality was established based on false statements that deceived solely USC or United Ways.  Contrary to defendant's contention, the government proved a scheme to "deceive his constituents."  (AOB 51.)  Defendant's conduct fell within the core pre-*McNally* bribery cases, and he was thus on notice that his conduct violated the honest services fraud statute.  *E.g.*, *United States v. Langford*, 647 F.3d 1309, 1321 n.7 (11th Cir. 2011) ("[I]n honest services cases, the scheme to defraud the public of honest services can be proven when a public official accepts a bribe and fails to disclose it to the public."); *Bohonus*, 628 F.2d at 1171 ("The requisite 'scheme or artifice to defraud' is found in the deprivation of the public's right to honest and faithful government.  When a public official is bribed, he is

paid for making a decision while purporting to be exercising his independent discretion. The fraud element is therefore satisfied.")[11]

Further, because the evidence established that defendant's bribery scheme and his conduct in carrying it out were material to County decisionmakers and the citizenry, nothing about defendant's conviction "risks turning innocent conduct into a federal crime." (AOB 49.) Defendant's demand that Flynn obtain, on short notice, a $100,000 payment from USC to United Ways for Sebastian's nonprofit in exchange for the Telehealth contract was not a "*de minimis*" bribe, such as a free telephone call, luncheon invitation, or modest Christmas present," that would likely be immaterial. *United States v. Rybicki*, 354 F.3d 124, 146 (2d Cir. 2003).

---

[11] Defendant claims he "violated no duty to disclose USC's role in his donation to PRPI." (AOB 48.) But defendant did not make a donation to PRPI. He made a donation to the Social Work School. Subsequently, Flynn arranged for USC to make a donation to United Ways for the benefit of PRPI in return for defendant finally delivering the Telehealth contract—conduct the jury found to constitute a bribe. Concealment of that bribe was material and violated section 1346, as discussed *supra*.

In sum, viewed in the light most favorable to the government and drawing all reasonable inferences in support of the jury's verdict, there was more than sufficient evidence of materiality.

### 4. *The court properly instructed the jury regarding the* mens rea *for honest services fraud*

The court instructed the jury that honest services fraud requires the government to prove:

1. Defendant devised or knowingly participated in a scheme or plan to deprive the residents of the County of Los Angeles of their right of honest services;

2. The scheme or plan consisted of a bribe in exchange for at least one official act by defendant, with all of you agreeing as to which act. The "exchange" may be express or may be implied from all the surrounding circumstances;

3. Defendant owed a fiduciary duty to the residents of the County;

4. Defendant acted with the intent to defraud by depriving the residents of the County of their right of honest services;

5. Defendant's act was material; that is, it had a natural tendency to influence, or was capable of influencing, a person or entity's acts; and

6. Defendant used, or caused someone to use, [the mails/an interstate wire communication] to carry out or to attempt to carry out an essential part of the scheme or plan.

(1-ER-68, 70.) This instruction tracks both defendant's proposed language (5-ER-941, 968) and Ninth Circuit Model Criminal Jury Instruction No. 15.34 (2023).

Relying on *United States v. Miller*, 953 F.3d 1095, 1098 (9th Cir. 2020), defendant requested an additional instruction that "[a]n intent to defraud is an intent to deceive and cheat." (5-ER-956.) *Miller*, a money-and-property fraud case, held that the jury charge misstated the law by instructing that wire fraud requires an intent to "deceive *or* cheat" rather than "deceive *and* cheat." *Miller*, 953 F.3d 1098. *Miller* explained that it is not enough for the defendant to deceive the victim; the defendant must also intend "to deprive a victim of money or property by means of those deceptions." *Id.* at 1101. Here, defendant makes the reverse argument—that the jury instructions erroneously required only "cheating" (the intent to deprive another of honest services), but not deception. (AOB 54.) He is wrong.

Other instructions already incorporated the requirement of deceptive intent. *See United States v. Kaplan*, 836 F.3d 1199, 1215 (9th Cir. 2016) ("A defendant is not entitled to any particular form of instruction, nor is he entitled to an instruction that merely duplicates

what the jury has already been told." (quotations omitted)). In a case involving bribery of a public official, the deceit is the fact that the official "is paid for making a decision while purporting to be exercising his independent discretion." *Bohonus*, 628 F.2d at 1171. "The fraud element is therefore satisfied." *Id.* Thus, if defendant acted with the intent to deprive County residents of their right to his honest services through *quid pro quo* bribery, as the instructions required the jury to find (1-ER-68, 70, 74-75), he acted with the necessary deceptive intent. *See United States v. Hernandez*, 2021 WL 3579386, at *1 (9th Cir. 2021) (unpublished) (no *Miller* error in honest services fraud case where instructions made clear that "scheme or plan" must consist of a bribe or kickback and the "deprivation" or "cheat" element was covered by the separate instruction that "the defendant acted with the intent to defraud by depriving Fannie Mae of its right of honest services").

Defendant's reliance on *United States v. Kincaid-Chauncey*, 556 F.3d 923 (9th Cir. 2009), is misplaced, as that case actually supports the government's position. In *Kincaid-Chauncey*, this Court held that the jury instructions "adequately stated the elements of honest services fraud on a bribery theory," including the intent to defraud, "[b]ecause

the instructions, taken a whole, contained an implicit *quid pro quo*
requirement." *Id.* at 946. Here, the jury was instructed on the requisite
intent to defraud more clearly than in *Kincaid-Chauncey* because the
jury was expressly told that it must find *quid pro quo* bribery—the jury
was instructed that the government was required to prove (1) a scheme
to deprive the public of defendant's honest services through bribery,
(2) defendant's intent to defraud by depriving the public of his honest
services, and (3) a *quid pro quo*, *i.e.*, "the exchange of a thing or things
or value for official acts by a public official." (1-ER-68, 70, 74-75.)
Meanwhile, *United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996),
another pre-*Skilling* case, did not involve *quid pro quo* bribery and
therefore has little bearing on the issue here. No additional instruction
was necessary.

Even if there was error, it was harmless. "Jury instructions, even
if imperfect, are not a basis for overturning a conviction absent a
showing that they prejudiced the defendant." *United States v. Lonich*,
23 F.4th 881, 898 (9th Cir. 2022) (internal quotations and citations
omitted). Based on the instructions given by the court, defendant was
fully able to pursue his defense—that he did not engage in any *quid pro*

77

*quo* and thus had no intent to deceive the County and public or deprive

them of his honest services. The jury's rejection of that defense given

the compelling evidence of a *quid pro quo* in relation to the Telehealth

contract does not establish prejudice.

### 5. The government's references to defendant "monetizing" his public office were not legal error

Defendant claims that the government secured his honest services

fraud convictions under a legally invalid gratuity theory by referring to

defendant "monetizing" the power of his public office for private gain.

(AOB 58-62.) He further argues that this purported error requires

reversal because a general verdict of guilt must be set aside "where the

verdict is supportable on one ground, but not on another, and it is

impossible to tell which ground the jury selected." *Yates v. United

States*, 354 U.S. 298, 312 (1957). His argument, which was never raised

at trial, establishes no plain error. Fed. R. Crim. P. 52(b); *Sullivan*, 797

F.3d at 632 n.5; *Yijun Zhou*, 838 F.3d at 1010, 1012.

### a. The government did not argue a gratuity theory

Defendant mischaracterizes the government's evidence and

argument as advancing a gratuity theory of honest services fraud.

First, defendant distorts the agent's testimony by failing to recount his actual words.  (*See* AOB 60.)  The agent testified that an official "monetizes" his position by "*[t]rading* official acts in their official capacity as an elected official *in exchange for* benefits, benefits to themselves or benefits to a third party."  (19-ER-3558 (emphasis added).)  That is the definition of *quid pro quo* bribery, not a gratuity. *McDonnell*, 579 U.S. at 555 (bribery required proof that the defendant "committed (or agreed to commit) an 'official act' in exchange for the loans and gifts").  The agent further confirmed that even "where a public official might already be planning to take certain action," he could monetize his position by "trying to extract benefits from people, making others think that they need to provide those benefits to get help with that government business."  (19-ER-3558.)  That is true.  As discussed herein, extracting benefits by making others believe the benefits are necessary to prompt official action is bribery; it is not the same as accepting a gratuity or reward.

Second, defendant conflates the government's arguments regarding honest services fraud and federal program bribery.  Federal program bribery criminalizes a defendant's corrupt solicitation of a

79

benefit where he intends to be influenced or rewarded in connection with government business. 18 U.S.C. § 666(a)(1)(B). Unlike honest services fraud, no *quid pro quo* is required under section 666 (although the government argued throughout trial that defendant engaged in a *quid pro quo*). *United States v. Garrido*, 713 F.3d 985, 996 (9th Cir. 2013). The government's references to a "reward" in closing argument were, in proper context, references to the elements of federal program bribery, not honest services fraud. (1-ER-129-31; 23-ER-4491.)

Third, defendant takes aim at the government's comments that as long as a bribe was agreed on, it was not a defense to honest services fraud that defendant would have performed a certain official act without a bribe. (AOB 76 (citing 1-ER-133-34, 203; 23-ER-4551-52).) That was a correct statement of law, as the jury was instructed. (1-ER-67, 76.) Throughout trial, defendant leaned into a "defense" that he purportedly always supported Telehealth and thus did not "need" to be bribed. (1-ER-224.) But even if defendant always planned to support the Telehealth contract—a fact very much in dispute given defendant's failure to move the contract forward until he extracted benefits for his son—if he solicited and demanded benefits *in exchange for* official acts,

80

it is not a valid defense to honest services fraud (or federal program bribery) that defendant would have performed an official act absent the bribe, nor is it a defense that such acts were good for the community. An official "is guilty of accepting a bribe even if he would and should have taken, in the public interest, the same action for which the bribe was paid." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 378 (1991). "That is frequently the defense asserted to a criminal bribery charge—and though it is never valid in law, it is often plausible in fact." *Id.* (internal citation omitted).

Courts have confirmed this proposition many times. *See, e.g.*, *United States v. Silver*, 948 F.3d 538, 562 n.14 (2d Cir. 2020) ("It is no defense that an official would have taken certain actions regardless of any alleged bribe."); *United States v. Nagin*, 810 F.3d 348, 351-52 (5th Cir. 2016) (finding no error in an honest services wire fraud prosecution where the court instructed the jury that "[i]t is not a defense to claim that a public official would have lawfully performed the official action in question even without having accepted a thing of value"); *United States v. Quinn*, 359 F.3d 666, 675 (4th Cir. 2004) (finding no error with an instruction stating: "It is not a defense that the official act sought to be

81

influenced would have been done anyway regardless of the fact that the bribe was received or accepted. That is to say, even if the defendant acted as he or she normally would if the bribe had not been requested, the crime of bribery has still been committed."); *United States v. Jannotti*, 673 F.2d 578, 601 (3d Cir. 1982) (en banc) ("[I]t is neither material nor a defense to bribery that 'had there been no bribe, the (public official) might, on the available data, lawfully and properly have made the very recommendation that (the briber) wanted him to make.'").

In sum, the government argued that defendant acted corruptly by engaging in a *quid pro quo* bribery scheme. (1-ER-131.) The comments defendant cites did not improperly urge conviction on a gratuity theory.

### b. Any error cannot support reversal because the jury instructions required a quid pro quo

Even if the government made an isolated remark that could be construed as asking the jury to convict based on a gratuity theory (it did not), "errors of the *Yates* variety are subject to harmless-error analysis." *Skilling*, 561 U.S. at 414. "[A] *Yates* error is harmless if, after a 'thorough examination of the record,' we are able to 'conclude beyond a reasonable doubt that the jury verdict would have been the same absent

82

the error.'" *United States v. Galecki*, 89 F.4th 713, 741 (9th Cir. 2023) (quoting *Neder*, 527 U.S. at 19). That standard is met here because the jury instructions required a *quid pro quo* bribery scheme for the honest services fraud counts, prohibiting a conviction based on a gratuity. (1-ER-68, 70, 74-75.) The indictment similarly alleged bribery and made no reference to an illegal gratuity for the honest services fraud counts. (6-ER-1138-39.) And the government repeatedly reminded the jury in closing and rebuttal that the honest services fraud counts required *quid pro quo* bribery. (1-ER-131-32, 203; 23-ER-4449.) *See Garrido*, 713 F.3d at 998 (evaluating harmlessness of invalid legal theory by examining the indictment, jury instructions, and closing arguments).

Defendant's reliance on this Court's decision in a separate case also titled *Yates*, 16 F.4th 256, is misplaced. (AOB 60.) There, "the jury instructions, although correct so far as they went, did nothing to…preclude conviction under the government's invalid theories, despite the defendants' request for an instruction on that issue." *Yates*, 16 F.4th at 269. Here, in contrast, the honest services fraud instructions requiring a bribery scheme involving a *quid pro quo* precluded conviction based on a gratuity. The requirement of a *quid pro quo* is

83

one of the many "distinguishing feature[s]" that separates bribery from gratuities. *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404 (1999). In contrast to bribery, an illegal gratuity does not require a *quid pro quo*, only a "reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 404-05.

Defendant also complains that the court compounded the alleged error by failing to instruct the jury that "[a] benefit made to reward a politician for an act he has already taken or has already determined to take is not a bribe." (AOB 62 (citing defendant's proposed instruction 37(d) at 5-ER-928).) While defendant requested this instruction for federal program bribery (5-ER-928), he never—either in his proposed instructions (5-ER-838-1002) or at the charging conference (2-ER-386-437)—sought this instruction for honest services fraud. "The court's failure to give an instruction not requested is reviewed for plain error," *United States v. Bonanno*, 852 F.2d 434, 440 (9th Cir. 1988), a standard defendant does not even attempt to meet. Nor could he. Defendant wrongly latches onto *Sun-Diamond's* reference of a *reward* for some future act the official already determined to take to argue that he

cannot be guilty of any offense if he was already planning to vote for the Telehealth contract. (AOB 62.) As discussed *supra*, that is inaccurate. Provided the elements of honest services fraud, including the *quid pro quo* bribe, were otherwise established, preexisting support for the Telehealth contract did not insulate defendant from criminal liability. *See supra* at section V.A.5.a.

Furthermore, any error was harmless because defendant's theory of the case was adequately covered by other instructions. The court properly instructed that honest services fraud requires that the "scheme or plan consisted of a *bribe in exchange for* at least one official act by defendant, with all of you agreeing as to which act." (1-ER-68, 70 (emphasis added).) The court stated that bribery requires a *quid pro quo* exchange and, for a public official, "bribery includes the public official's solicitation or agreement to accept a thing of value *in exchange for* an official act." (1-ER-74-75 (emphasis added).) The government embraced that burden, stating that it must "prove a *quid pro quo* for the fraud counts in this case." (1-ER-132 (emphasis added); *see also* 1-ER-131, 203; 23-ER-4449.) These instructions permitted defendant to argue his theory of the case—in essence, that because he purportedly

85

always supported Telehealth, he did not need to be bribed, would not have solicited a bribe, and never engaged in a *quid pro quo* scheme with Flynn. (1-ER-224; 23-ER-4382-87.) That theory failed because the jury disbelieved it, not because of any instructional error.

## B. Defendant's Federal Program Bribery Conviction Should Be Affirmed

### 1. *Standard of review*

In the district court, defendant never claimed that the "thing of value" was reputational benefit, nor did he assert that any alleged thing of value was legally insufficient. Accordingly, review of that claim is for plain error. *Sullivan*, 797 F.3d at 632 n.5; *Yijun Zhou*, 838 F.3d at 1010, 1012.

Defendant's claim that the jury instructions incorrectly stated an element of federal program bribery is reviewed *de novo*, while his challenges to the formulation of the instructions is reviewed for abuse of discretion. *Koziol*, 993 F.3d at 1179.

### 2. *Reputational benefit was a motive, not the charged thing of value*

Defendant duplicates his newly-invented "reputational benefit" claim in attacking his federal program bribery conviction on Count 2. (AOB 62-68.) That claim fails for the same reasons set forth *supra* in

section V.A.2.  In brief, the court gave a supplemental instruction with respect to Count 2 expressly stating that the four alleged "thing[s] of value in this case" were the USC admission, scholarship, professorship, and $100,000 payment from USC to United Ways (1-SER-2), and the government consistently argued that those four items were the things of value at issue (6-ER-1116, 1136, 1138 (indictment); 9-ER-1752 (opening); 1-ER-123-24, 129, 134, 147, 167, 185, 202 (closing); 23-ER-4494 (rebuttal)).  Reputational benefit was merely one of defendant's motives in soliciting and demanding benefits for his son.

Because reputational benefit was not the thing of value, this Court need not address defendant's argument that the "thing of value" must be construed coextensively in sections 1346 and 666(a)(1)(B) and cannot be broader than traditional notions of property.  (AOB 63-66.) In any event, money—in the form of the $100,000 payment from USC to United Ways for Sebastian's nonprofit—is clearly a thing of value. *Abdelaziz*, 68 F.4th at 24; *Renzi*, 769 F.3d at 744.  Moreover, defendant sought that $100,000 payment to provide future employment and income for his son.  That, too, is a thing of value.  *Gorman*, 807 F.2d at 1305 (promised future employment was thing of value).

87

It is immaterial that defendant made a sham donation to the Social Work School to facilitate USC's payment to United Ways and PRPI.  Just as a loan is a thing of value even if it must be repaid, the payment from USC had value to defendant; no "loss" to USC was required.  *Kemp*, 500 F.3d at 284-85; *Crozier*, 987 F.2d at 901; *Gorman*, 807 F.2d at 1304-05.

Finally, even if this Court were to accept defendant's mischaracterization that Flynn merely provided assistance securing the $100,000 payment from USC, that service constituted a "thing of value" because defendant subjectively believed it had value.  *Renzi*, 769 F.3d at 744 ("'thing of value' is defined broadly to include 'the value which the defendant subjectively attaches to the items received.'").  For example, this Court has held that the term "thing of value" includes intangible services, such as "providing assistance in arranging a merger." *United States v. Schwartz*, 785 F.2d 673, 679, 681 (9th Cir. 1986).  Here, Flynn's assistance in arranging the payment had value to defendant because her services helped ensure that his son actually received the money and that the payment was not rejected by United Ways (like Community Partners had done months earlier).  In addition, her

services allowed defendant to avoid the unseemly appearance of using his campaign funds to benefit his son directly.

The $100,000 bribe payment here is a far cry from a scheme to reduce lanes on a bridge as political retribution, *Kelly v. United States*, 140 S. Ct. 1565, 1572 (2020), or to deprive a victim of "potentially valuable economic information necessary to make discretionary economic decisions," *Ciminelli v. United States*, 598 U.S. 306, 309-10 (2023) (cleaned up). Proscribing defendant's "shakedown" of Flynn (2-SER-310-11) in no way "risks criminalizing quotidian interactions between constituents and their elected officials" (AOB 66).

### 3. *The court properly instructed the jury*

#### a. *Binding precedent does not require a* quid pro quo *for section 666 bribery*

Defendant sought an instruction that section 666 requires *quid pro quo* bribery (5-ER-932), while acknowledging that this Court has held to the contrary (5-ER-933 (citing *Garrido*, 713 F.3d at 996-97)). *Garrido* held that section 666 "does not require a jury to find a specific *quid pro quo*." *Garrido*, 713 F.3d at 996. As *Garrido* explained, "the government must prove at least an implied *quid pro quo* to prove bribery under § 1346, but the government does not need to prove a *quid*

89

*pro quo* under § 666 bribery." *Id.* at 997 n.10. *Garrido* is the law of this Court, and absent intervening Supreme Court authority that is "clearly irreconcilable" with this Court's precedent, it would have been error for the district court to instruct the jury in a manner inconsistent with this Court's binding precedent. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Although the question of whether section 666 is limited to *quid pro quo* bribery is currently before the Supreme Court, *Snyder v. United States*, 144 S. Ct. 536 (2023) (granting certiorari petition), that grant alone does not establish any clearly irreconcilable higher authority.

Moreover, even if the instructions incorrectly omitted a *quid pro quo* requirement for federal program bribery, any error was harmless. In *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011), this Court held that instructing the jury on the nondisclosure theory invalidated in *Skilling* was harmless because the jury convicted the defendant of federal bribery under 18 U.S.C. § 201, which required a *quid pro quo* and thus "confirm[ed] beyond any reasonable doubt that the jury would have convicted Wilkes of honest services fraud if the court's definition had been limited to the bribery basis that *Skilling* expressly approved."

90

*Id.* at 544. The same is true here. The jury convicted defendant of five counts of honest services fraud that required *quid pro quo* bribery. (1-ER-68, 70, 74-75.) It is thus "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty [under section 666] absent the [alleged] error." *Neder*, 527 U.S. at 18.

### b. The court did not abuse its discretion in declining to give defendant's proposed instruction 37(d)

Contrary to defendant's claims (AOB 71-74), the court did not abuse its discretion in declining to give defendant's proposed instruction 37(d), which stated:

> A benefit given to curry favor, to cultivate a friendship, or to express gratitude is not a bribe. A benefit given to a politician with the generalized hope or expectation of future benefit likewise does not constitute a bribe. A benefit made to reward a politician for an act he has already taken or has already determined to take is not a bribe. Nor is a benefit a bribe merely because there is some connection in time or place between a benefit to a politician and action by the politician that helps the one who made the benefit.

(5-ER-928.)

The instruction was erroneous, confusing, and unnecessary given the court's other instructions properly articulating the elements of federal program bribery (which defendant does not challenge).

i.   Gratuity

Defendant's assertion that the court was required to instruct the jury that a gratuity is not a bribe rests on the faulty premise that federal program bribery requires a *quid pro quo* and does not cover gratuities.  That premise is incorrect.  *Garrido*, 713 F.3d at 996, 997 n.10.  Thus, even if the statement "[a] benefit made to reward a politician for an act he… has already determined to take" accurately defines a gratuity, *Sun-Diamond*, 526 U.S. at 405, the remainder of the sentence ("is not a bribe") was legally incorrect with respect to section 666.  Where part of an instruction does not correctly state the law, the court is entitled to reject the instruction in its entirety.  *United States v. Cervantes*, 542 F.2d 773, 778 (9th Cir. 1976); *accord United States v. Oreto*, 37 F.3d 739, 749 (1st Cir. 1994) ("the district judge is not required to edit a proposed instruction to delete the bad and preserve the good").

Furthermore, taking a single-sentence definition of gratuity out of context was misleading.  Section 666 criminalizes instances in which a defendant "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person,

92

intending to be influenced *or rewarded* in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." 18 U.S.C. 666(a)(1)(B) (emphasis added). The jury was instructed on the elements of the offense consistent with the statutory language. (5-ER-66 ("Defendant acted corruptly, that is, intending to be influenced *or rewarded* in connection with any business… of the County involving anything of value of $5,000 or more" (emphasis added)).) Defendant's instruction was inaccurate and confusing because it wrongly suggested that defendant's preexisting support of the Telehealth contract prohibited conviction even if all the elements of federal program bribery were met. *See supra* at section V.A.5.a.

United States v. Chen, 754 F.2d 817 (9th Cir. 1985), is distinguishable. The defendant in *Chen* was prosecuted for bribing a federal immigration official in violation of 18 U.S.C. § 201(b), which requires that the defendant act "corruptly." *See id.* at 822. The corresponding gratuity provision, however, does not contain a requirement of corrupt intent and carries a lower penalty. 18 U.S.C. § 201(c). Thus, in *Chen*, an instruction distinguishing bribes from

93

gratuities was necessary because "proof of a gratuity does not establish the requisite corrupt intent for a bribery conviction." 754 F.2d at 825. Here, on the other hand, federal program bribery contains a single provision, with a single penalty, requiring corrupt intent for both bribes and gratuities. 18 U.S.C. § 666(a)(1)(B) (requiring that the defendant "corruptly" solicit or demand anything of value "intending to be influenced or rewarded" in connection with government business).

ii.     Ingratiation

Defendant contends his instruction was necessary to distinguish bribes from lawful ingratiation, but the proposed instruction was incorrect and misleading.

The instruction inaccurately suggests that there was no bribe, and defendant was entitled to acquittal, if the bribe-payor (Flynn) *gave* a benefit to curry favor. However, Flynn's intent for the substantive charge of federal program bribery was irrelevant; what mattered was *defendant*'s intent and whether *defendant* corruptly solicited or demanded a thing of value intending to be influenced or rewarded in connection with County business. As opposed to the conspiracy count, where the intent of both coconspirators is at issue, the substantive

94

charge of bribery requires only a finding related to the defendant's *mens rea*. 18 U.S.C. § 666(a)(1)(B); *see Kimbrew*, 944 F.3d at 811-13 (public official guilty of bribery where he demanded benefits from an undercover agent who lacked corrupt intent). Defendant was "not entitled to an instruction that misstates the law." *United States v. George*, 420 F.3d 991, 1000 (9th Cir. 2005).

Moreover, "[a] defendant is not entitled to any particular form of instruction, nor is he entitled to an instruction that merely duplicates what the jury has already been told." *Kaplan*, 836 F.3d at 1215 (quotation omitted). A judge also "need not include proposed instructions that are not necessary to explain to the jury the legal effect of the theory of the defense." *Id.* (cleaned up). The court properly instructed the jury on the elements of federal program bribery, which permitted defendant to argue his theory of the case. (1-ER-66-67.) The court specifically instructed that the government had to prove beyond a reasonable doubt that defendant acted "corruptly, that is, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of the County involving anything of value of $5,000 or more." (1-ER-66.) At defendant's request (5-ER-923), the

court went further, instructing that an act is done corruptly "if it is performed voluntarily, deliberately, and dishonestly, for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by an unlawful method or means" (1-ER-24).

With these instructions, defendant was well positioned to argue his theory of the case, namely, that he lacked corrupt intent, nothing he solicited was in connection with any County business, and that he purportedly always acted in "good faith." (AOB 57.) A separate theory-of-defense instruction is not required where "other instructions, in their entirety, adequately cover that defense theory." *United States v. Marguet-Pillado*, 648 F.3d 1001, 1006 (9th Cir. 2011). For example, "the failure to give an instruction on [a] good faith defense is not fatal so long as the court clearly instructed the jury as to the necessity of specific intent as an element of a crime." *Inzunza*, 638 F.3d at 1020 (quotation marks omitted). Similarly, here, where the court clearly instructed on the elements of federal program bribery, it was not required to give defendant's instruction as to what bribery is *not*.

96

Defendant's cases are inapposite. *Kincaid-Chauncey* did not hold
that an explanation of goodwill gifts is required in a section 666 case;
rather, there the district court did not explicitly instruct on the *quid pro
quo* bribery required for honest services fraud, so this Court pieced
together adequate guidance for the jury from the instructions as a
whole, including what bribery is not. 556 F.3d at 945-46 (jurors "could
not convict for mere influence or political friendships"). Here, no *quid
pro quo* was required for Count 2, and the instructions as a whole
adequately guided the jury. *Sawyer* involved hospitality—including
meals, rounds of golf, and other entertainment—the defendant lobbyist
lavished upon legislators. 85 F.3d at 721. He was charged under the
Travel Act with interstate travel with intent to promote unlawful
activity in the form of illegal gratuities. *Id.* at 734. In those particular
circumstances, the First Circuit held that "the jury needs to be told
specifically that the defendant has not violated the bribery component
of the Travel Act (or committed honest services fraud) if his intent was
limited to the cultivation of business or political friendship." *Id.* at 741.

Because this case, by contrast, involved a charge of
"straightforward corruption," *Sawyer*, 85 F.3d at 741, the instructions

97

as a whole—requiring that defendant corruptly solicited or demanded a thing of value intending to be influenced or rewarded in connection with County business, coupled with the additional instructions on "corrupt" intent (1-ER-66)—adequately advised the jury that goodwill gifts lacking such intent are insufficient to support conviction under section 666. *Koziol*, 993 F.3d at 1179.

### c. Any error was harmless

Even if there was instructional error, it was harmless. The jury was instructed that it must find *quid pro quo* bribery to convict defendant of honest services fraud (1-ER-68, 70, 74-75), and it convicted defendant on five such counts. Therefore, it is clear beyond a reasonable doubt that even with defendant's proposed instructions, the jury would have convicted him of the section 666 violation. *Wilkes*, 662 F.3d at 544.

## C. Defendant's Conspiracy Conviction Is Valid

A conspiracy conviction with multiple objects can only be overturned where the *legal* theory of one of the objects is invalid, not based on claims of factual insufficiency. *Griffin v. United States*, 502 U.S. 46, 56-57 (1991); *United States v. Gonzalez*, 906 F.3d 784, 790-91

(9th Cir. 2018). For the reasons discussed *supra*, there is no legal infirmity with the theory of conviction for either object of the conspiracy. Defendant's conspiracy conviction must stand.

## D. The District Court Properly Denied Defendant's *Batson* Challenges

### 1. *Facts*

#### a. *Initial voir dire*

After placing the first 18 venirepersons in the box, the district court read a set of questions that might form the basis of challenges for cause and privately questioned each prospective juror who had a positive response. (4-ER-706.) The government asked follow-up questions of four prospective jurors:

- Juror 4 felt strongly that there is corruption among elected officials. The government asked whether he could follow the court's instruction to listen to the facts and put aside his personal opinions. The juror indicated that he would try, but his opinion would be hard to change. (4-ER-708-10.)

- Juror 14 had served as a board member on her local neighborhood council when it supported defendant's re-election and had a friend whom she believed had been wrongfully

99

terminated from employment at USC. (4-ER-711-14.) When the government asked whether she could set aside her prior opinions about defendant and USC, the juror responded, "I'm concerned." (4-ER-715-17.) Later, the government again asked if the juror could keep an open mind when hearing about initiatives defendant supported. The juror hesitated and ultimately replied, "I don't know." (4-ER-721.)

- Juror 16 had strong feelings about legacy admissions because he paid his way through college and had significant student debt. When the government asked whether he felt so strongly on this point that he could not set aside his views, the juror responded, "I don't know that I could." (4-ER-723-25.)

- Juror 18 had difficulty hearing, and the government inquired about the juror's ability to hear the prior proceedings. (4-ER-730-31.)

The district court dismissed all four jurors for cause. (4-ER-736-37.) Their race does not appear in the record.

### b. *Juror 13* Batson *challenge*

The government exercised its first peremptory strike against Juror 13, a Black female. (4-ER-782-84.) Juror 13 had a dual bachelor's degree in business and Mandarin, was enrolled in a master's program in East Asian Studies, worked for a bank as a relationship manager and financial solutions advisor, was single, and had no prior jury service. (4-ER-749, 757.) She had worked as a management analyst for a state agency in Ohio (4-ER 754) and had experience in budgeting and expense tracking (4-ER-757).

One of the case-specific voir dire questions defendant requested was "Do you think it's appropriate for universities to consider race or legacy as a factor in determining admission?" (4-ER-768, 785.) When the court asked this question to the group, Juror 13 responded: "[Y]es, because affirmative action currently is the law and so a lot of universities do consider race when it comes to college admissions and legacy—a lot of institutions have legacy admissions so it's a current practice." (4-ER-768.) One other juror (Juror 16) briefly responded too: "I think legacy is OK when determining admission." (*Id.*) The court then reformulated the question, asking whether any juror felt race and

101

legacy should not be considered in admissions. (4-ER-769.) Juror 10

responded that he opposed legacy admissions. (*Id.*)

Before the parties exercised peremptory challenges, the court

permitted attorney voir dire. After questioning another juror (Juror 15)

about her experience working for a government agency (4-ER-772-73),

the government asked Juror 13 to describe her work with the Ohio

government agency, whether she worked with government officials in

that job, and whether her education related to government

administration (4-ER-774-75). She described one of her roles as

reviewing hearing orders from a state agency to determine "whether

there were any discrepancies that would impact the legality of the

proceedings." (4-ER-774.) The government also asked her to clarify her

response that it was appropriate to consider legacy in the admissions

process. (4-ER-775.) The juror stated: "Yes. Because they have a

percentage of legacy admissions and then they have a percentage of

race-based admissions. I know that that is the current way that

universities bring on students." (*Id.*) She also stated she had

"experience with admissions." (*Id.*) When pressed about whether she

102

believed legacy admissions were fair, she responded that she did not have enough information to formulate an opinion.  (4-ER-776.)

Defendant also asked Juror 13 follow-up questions about her education.  (4-ER-779-80.)

Outside the presence of the court and jury, the government informed defendant that it planned to strike Juror 13.  (4-ER-782-84.) Defendant said he intended to strike Juror 10, a white male who opposed legacy admissions.  (4-ER-769, 782-83, 791, 794.)  When the government asked the court on the record to excuse Juror 13, defendant raised a *Batson* challenge.  (4-ER-782.)

In support of a prima facie case, defendant argued—incorrectly— that the government questioned only three jurors, all minorities, when in fact the government had questioned seven jurors by that point.  (4-ER-783-85.)  He contended that the government asked detailed questions of two Black jurors "designed to give the basis to strike them." (4-ER-783.)  He claimed there was "extensive questioning" about Juror 13's "impressions of affirmative action" despite the fact that the government asked about legacy, not race.  (4-ER-775-76, 785.) Defendant also claimed that affirmative action had "little to do with the

substantive issues in this case" (even though defendant had himself proposed the question about race and shortly thereafter told the court that "race plays an obvious and important issue" in this case). (4-ER-768, 785, 801.)

The prosecutor volunteered why he had questioned each juror. Juror 15, an Asian-American woman, worked for the Department of Public Social Services, which falls under the purview of the Board of Supervisors. (4-ER-772-73, 787.) The government inquired about her interactions with the Board of Supervisors or DCFS, which administered one of the contracts involved in this case. (*Id.*) Juror 5 was a Black male who lived in defendant's district or adjacent to it, so the government asked whether he was involved in local politics. (4-ER-745, 776, 787.) When the juror indicated that he worked for a homeless shelter, the government followed up because Flynn wrote to defendant about homelessness and the two had worked together on homelessness initiatives. (4-ER-776-78, 787-88.) With respect to Juror 13, the prosecutor clarified that the government never asked about race, only legacy, because the case involved Sebastian's admission to USC potentially as a legacy admission. (4-ER-786, 788.) The prosecutor

104

explained that Juror 13 said it was her understanding that the practice occurred in universities and that the government was trying to determine whether the juror believed legacy admissions were appropriate because that was the question posed by the court, which she had not answered. (4-ER-788.) The prosecutor inquired about her experience with local government "because this is what the case is about, local government." (*Id.*)

The government explained that, in striking the juror, it considered that Juror 13 "multiple times talked about what the law is and what is legal" but stated that she had no opinion regarding whether legacy admissions were appropriate. (4-ER-789.) She also worked in local government, dealt with government hearings, and had a dual bachelor's degree—all of which were "issues in the case." (*Id.*)

In response, defendant argued that Juror 13's education was not a reason to challenge "a Black juror" because there was a white juror in the venire who had a high level of education. (4-ER-790.) Defendant subsequently asserted that "the specific justification" allegedly demonstrating a prima facie case was the absence of questioning of

other jurors with advanced degrees and the lack of a nexus between the juror's education and the issues in the case. (4-ER-793.)

The court ruled that defendant failed to establish a prima facie case. The court correctly stated that it was required "to consider the total[ity] of the relevant facts." (4-ER-792.) Those facts included that defendant had submitted the question regarding race and legacy in university admissions (4-ER-785), the government had questioned two Black jurors and one Asian-American (4-ER-792), and defendant had raised his claim in response to the government's very first challenge (4-ER-791). The venire panel, moreover, was "mostly nonwhite" (4-ER-793); at that point, it appeared to be comprised of four Black jurors (including Juror 13), five Hispanic jurors, five white jurors, two Asian-American jurors, one juror who was Black/Hispanic, and one who was Hispanic/white (4-ER-790-91). The court understood that a *Batson* claim is cognizable "even on a first challenge" but found that defendant had, at that point, failed to establish a prima facie case. (4-ER-793-94.)

### c. *Further challenges*

The government exercised its next two peremptory challenges against white males (4-ER-800)—Juror 8, who had a double bachelor's

degree and was a doctoral student at Caltech (4-ER-746-47), and Juror 11, a marketing and fund development manager with a bachelor's degree who had experience with budgeting and fundraising and some familiarity with the role of a county board of supervisors (4-ER-748, 755-56, 764).

As noted, defendant exercised his first peremptory challenge against Juror 10, a white male who opposed legacy admissions. (4-ER-769, 791, 794, 800.) He also challenged Juror 18, a Hispanic male, and Juror 6, a Hispanic female. (4-ER-800.)

### d. *Juror 1* Batson *challenge*

When the government exercised its fourth peremptory challenge against Juror 1, a Black woman, defendant raised another *Batson* challenge. (4-ER-798, 800.) Juror 1 lived in Los Angeles, had attended some college, was single, was unemployed, had a daughter who was almost 18, and had never been on a jury. (4-ER-743.) As the juror was the first one to respond to the standard questions and seemed nervous ("I've never done anything like this at all. This is my very, very first time ever…."), the court assured her: "Well, you couldn't tell it by me.

You have done a fine job of showing everybody else how this should be done." (*Id.*)

Defendant, in addition to reiterating his previous claims about the government's questioning of jurors, stated that the government had now challenged the second, and only remaining, Black female on the jury. (4-ER-801.) The district court found that defendant had established a prima facie case. (4-ER-807.)

The government gave three reasons for its strike: (1) two of the prosecutors observed that, during the court's reading of the summary of charges, the juror was shaking her head and looking down; (2) the juror wore sunglasses for most of the jury questioning and took them off only when the court directly addressed her; and (3) the juror was unemployed. (4-ER-802, 809.) The government also reviewed the case-related reasons why it had previously questioned Jurors 5, 13, and 15, including because the government expected defendant to argue that Sebastian had been admitted to USC based on some level of diversity and legacy, as defendant had specifically proposed a voir dire question on that point. (4-ER-803-05.) The government noted that there were still two Black men on the jury and the government had challenged two

white jurors. (4-ER-802-03.) Finally, the government observed that given the predominantly nonwhite composition of the panel, multiple challenges to nonwhite individuals would be expected (4-ER-802), and in fact, the defense had struck two Hispanic jurors by that point (4-ER-800). The court found that the government's reasons were race-neutral and also agreed with the government's statistical point about challenges to nonwhite jurors considering the composition of the panel—in over 25 years on the bench, the court had never seen a venire panel with so few white jurors. (4-ER-792, 807-09.)

Defense counsel argued that they had not observed Juror 1 shaking her head and that the better inference was that the strike was racially motivated. (4-ER-806-07.) Regarding the composition of the panel as a whole, defendant emphasized that he was focusing specifically on "challenges to Black jurors," as there were four Black jurors on the jury panel and the government was striking the second Black and only other Black woman on the panel. (4-ER-808.)

The court ruled that defendant failed to meet his burden to prove intentional discrimination at *Batson* step three. (4-ER-810-11.) Although the court had not personally observed this particular juror

sitting in the audience, it found the reasons offered by the government to be credible, not pretextual, and found no reason to discredit the two prosecutors' statements of what they had observed. (4-ER-811.) The court further reasoned that the government's explanations regarding its follow-up questions were all case-specific and legitimate. (*Id.*) "[I]n fact," the court stated, "I agree with all of them." (*Id.*)

### e.    *The final jury*

The government's questioning of replacement jurors was consistent with its earlier case-related questioning. For example, the government extensively questioned Replacement Juror 13 about his graduate degree from USC, his wife's degree from the Social Work School and any continuing connection to USC, his involvement in local politics, and his knowledge of the operations of the Board of Supervisors.[12] (1-SER-132, 141-46, 154-55.) The government discussed with Replacement Juror 16 his work in the California State Assembly, including whether he worked on any initiatives involving nonprofit organizations. (1-SER-149-50.) And the government asked

---

[12] The court later excused Replacement Juror 13 for cause. (1-SER-175.)

Replacement Juror 1 whether his experience with contract bidding related to any government entity.  (1-SER-148-49.)

Defendant exercised three more peremptory challenges, including against Replacement Juror 16, who stated that he did not support affirmative action.  (1-SER-134, 176.)  The government passed and accepted the jury with two Black males and one Black/Hispanic male.  (1-SER-177.)

Although the race of the replacement jurors is not reflected in the record, the seated members of the jury included at least two Black men (Jurors 5 and 9), one Black/Hispanic man (Juror 7), three Hispanic women (Jurors 2, 6, and 10), one Hispanic/white woman (Juror 12), two Asian-American women (Jurors 4 and 8), and two white women (Jurors 3 and 11).  There were at least eight women (Jurors 2, 3, 4, 6, 8, 10, 11, and 12).  (*See* 4-ER-790-91.)[13]

After the jury had been seated and prior to opening statements, Juror 5 (a Black man) informed the court that his cousin had

---

[13] Following peremptory challenges, Juror 17 became Juror 6 (4-ER-799), Juror 15 became Juror 8 (4-ER-795), and Juror 14 became Juror 10 (4-ER-795).

"mentioned a couple of things about [defendant]" and his "policies." (9-ER-1732.) After questioning from the court (9-ER-1732-36), Juror 5 stated that he could still give defendant a "perfectly fair trial" (9-ER-1736). The government said it had "[n]o concerns," did not question the juror, and never asked the court to strike him. (*Id.*)

### 2. Batson's *framework*

"*Batson v. Kentucky*, 476 U.S. 79 (1986), established a three-step burden-shifting framework for evaluating a defendant's claim that the prosecution exercised peremptory strikes in a racially discriminatory manner." *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1166 (9th Cir. 2022). "The defendant must first make a prima facie showing that the prosecution exercised its strikes based on race." *Id.* "Then, the burden shifts to the prosecution to provide a 'race-neutral explanation for striking the jurors in question.'" *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 358-59 (1991)). "If the prosecution provides race-neutral reasons, the district court must determine based on the record whether the 'defendant has carried his burden in proving purposeful discrimination.'" *Id.* (quoting *Hernandez*, 500 U.S. at 359).

This Court has established a separate three-part test for step one. *Nguyen v. Frauenheim*, 45 F.4th 1094, 1099 (9th Cir. 2022). "[T]o show a prima facie case: (1) the prospective juror must be a member of a cognizable group, (2) the prosecutor must use a peremptory strike to remove that juror, and (3) the totality of the circumstances must raise an inference that race or gender motivated the prosecutor to strike."[14] *Id.* If the defendant fails to establish a prima facie case, the burden

---

[14] In a footnote, defendant asserts for the first time on appeal that this Court should recognize Black women as a cognizable group. (AOB 76 n.17.) But this case presents no vehicle to do so. There was no plain error because no controlling authority recognizes combined race-gender classes for *Batson* purposes. *Nguyen*, 45 F.4th at 1097; *United States v. Mikhel*, 889 F.3d 1003, 1032 (9th Cir. 2018) (no plain error where no controlling authority). Furthermore, defendant never claimed below that the government struck Juror 13 on gender grounds, and although defendant commented that Juror 1 was the second, and only remaining, Black woman on the panel, defendant made no argument about her gender and instead focused on "Black jurors" and "challenges to Black jurors." (4-ER-801, 808.) On that basis, the court found a prima facie case as to Juror 1. (4-ER-807.) *See Tolbert v. Gomez*, 190 F.3d 985, 988 n.1 (9th Cir. 1999) ("Whether the cross-section of gender and race [Black males] constitutes a cognizable class" was "irrelevant" where "[t]he district court properly found that the defendant was a member of a cognizable racial group and the prosecution removed another member of this cognizable group."). Moreover, when the court reaches the third step (as it did with Juror 1), the issue of the prima facie showing becomes moot. *United States v. Cruz-Escoto*, 476 F.3d 1081, 1089 (9th Cir. 2007).

never shifts, and the prosecutor is not required to explain the challenge. *Id.*

### 3. *Standard of review*

This Court reviews for clear error a district court's: (1) decision of whether a prima facie showing of discrimination has been made, *United States v. Stinson*, 647 F.3d 1196, 1207 (9th Cir. 2011); (2) determination of whether purposeful discrimination has been shown at the third step, *id.*; and (3) "credibility findings," *Rice v. Collins*, 546 U.S. 333, 338 (2006). A finding is clearly erroneous only if it is illogical, implausible, or without support in inferences that may be drawn from facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1262-63 (9th Cir. 2009) (en banc).

Defendant wrongly asserts that the court denied his *Batson* challenge to Juror 13 on the legally erroneous ground that a pattern is required. *See United States v. Collins,* 551 F.3d 914, 919-20 (9th Cir. 2009) (court applied improper standard by requiring pattern). On the contrary, the court explicitly recognized that it could find a prima facie case even on the first challenge. (4-ER-793.) And even if the court had applied the wrong legal standard (it did not), that is not a basis for

114

reversal. *Collins*, 551 F.3d at 920. This Court simply reviews the *Batson* claim *de novo*. *Id.* Under either standard, defendant's claim fails.

### 4. Defendant failed to establish a prima facie case of purposeful discrimination as to Juror 13

It is undisputed that Juror 13 was a member of a cognizable group and the government used a peremptory strike to remove her. The only issue at step one is whether defendant "produc[ed] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson v. California*, 545 U.S. 162, 170 (2005). The district court did not clearly err in finding that defendant failed to do so.

Striking one or even two prospective jurors belonging to a protected group, standing alone, is insufficient to raise an inference of discrimination. *Nguyen*, 45 F.4th at 1101. "More is required." *Wade v. Terhune*, 202 F.3d 1190, 1198 (9th Cir. 2000). In assessing whether the defendant has established a prima facie case, the court should consider "all relevant circumstances." *Batson*, 476 U.S. at 96. Comparing challenged and unchallenged jurors is one available tool. *Collins*, 551 F.3d at 921-22. This Court "can look to the entire trial record, even after defense counsel made the motion." *Nguyen*, 45 F.4th at 1101.

A "prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or *refute* an inference of discriminatory purpose." *Batson*, 476 U.S. at 97 (emphasis added). Here, contrary to defendant's claim, the questioning refutes an inference of discrimination.

First, the topics the government probed were case-specific, and the record does not reflect disparate questioning of Juror 13 (or other Black or minority jurors) compared to other similar jurors. *McDermott v. Johnson*, 85 F.4th 898, 918 (9th Cir. 2023) (no *Batson* violation where prosecutor questioned non-Black jurors and stricken Black jurors on the same issues and questions were relevant to circumstances of the case). All four jurors the government questioned in the initial stage of voir dire were excused for cause. And the government questioned in a uniform manner others besides Juror 13 who indicated knowledge of, or involvement in, local government: (1) Juror 14, a board member of her local neighborhood council (4-ER-711-21); (2) Juror 15, an Asian-American woman who worked for the Department of Public Social Services (4-ER-772-73); (3) Juror 5, a Black man who lived in defendant's district or adjacent to it (4-ER-745, 776); (4) Replacement

Juror 13, whose father had worked closely with the Board of Supervisors (1-SER-145-46); and (5) Juror 16, who interned with the California State Assembly (1-SER-149-51).

Second, defense counsel mischaracterized the government's inquiry of Juror 13, claiming that "[t]here was extensive questioning about how she felt about affirmative action and whether it was something she supported." (4-ER-786.) In fact, the government never asked Juror 13 about affirmative action and instead probed Juror 13 about her work in government and her views about legacy admissions— issues related to the case. Typically, the *government*'s mischaracterization of a juror's answers may support an inference of discrimination. *Miller-El v. Dretke*, 545 U.S. 231, 244-46 (2005). Conversely, defendant's mischaracterization of the record undermines any inference of discrimination here.

Third, contrary to defendant's assertion that the government's inquiry of Black jurors was "designed to give a basis to strike them" (4-ER-783), Juror 5 was seated on the jury (as was another Black juror and a Black/Hispanic juror). In fact, when given a second opportunity

117

to challenge Juror 5 after the jury had been sworn, the government did not seek to strike him. (9-ER-1732-36.)

Defendant argues for the first time on appeal that the government did not question Juror 16, a white woman who thought "legacy is okay when determining admission." (4-ER-768-69.)[15] But the government explained that its concern (among others) was that Juror 13 made pronouncements about the practice being legal in the sense that it regularly occurred at universities. (4-ER-768, 775-76, 788-89.) Unlike Juror 16, Juror 13 did not offer her opinion about the propriety of legacy admissions (4-ER-776); rather, Juror 13 discussed the commonplace nature of the practice (4-ER-768, 775). Juror 13's responses indicated that she thought legacy admissions were routine and that she had familiarity with the admissions process. (4-ER-768 ("a lot of institutions have legacy admissions"); 4-ER-775 (discussing knowledge of the "current way" universities admit students and that universities

---

[15] "[A] retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008).

have a "percentage of legacy admissions").)  She also said she had knowledge of the legacy process based on her "experiences with admissions."  (4-ER-775.)  In this regard (among multiple others), Juror 13 was unique.  She was the only juror to express an opinion on the legality and commonplace nature of legacy admissions, which played into the defense narrative at trial that because the benefits afforded to Sebastian (including admission to USC potentially as a legacy admit) were routine and otherwise legal, nothing out of the ordinary occurred in defendant's dealings with Flynn.  (2-ER-304, 333; 23-ER-4410-12, 4432, 4438.)  No other juror expressed comparable views.  *Hoyos v. Davis*, 51 F.4th 297, 312 (9th Cir. 2022) (finding no prima facie case where no seated juror had comparable views to challenged juror).  No inference of discrimination arose from striking a juror whose responses suggested she would be sympathetic to the defense.  *See United States v. Herrera-Rivera*, 832 F.3d 1166, 1173-74 (9th Cir. 2016) (no pretext in striking only Black male where his background indicated he "might be sympathetic to the defense").

At step one, a court may also consider any reasons in the record for the strike.  *See United States v. Guerrero*, 595 F.3d 1059, 1063 (9th

Cir. 2010); *Wade*, 202 F.3d at 1198. The government's remaining stated reasons further undermine any inference of discrimination. The government cited Juror 13's education (4-ER-789), and the government also struck two white males with advanced degrees (4-ER-800)—Juror 8, who had a double bachelor's degree and was a doctoral student at Caltech (4-ER-747), and Juror 11, who had a bachelor's degree (4-ER-748). As for Juror 13's contacts with government agencies, her job, unlike any other juror, dealt with government hearings and oversight of their "legality." (4-ER-774.) *United States v. Alvarez-Ulloa*, 784 F.3d 558, 566 (9th Cir. 2015) ("In general, the concern that jurors with legal experience will bias or commandeer a jury is widespread among lawyers, and other courts have accepted it as a persuasive justification at step three of *Batson*."). Additionally, Juror 13 had experience with budgeting, as did Juror 11 whom the government also struck. (4-ER-756-57.) Defendant points to no retained juror with a similar combination of characteristics—indeed, there are none. *See Hernandez-Garcia*, 44 F.4th at 1167-68 (noting that the decision to strike a juror involves the interplay of various factors).

Other relevant considerations also supported the court's finding. The prosecutor defended his questioning and conduct without being asked. *See Hernandez*, 500 U.S. at 369. The government did not exercise all its peremptory challenges. *See Hoyos*, 51 F.4th at 312 (no prima facie case where prosecutor did not exhaust all peremptory challenges and Hispanic jurors remained); *Nguyen*, 45 F.4th at 1102 (same). And the final jury had at least two Black jurors and one Black/Hispanic juror, as well as several Hispanic and Asian-American women. *See id.*; *United States v. Hernandez-Quintania*, 874 F.3d 1123, 1129 (9th Cir. 2017) (no prima facie case where government struck two minority jurors but jury contained six minority jurors); *Wade*, 202 F.3d at 1198 (no prima facie case where Black juror was seated).

*Batson* issues turn largely on an "evaluation of credibility." *Batson*, 476 U.S. at 98 n.21. "The district judge witnessed the prosecutor's behavior during voir dire and jury selection and was in a far better position than [this Court] to evaluate whether the defendant raised an inference of discrimination regarding the prosecutor's strike." *Guerrero*, 595 F.3d at 1064. The totality of the circumstances supports

the court's finding that defendant failed to establish a prima facie case.[16]

### 5. *The strike of Juror 1 was not pretextual*

At the third step, the district court evaluates "the persuasiveness of the justification" offered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Here, the court found the government's reasons for striking Juror 1 to be "credible" (4-ER-810-11)—not merely "plausible" (AOB 81)—and the court's decision to credit the prosecutors' explanations was logical, plausible, and supported by the record.

The primary reason the prosecutors gave for striking Juror 1 was that she was shaking her head and looking down when the court read

---

[16] If the court erred (it did not), the remedy would be to remand for the district court to complete the remaining two steps of the analysis. *Batson*, 476 U.S. at 100 (remanding for prosecutor to state neutral explanation and court to decide whether facts establish purposeful discrimination); *Collins*, 551 F.3d at 923 (after finding that district court erred in concluding there was no prima facie case, remanding "with instructions that the court require the government to provide its reason for striking Juror No. 9" and "then determine, in the first instance, whether the strike was discriminatory"); *United States v. Esparza-Gonzalez*, 422 F.3d 897, 906 (9th Cir. 2005) (same process).

the case summary, thus signaling that she might disagree with the charges and could be hostile to the government. (4-ER-802, 809.) That was a race-neutral reason, a point defendant does not meaningfully dispute. *See Rice*, 546 U.S. at 336 (juror rolling her eyes in response to a question from the court was race-neutral); *Rowell v. Ferreira*, 830 F. App'x 698, 699-700 (2d Cir. 2020) (juror "'shaking his head' while the district court summarized the case" was a race-neutral explanation for strike). "[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor," and even if demeanor-based explanations may sometimes serve as a pretext for discrimination, it is "peculiarly within a trial judge's province" to make determinations about "the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes." *Davis v. Ayala*, 576 U.S. 257, 273-74 (2015); *Sifuentes v. Brazelton*, 825 F.3d 506, 515 (9th Cir. 2016). The court was entitled to credit the government's explanation that it struck Juror 1 because she was shaking her head and looking down during the reading of the case summary.

It is of no moment that the court did not observe the behavior; the judge was reading from a document at the time, so it is perfectly

123

sensible that she did not see the juror's reactions. *See Rice*, 546 U.S. at 339 (court could credit prosecutor even though judge did not witness juror's eye rolling); *see also Thaler v. Haynes*, 559 U.S. 43, 48 (2010) (per curiam) (no Supreme Court rule that "a demeanor-based explanation must be rejected if the judge did not observe or cannot recall the juror's demeanor"). Nor is it accurate to assert that the defense team was "best positioned to observe Juror 1's demeanor." (AOB 81.) Although a defense attorney claimed that "many of the prosecution had their back to the jury" (4-ER-806), the prosecutors were positioned closer to the jury box, they had good reason to observe the venire carefully during jury selection, and one prosecutor specifically identified where Juror 1 was seated when she was shaking her head—"the far back left" (4-ER-809). The court reasonably credited the government's justification for its strike, which falls far short of clear error.

The government's remaining reasons also disproved that "race was a substantial motivating factor" for the strike. *Mikhel*, 889 F.3d at 1029 (citation omitted).

Striking a juror for wearing sunglasses is race-neutral. *United States v. Edouard*, 485 F.3d 1324, 1342-43 (11th Cir. 2007); *United*

*States v. Swinney*, 870 F.2d 494, 496-97 (8th Cir. 1992); *see also Purkett*, 514 U.S. at 769 (striking juror for "long, unkempt hair, a mustache, and a beard" was race-neutral). That is especially so given that defendant failed to identify any other venireperson who wore sunglasses. *Compare Hernandez-Garcia*, 44 F.4th at 1168 (no *Batson* violation where juror was challenged in part because he was dressed in a hoodie and the defendant "failed to identify a single similarly dressed non-Asian juror who went unchallenged"), *with United States v. Alanis*, 335 F.3d 965, 966, 969 (9th Cir. 2003) (finding *Batson* violation in case charging abusive sexual contact where prosecutor used all six peremptory strikes against men, but did not strike female jurors who possessed the same objective characteristics). "[R]eliance on instinct is permissible," and the prosecutor could reasonably conclude that the sunglasses, which made it difficult to gauge the juror's reactions during voir dire, reinforced the government's concern that Juror 1's head-shaking and looking downward reflected hostility to the government's case. *Hernandez-Garcia*, 44 F.4th at 1168 (casual dress rationale and prosecutor's other stated reason reinforced one another).

Striking a juror based on employment status is also race-neutral. *Cruz-Escoto*, 476 F.3d at 1089-90; *United States v. Gillam*, 167 F.3d 1273, 1278 (9th Cir. 1999). In *Cruz-Escoto*, for example, this Court found that striking two Hispanic jurors because they or their sons were unemployed did not violate *Batson* where the seated jury included two Hispanic jurors whom the government did not strike and the government's other peremptory challenges did not suggest a general pattern of discrimination against racial minorities. 476 F.3d at 1089-90. That same logic applies here where at least two Black jurors were selected to serve, and the government did not exhibit a pattern of striking racial minorities.

Finally, as discussed *supra*, several other considerations undercut defendant's claim of pretext, including the government's even-handed, case-related questioning of jurors, its overall pattern of strikes, and the fact that the government did not exercise all its peremptory challenges although the final jury included at least two Black jurors, one Black/Hispanic juror, and several other Hispanic and Asian-American jurors. *See Mikhel*, 889 F.3d at 1028-31 (striking Black woman did not violate *Batson* where juror could not give unequivocal answer to

whether she could consider imposing the death penalty, final jury had two Black jurors and two Black alternates, and government left several peremptory challenges unexercised).  The jury that convicted defendant was highly diverse.

Defendant's contrary arguments do not come close to surmounting the clear error hurdle.  Defendant points to cases considering the lack of questioning of a juror before striking him or her as relevant at the prima facie stage.  But, as defendant acknowledges, the prosecutor "has no obligation to question all potential jurors," and here the government already had the relevant information about the juror.  *Esparza-Gonzalez*, 422 F.3d at 905; *cf. Collins*, 551 F.3d at 922 (if the prosecutor was interested in marital or parenthood status as basis for strike, he should have inquired because the record did not show whether the juror had a spouse or children).  And this Court has held that "[t]here is no requirement…that the prosecution's reasons be directly relevant to *the crime charged*."  *Hernandez-Garcia*, 44 F.4th at 1167 n.7.

In sum, defendant has not shown purposeful discrimination.  The district court properly rejected defendant's *Batson* challenge and did not clearly or otherwise err in its findings.

127

# VI

## CONCLUSION

Defendant's convictions should be affirmed.

DATED: April 8, 2024    Respectfully submitted,

           E. MARTIN ESTRADA
           United States Attorney

           BRAM M. ALDEN
           Assistant United States Attorney
           Chief, Criminal Appeals Section

           */s/ Lindsey Greer Dotson*

           LINDSEY GREER DOTSON
           Assistant United States Attorney
           Chief, Public Corruption
           and Civil Rights Section

           ELANA SHAVIT ARTSON
           Assistant United States Attorney
           Criminal Appeals Section

           THOMAS F. RYBARCZYK
           MICHAEL J. MORSE
           Assistant United States Attorneys
           Public Corruption and
           Civil Rights Section

           Attorneys for Plaintiff-Appellee
           UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, under Ninth Circuit Rule 28-2.6, that it is unaware of any case related to this appeal that is not identified in the appellant's brief.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-2200

I am the attorney or self-represented party.

**This brief contains** 24,065 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

⦿ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Lindsey Greer Dotson **Date** April 8, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*